Page 1

1            UNITED STATES DISTRICT COURT
            MIDDLE DISTRICT OF FLORIDA
2                  IN ADMIRALTY
          CASE NO.  8:20-cv-00911-MSS-AAS
3
4    IN RE:
5
     PETITION OF MAD TOYZ III, LLC,
6    as titled owner of and for one
     2018 38' Statement 380 Open
7    Motorboat bearing hull identification
     number STTEB112L718, her engines,
8    tackle, and appurtenances, and
9
     JEFFRY KNIGHT, as owner pro hac vice
10   of and for one 2018 38' Statement 380
     Open Motorboat bearing hull
11   identification number STTEB112L718,
     her engines, tackle, and appurtenances,
12   for Exoneration from or Limitation of
     Liability,
13
                  Petitioners.
14   _____/
15
                Zoom Virtual Deposition
16                    Florida
            Tuesday, 10:04 a.m. to 2:43 p.m.
17                December 1, 2020
18
19      VIDEOTAPED DEPOSITION OF JEFFRY KNIGHT
20
21
22       Taken on behalf of the Repondents/Claimants
     before Nancy Gilbert, NCRA-certified stenographic
23   reporter, RPR, RMR, RDR, CRR, and Notary Public,
     State of Florida at Large, pursuant to Claimants'
24   Re-Notice of Taking Videotaped Deposition via Zoom
     and Federal and Supreme Court of Florida
25   Administrative Orders.)

Page 2

1  APPEARANCES (All Appearing Remotely):
2
3  ATTORNEYS FOR PETITIONERS
   Mad Toyz III, LLC and Jeffry Knight
4
      CHARLES S. DAVANT, ESQUIRE
5     PATRICK J. RYAN, ESQUIRE
      DAVANT LAW, P.A.
6     401 East Las Olas Boulevard
      Suite 1400
7     Fort Lauderdale, Florida  33301
      (954) 414-0400
8     csd@davantlaw.com
      pjr@davantlaw.com
9
10 ATTORNEYS FOR RESPONDENTS/CLAIMANTS
   Natalie Strehling and Jacqueline Strehling
11
      COSME CABALLERO, ESQUIRE
12    DEUTSCH BLUMBERG & CABALLERO, P.A.
      2802 New World Tower
13    100 North Biscayne Boulevard
      Miami, Florida  33132
14    (305) 358-6329
      ccaballero@deutschblumberg.com
15
16 ATTORNEYS FOR RESPONDENTS/CLAIMANTS
   Erwin Rusli and Nadine Rusli
17
      FRANK D. BUTLER, EQUIRE
18    KELLY ANN L. MAY, ESQUIRE
      FRANK D. BUTLER, P.A.
19    10550 U.S. Highway 19 North
      Pinellas Park, Florida  33782
20    (727) 399-2222
      fdblawfirm@aol.com
21    kmay@fightingforfamilies.com
22
23 ALSO PRESENT:
24    Geoffrey Bassett, Videographer
25

Page 3

1            INDEX
2
   WITNESS                        PAGE
3
4  JEFFRY KNIGHT
5    Direct Examination by Mr. Caballero      8
6    Direct Examination by Mr. Butler        118
7    Further Direct Exam. by Mr. Caballero   171
8    Cross-Examination by Mr. Davant         173
9    Redirect Examination by Mr. Butler      176
10   Redirect Examination by Mr. Caballero   178
11   Recross-Examination by Mr. Davant       179
12   Redirect Examination by Mr. Butler      183
13   Redirect Examination by Mr. Caballero   184
14   Witness Signature Page                  187
15   Errata Sheet              188
16   Certificate of Oath of Witness          189
17   Reporter's Deposition Certificate       190
18   Letter to Witness Re: Reading           192
19
20
21
22
23
24
25

Page 4

1  QUESTIONS WITH INSTRUCTION NOT TO ANSWER
2        Page    Line
3        20      22
4
5
6        PLAINTIFF'S EXHIBITS
7
   NUMBER        DESCRIPTION        PAGE
8
9  Exhibit 1    March 8, 2018 Invoice for      32
               Statement, Durable Power of
10             Attorney, Sunbiz.org documents
               re: Mad Toys III, LLC
11
12 Exhibit 2    Map of area (markings made     54
               during deposition)
13
14 Exhibit 3    NOAA nautical chart of area    59
15
16 Exhibit 4    NOAA nautical chart with red   78
               circle as referred to in the
17             transcript
18
19 Exhibit 5    Sept. 2, 2019 - Florida FWC -  82
               Sworn Written Statement with
20             Miranda Rights of Jeffry Knight
21
22 Exhibit 6    Color copy of photograph of GPS  84
               screen
23
24 Exhibit 7    Jeffry Knight's Answers to     93
               Natalie Strehling's First Set
25             of Interrogs.

Page 5

1  PLAINTIFF'S EXHIBITS - continued
2
   NUMBER        DESCRIPTION        PAGE
3
4  Exhibit 8    Sketch by Jeff Knight          100
5
6  Exhibit 9    Sketch by Jeff Knight - with   103
               red circle made during
7              deposition by counsel
8
9
10
11      DEPOSITION EXHIBITS - MARKED BY MR. BUTLER
12
   NUMBER        DESCRIPTION        PAGE
13
14 Exhibit G    Sept. 5, 2019 - Letter from    148
               Butler to Knight re:
15             Notification of Claim
16
17 Exhibit H    Sept. 5, 2019 letter from      154
               Butler to Knight re: Erwin &
18             Nadine Rusli
19
20 Exhibit I    Composite - Sept. 16, 2019     158
               letter from Butler to Knight
21             re: Erwin & Nadine Rusli
               w/attachments
22
23
24
25

2 (Pages 2 - 5)

Page 6

1 (Supreme Court of Florida Administrative
2 Order No. AOSC20-16 and AOSC20-23 suspended any
3 actual or implied requirement that notaries, and
4 other persons qualified to administer an oath in the
5 State of Florida, must be in the presence of
6 witnesses for purposes of administering an oath for
7 depositions and other legal testimony, so long as
8 the notary or other qualified person can both see
9 and hear the witness via audio-video communications
10 equipment for purposes of readily identifying the
11 witnesses. 1. Notaries and other persons qualified
12 to administer an oath in the State of Florida may
13 swear a witness remotely by audio-video
14 communication technology from a location within the
15 State of Florida, provided they can positively
16 identify the witness; and 2. If a witness is not
17 located within the State of Florida, a witness may
18 consent to being put on oath via audio-video
19 communication technology by a person qualified to
20 administer an oath in the State of Florida.)
21 (Prior to being placed under oath, the
22 witness, JEFFRY KNIGHT, confirmed his identity by
23 displaying for the Florida Notary Public, on the
24 virtual video, his photographic identification, his
25 Florida Driver's License.)

Page 7

1 MR. CABALLERO: Patrick, I think what we
2 can do is waive the intro, if that is okay
3 with everybody, and just jump right into it.
4 MR. RYAN: Are you asking, you know, our
5 appearances?
6 MR. CABALLERO: The videographer will do
7 the time and date, go on the record, and we
8 can just quickly say who we represent, and
9 then just go quickly into it.
10 MR. RYAN: That's fine by me.
11 MR. BUTLER: Okay.
12 (It was stipulated by counsel that the
13 formal read-on of the case caption was waived.)
14 THE VIDEOGRAPHER: All right. Good
15 morning. We are now on the record.
16 This is the videographer speaking,
17 Geoffrey C. Bassett, with Veritext Legal
18 Solutions.
19 Today's date is December 1st, 2020, and
20 the time is now 10:04 a.m., Eastern Standard
21 Time.
22 We are here to take the remote video
23 deposition of Jeffry Knight, in the Matter of
24 Re: Petition of Mad Toyz, III, LLC, et al.
25 Would counsel please introduce

Page 8

1 themselves for the record.
2 MR. CABALLERO: This is Cosme Caballero,
3 for Jaqueline and Natalie Strehling.
4 MR. BUTLER: Attorney Frank Butler for
5 Erwin and Nadine Rusli.
6 MR. RYAN: This is Patrick Ryan,
7 attorney for the Petitioners, Jeffry Knight.
8 MR. DAVANT: And Charlie Davant, also
9 for Jeffry Knight and Mad Toyz, Petitioners.
10 CERTIFIED REPORTER: Sir, would you
11 raise your right hand, please.
12 (Oath administered by the court
13 reporter/Notary Public.)
14 THE WITNESS: I do.
15 CERTIFIED REPORTER: Thank you.
16 Thereupon:
17 JEFFRY KNIGHT
18 was called as a witness and, having been first duly
19 sworn and responding, "I do," was examined and
20 testified as follows:
21 DIRECT EXAMINATION
22 BY MR. CABALLERO:
23 Q. All right. Good morning, Mr. Knight.
24 A. Good morning.
25 Q. Tell us your full name, please.

Page 9

1 A. Jeffry David Knight.
2 Q. And what's your current home address, sir?
3 A. 2268 Kings Point Drive, Largo, Florida.
4 Q. Do you live there with anybody?
5 A. Yeah, I have -- I have some children.
6 Yeah. Kids.
7 Q. Just in case somehow we had to get ahold
8 of them, what are their names?
9 A. They're four years old and two years old.
10 Q. Okay. Got it.
11 THE VIDEOGRAPHER: I'm getting some bad
12 feedback. Is anyone else getting that?
13 MR. BUTLER: Yes.
14 MR. CABALLERO: Before we continue, is
15 it come -- Do you know where it's coming
16 from, Mr. Videographer?
17 THE VIDEOGRAPHER: I do not.
18 MR. CABALLERO: Is it -- Are you able
19 to hear me clearly?
20 THE VIDEOGRAPHER: Yes. The witness
21 has -- I'm getting feedback from the witness.
22 So it's someone else's computer that's looping
23 his audio, it seems.
24 Sir, Mr. Wright [sic], do you have --
25 All right. Mr. Wright [sic], do you

3 (Pages 6 - 9)

Page 10

1   want to just say your name again?  I want to
2   see if it still appears.
3       THE WITNESS:  Jeff Knight.
4       THE VIDEOGRAPHER:  Hmm.  It's not
5   immediately obvious where it's coming from,
6   unfortunately.
7       MR. CABALLERO:  Okay.  Well, let's
8   continue and see if it happens again.  If not,
9   we can address the technical issue as we go
10   along.
11      THE VIDEOGRAPHER:  All right.
12  BY MR. CABALLERO:
13      Q.   Have you ever been deposed before,
14  Mr. Knight?
15      A.   Yes.
16      Q.   Under what circumstances?
17      A.   Business-related.
18      Q.   How many times, prior to today, have you
19  been deposed?
20      A.   Oh, probably a dozen in my lifetime.
21      Q.   Have you ever been deposed related to a
22  personal-injury-type case?
23      A.   Not to my recollection, no.
24      Q.   The times you have been deposed, in what
25  capacity is that that you were involved?

Page 11

1       A.   In reference to --  I own several large
2   construction companies.  So, typically, it was in
3   litigation in reference to labor disputes or, you
4   know, damaged property.
5       Q.   Have you ever been involved in any type of
6   criminal proceeding?
7       A.   No.
8       Q.   So, you know, when was the last time you
9   were deposed, by the way?
10      A.   Several years ago.  I can't remember
11  exactly.  It has been a while.
12      Q.   So, what I'm going to do and what the
13  lawyers are going to do, as you know, we're going to
14  ask you some questions here today.  If you don't
15  understand a question or need it rephrased, let us
16  know that.  Okay?
17      A.   Yes.
18      Q.   And then, obviously, because of the Zoom
19  format, there may be technical issues where either
20  I'll cut out, or any of the other lawyers asking
21  questions may cut out, or your response may cut out.
22  If that happens, please let me know if I cut out or
23  anybody else that's asking a question cuts out, and
24  we'll do the same for you, so that we're
25  communicating.

Page 12

1       A.   That's fine.
2       Q.   All right?  And then the other thing I'll
3   mention, just so you know, at any point that you feel
4   like you need to take a break, let us know that.
5   We'll be happy to accommodate you.  But if we're in
6   the -- in the middle of a question, we'll finish the
7   question and then you can take a break.
8       Fair enough?
9       A.   That's fine.
10      Q.   Prior to today, coming to this deposition,
11  have you had an opportunity to -- to speak with your
12  lawyers?  And don't tell me what was discussed.  But
13  have you had that opportunity?
14      A.   Yes.
15      Q.   Other than anybody from Mr. Davant's
16  office, including Mr. Ryan, have you had any
17  interactions with anybody else in anticipation of
18  this deposition today?
19      A.   No.
20      Q.   Have you spoken at all to Ms. Tara
21  Kintz --
22      A.   Yes.
23      Q.   -- prior to today?
24      A.   Huh?  Yes.
25      Q.   When was that interaction?

Page 13

1       A.   Well, I see her almost on a regular daily
2   basis.  She's my girlfriend.
3       Q.   Okay.  Prior to the deposition today,
4   Mr. Knight, when was the last time you spoke to
5   Ms. Kintz about the fact -- the subject matter of
6   this case?
7       A.   Probably within the last couple days.
8       Q.   What was discussed?
9       A.   Pretty much we went over what we -- what
10  we assumed happened.
11      Q.   What you assumed happened, is that what
12  you said?
13      A.   What we think happened, yes.
14      Q.   And where were you guys located when you
15  were having this interaction?
16      A.   We've discussed this several times.  So,
17  it could have been at the house.  It could have been
18  at dinner.  Multiple places.
19      Q.   Have you had --
20      Well, do you know if Ms. Kintz has had
21  interactions with your lawyers?
22      A.   No.
23      Q.   Have --  Have your lawyers been present
24  with -- either virtually or by phone, when you're
25  having interactions with Ms. Kintz?

4 (Pages 10 - 13)

Page 14

1    A.   No.
2    Q.   Is Ms. Kintz represented by anybody?  Do
3 you know the answer to that?
4    A.   Not to my knowledge.
5    Q.   Other than Ms. Kintz --  And we'll discuss
6 what you spoke about and all of that in a little bit.
7 But, other than Ms. Kintz, have you spoken to anybody
8 else, putting aside your lawyers?
9    A.   Other than the -- other than our -- my
10 boat captain.
11    Q.   And what's his name?
12    A.   Hayden.
13    Q.   What's his last name?
14    A.   Oh, shit.  I can't think of it right this
15 second.
16    Q.   Does the -- Does the --
17        Does the name Vok, V-o-k, Vok or --
18    A.   Yeah, Vok.  Yeah.  Yeah, that's it.
19 Vokner or something like that.  I never can pronounce
20 it right.
21    Q.   How long has Mr. Hayden, as you know him,
22 how long has he worked for you?
23    A.   He has been around for years and years.
24    Q.   How many years?
25    A.   Probably -- Probably about five years.

Page 15

1    Q.   You don't --  And you don't know his last
2 name after five years?
3    A.   I didn't --  I -- I never pronounce it
4 right, so I couldn't think of it off the top of my
5 head, because I don't call him by his last name.
6    Q.   Is he a -- a W-2 employee of yours?
7    A.   He works through a -- He works through a
8 company that --
9        No, he works through another management
10 company that manages our yacht.
11    Q.   What's the name of that company?
12    A.   I think that's -- It's either Pirate
13 Limited -- Pirates Unlimited or --  I think --
14        I forget the name.  We had another captain
15 that was -- that managed all the payroll for -- for
16 the yacht company.
17    Q.   What's the name of that captain?
18    A.   Dave Coover.
19    Q.   How do you spell his last name?
20    A.   C-o-o-v-e-r.
21    Q.   And does Dave work for you,
22 Mr. Doover [sic], or is he through an outside
23 company?
24    A.   Well, he --  Yeah, he --
25        He had his own consulting company that

Page 16

1 over-- managed the -- oversaw the maintenance and
2 operations of the -- of the yacht, of the big boat,
3 and the other -- and the boats, all the boats that
4 went along with it.
5    Q.   For the work Mr. Vok does, Mr. Hayden, who
6 do you issue the payment to?
7    A.   Well, I think, now, he was on --
8        I'm -- I'm not sure when he transferred
9 over, but I know he was on the -- the -- Captain
10 Coover's payroll company.  And I believe, recently,
11 he might have trans- -- transferred over.
12        I'm not sure.  I don't know the exact --
13    Q.   So the --
14    A.   -- way.
15    Q.   In the September 2019 time period, who did
16 Mr. Vok work for, based on your --
17    A.   That would have been --
18        That would have been through Captain
19 Coover's payroll, Captain Coover's management
20 company.  I can't think of the name of it.
21    Q.   And how long has Captain Doover been with
22 you?
23    A.   Probably ten years.
24    Q.   How old is Mr. Vok?
25    A.   Excuse me?

Page 17

1    Q.   Do you know how old Mr. Hayden --
2    A.   I assume --
3    Q.   -- Vok is?
4    A.   I believe he's 28.  28, 29, somewhere in
5 that range.
6        CERTIFIED REPORTER:  Excuse me, sir.
7    Could you just please wait for the full
8    question?  Thank you.
9 BY MR. CABALLERO:
10    Q.   Yeah, give me a chance to get the question
11 out.  You may have a sense of where I'm going, but
12 if -- if we talk over each other, she can't
13 transcribe it.
14        What are --  What are Mr. Vok's duties?
15 And I'm going back.  I'm going to limit it to the
16 September 2019 time period, through the present.
17        MR. RYAN:  Object to form.
18        THE WITNESS:  Basically, was in charge
19    of maintaining -- the daily maintenance and
20    day-to-day operations on all the vessels that
21    we have.
22 BY MR. CABALLERO:
23    Q.   Was there anybody else who had that type
24 of responsibility?
25    A.   Between him and Dave Coover.

5 (Pages 14 - 17)

Page 18

1    Q.   And does that include --
2         Were both Mr. -- Captain Doover and
3    Mr. Vok involved in maintenance of the -- of the
4    center console involved in -- in the incident of
5    September 2nd, 2019?
6    A.   Yes.
7    Q.   And, Mr. Knight, what is it you're doing,
8    physically, while you're sitting in that room?  You
9    seem to be looking at something.
10   A.   (No response)
11   Q.   Do you have a phone?
12   A.   I'm probably looking out my window.
13   Q.   You seem to be looking at a phone.
14        Do you have your phone sitting in front of
15   you?
16   A.   No.
17   Q.   Is there anybody else near you there?
18   A.   No, just my dog.
19   Q.   With regard to Ms. Kintz, how did you meet
20   her?
21   A.   We've been friends for over ten years.
22   Q.   How did you initially meet her?
23   A.   Met her at -- through some mutual friends.
24   Q.   In what context?  Was this, like, a
25   professional initial meeting, a social --

Page 19

1    A.   Social.
2    Q.   What does she do for a living now?
3    A.   She's in the real estate management
4    business.
5    Q.   Are you involved with her in that
6    capac --
7    A.   No.
8    Q.   -- that capacity?
9         Does she have any involvement in terms of
10   the, the -- the various vessels that you own?
11   A.   No.
12   Q.   I know you indicated she's your girlfriend
13   and you're romantically involved.  When did that
14   commence, more or less, that relationship?
15   A.   Is that really any of your business?
16   Q.   I'm looking for a time frame.
17        Were you -- Was it the same situation you
18   describe, where she's your girlfriend back in
19   September of 2019?
20   A.   Yes.
21        MR. RYAN:  Object to form.
22   BY MR. CABALLERO:
23   Q.   Other than the interactions you had with
24   Mr. Vok, in terms of this deposition, did you speak
25   to Captain Doover about it as well?

Page 20

1    A.   To who?
2    Q.   Captain Coover or Doover, whatever his
3    name is?
4    A.   Captain Coover?
5    Q.   Yeah.
6    A.   Yeah, I spoke to him quite a while ago
7    about it.  I haven't discussed it with him lately.
8    Q.   Without discussing the subject matter,
9    have you had interactions with anybody from your
10   insurance company concerning this incident?
11   A.   I haven't discussed anything directly with
12   the insurance company.
13   Q.   Have you spoken to an insurance broker or
14   agent that you use concerning the incident?
15   A.   Yes.  When -- Stahl & Associates, who is
16   our agent, were -- obviously, they were the ones we
17   notified upon the incident.
18   Q.   And when did you notify your insurance --
19        Is it -- Is it a broker that you use?
20   A.   Yes, it's a --  Well, Stahl & Associates
21   is a broker.  So --
22   Q.   Okay.  When did you notify your insurance
23   broker of the incident?
24        MR. RYAN:  Cosme, I'm going to object
25   and assert a work product privilege.

Page 21

1         I'm going to -- I'm going to instruct
2    Jeffry Knight not to answer that question.
3         MR. CABALLERO:  In terms of when?
4         MR. RYAN:  Yes.
5         MR. CABALLERO:  Okay.  Well, we'll come
6    back for that one on a different day.
7         MR. BUTLER:  Let me, if I may, just
8    interject here.
9         I know, Cosme, this is your part of the
10   deposition, but I think as far as the when,
11   that's all fair game, isn't it, Patrick?  Even
12   as to -- Even when he first talked with you
13   guys is fair game.
14        It may not be the content, like Cosme
15   is -- is not trying to get at.  But the when,
16   that's -- that's legitimate.
17        MR. RYAN:  Well, I'm -- I'm going to
18   assert the work product privilege and -- and
19   instruct him not to answer it.
20        MR. CABALLERO:  Then we'll -- we'll --
21        So, if I'm understanding what you're
22   saying, Patrick, in terms of the objection, at
23   the time he notified his broker, it's -- it
24   was done in anticipation of litigation is what
25   you're saying?

6 (Pages 18 - 21)

Page 22

1     MR. RYAN:  Yes.
2     MR. CABALLERO:  Okay.
3  BY MR. CABALLERO:
4     Q.   And what's the name of the insurance
5  broker, Mr. Knight?
6     A.   Stahl & Associates.
7     Q.   Is that S-t-a-h-l?
8     A.   Yes.
9     Q.   Is there a particular contact you have
10 there?
11    A.   It would be either Bob Stahl himself or
12 his assistant.  I don't -- I can't remember Kelly's
13 last name.
14    Q.   So, other than these folks we've already
15 identified, is there anybody else -- and I cast a --
16 casting a wide net -- anyone else you spoke to about
17 this incident?
18    A.   Not -- Not that I recall.
19    Q.   Are there any documents that you reviewed
20 in anticipation of the deposition today?
21    A.   I -- I believe we went over some
22 interrogatories, if that's what you call them, with
23 my attorneys.
24    Q.   Were there any type of photographs,
25 videos, anything like that that you looked at before

Page 23

1  coming to the deposition?
2     A.   I think we've reviewed some information,
3  some charts and some drawings, but that's about it.
4     Q.   When you say "charts," are you talking
5  about nautical charts?
6     A.   Yes.
7     Q.   Were those computerized or paper charts?
8  Even though folks don't use the paper ones really
9  anymore.
10    A.   Well, it was over the -- It was over the
11 computer.  So, whatever.  However they generated
12 them, I don't know.
13    Q.   Other than the interrogatories, some
14 drawings, some charts, was there anything else you
15 looked at?
16    A.   No.
17    Q.   What is it that you do for a living,
18 Mr. Knight?
19    A.   I'm in the telecommunications construction
20 industry.
21    Q.   How long have you been in that business?
22    A.   Thirty years.
23    Q.   Do you maintain any other type of
24 enterprise or -- or endeavors?
25    A.   I -- We -- Yeah, I have --  Me --

Page 24

1     I have restaurants.  I have several other
2  commercial properties.
3     Q.   In terms of your day-to-day, what do you
4  principally do?
5     A.   A little bit of everything.
6     Q.   Do you have any type of personal assistant
7  that -- that you use on a daily basis?
8     A.   Not in particular.
9     Q.   Is there someone who is not a personal
10 assistant, but someone who you use to help you carry
11 out your tasks for your various businesses?
12    A.   Yep.
13    MR. RYAN:  Object to form.
14    THE WITNESS:  Megan, my niece.
15 BY MR. CABALLERO:
16    Q.   Does she work for you?
17    A.   She works in one of our companies, yes.
18    Q.   What company is that?
19    A.   Jeffry Knight, Inc.
20    Q.   Have you had interactions with -- with
21 Megan concerning this incident?
22    A.   Yes.  I know she has helped retrieve some
23 information that was requested, like, in all the
24 paperwork in reference to the boat, and invoices for
25 the purchase of the boat and the repairs.

Page 25

1     Q.   And what's Ms. Megan's last name?
2     A.   Barnes.
3     Q.   Other than Ms. Barnes, is there anyone
4  else that has a similar function, where they assist
5  you in your day-to-day work and activities?
6     MR. RYAN:  Object to form.
7     THE WITNESS:  No.
8  BY MR. CABALLERO:
9     Q.   In September of 2019, what were you
10 principally involved in in doing in terms of your
11 work?
12    A.   I'm the CEO of several of those
13 operations.
14    Q.   Are any of these businesses clients of
15 Ms. Kintz's firm?
16    A.   No.
17    Q.   Can you walk us through your educational
18 background, Mr. Knight?
19    A.   Didn't -- Never graduated high school.
20 And went to work.
21    Q.   What line of work did you go into when you
22 first started?
23    A.   Cable television.
24    Q.   What were you doing in the cable
25 television sector?

7 (Pages 22 - 25)

Page 26

1    A.   Wiring apartment buildings and installing
2 fiber optic cable.
3        CERTIFIED REPORTER:  I'm sorry.  Could
4    you repeat that answer?
5        THE WITNESS:  I was installing cable TV
6    equipment, installing fiber optic cable.
7 BY MR. CABALLERO:
8    Q.   And then what did you do?
9    A.   I did that for 30 years.
10    Q.   So, after that venture, what did you do
11 next?
12    A.   I sold one of those divisions off, and I'm
13 doing work for the power company and the water
14 company, and we do projects for civilization roadway
15 lighting.
16    Q.   Is that throughout Florida or is it
17 limited to the west coast?
18    A.   It's throughout Florida and the Southeast.
19    Q.   The -- The work you were doing, in terms
20 of installation and wiring work in the -- in that,
21 what you described as cable television sector, did
22 you own your own company that -- that did that type
23 of work?
24    A.   Yes.  It was called Knight Enterprises.
25 JKI, is the parent company.  Knight Enterprises was

Page 27

1 the d/b/a.
2    Q.   Where are you from originally?
3    A.   Plantation, Florida.
4    Q.   How long did you live in Plantation?
5    A.   Oh, I don't know.  Until I was 15 or 16.
6    Q.   And then where did you move?
7        MR. RYAN:  Object to form.
8        THE WITNESS:  I lived on a --
9        I traveled and worked on a commercial
10    fishing vessel when I was younger, traveled
11    around, and ended up in Clearwater, Florida
12    probably when I was 18 or 19.
13 BY MR. CABALLERO:
14    Q.   Have you lived in -- in the Clearwater --
15 sort of the general vicinity to that area
16 continuously since you were that age?
17    A.   Yes.  Since I was in my early twenties.
18    Q.   I know you indicated you worked on a
19 commercial fishing vessel.  Would that have been
20 between, roughly, the years of fifteen to eighteen,
21 nineteen, roughly?
22    A.   Yes.
23    Q.   What kind of commercial fishing was
24 involved?
25    A.   Shrimp, shrimping, scalloping, grouper,

Page 28

1 commercial bottom fishing long line.
2    Q.   Did you do any of that type of work after
3 you moved to the Clearwater area?
4    A.   No.
5    Q.   What did you do when you first moved to
6 the Clearwater area in your twenties?
7    A.   I was a contractor for Vision Cable.
8    Q.   When did you first own a boat of any
9 nature?
10    A.   Hmm.  Well, I've been around boats my
11 whole life.  So, probably when I was fifteen or
12 sixteen years old, I had my first boat.
13    Q.   Do you remember what kind of boat that
14 was?
15    A.   It was like an 18-foot Mako with a 140
16 Evinrude on it.  My dad gave it to me.
17    Q.   Okay.  When you moved to Clearwater and
18 were working as a contractor in the cable business,
19 did you have any type of boat at that time?
20    A.   Yeah, over the years, I had several boats.
21    Q.   How many boats you think you've owned
22 between the time -- And we'll limit it.  Even though
23 the Mako -- You mentioned the Mako.
24        But since the time you moved to Clearwater
25 and the 2019 incident, how many boats do you think

Page 29

1 you've owned?
2        MR. RYAN:  Object to form.
3        THE WITNESS:  Probably a dozen.
4        Somewhere in that range.
5 BY MR. CABALLERO:
6    Q.   What kind of boats are they, typically
7 just center console boats?
8        MR. RYAN:  Object to form.
9        THE WITNESS:  Center console, some were
10    sport boats, some were sport fish, and larger
11    motor yacht.
12 BY MR. CABALLERO:
13    Q.   In September of 2019, what vessels did you
14 personally own?
15    A.   I had -- I have a -- a 110-Broward, and
16 the center -- the Statement center console.
17        I have a Spectre 34-foot center console.
18 I have a 38-foot Nor-Tech.
19        And I think that covers most of it.  The
20 rest of it were, you know, smaller dinghies and
21 Jet Skis.
22    Q.   In terms of the powerboats, the four you
23 mentioned, the Statement, the Spectre, the Nor-Tech,
24 and the -- the larger yacht, are there any type of
25 restrictions that are imposed upon you, that were in

8 (Pages 26 - 29)

Page 30

1 effect in September of 2019, concerning the operation
2 of any of those vessels?
3    A.   No.
4    Q.   Do you know if any of those vessels --
5        Well, I'll ask it a different way.
6        Were you permitted to captain all of those
7 vessels?
8    A.   Yes.
9    Q.   Before the September 2nd, 2019 incident,
10 have you ever been involved in any other type of
11 collision on the water?
12    A.   No.
13    Q.   Before September 2nd, 2019, had you ever
14 been cited for any type of incident on the water?
15        MR. RYAN:  Object to form.
16        THE WITNESS:  The only thing I can think
17    of is a -- was a life jacket violation.
18 BY MR. CABALLERO:
19    Q.   When was that?
20    A.   Oh, several years ago.
21        And I didn't have the proper size life
22 jacket, apparently, for my daughter.
23    Q.   When did you acquire the -- the Statement
24 vessel?
25    A.   I think in 2018.

Page 31

1    Q.   How did that come about?
2    A.   I purchased it to -- for the --
3        Typically, that boat goes wherever the
4 larger boat goes.  It's the tender for that boat.
5    Q.   For the 110 Broward?
6    A.   Yep.  It's designed to be towed behind
7 that boat.
8    Q.   Who did you buy it from?
9    A.   A company called Statement Boats.
10    Q.   Did they manufacture it for you or was it
11 already produced?
12        MR. RYAN:  Object to form.
13        THE WITNESS:  It -- it was built -- It
14    was built -- I don't know.
15        I mean, we had input into colors and
16    the -- So, it -- it wasn't fully built for
17    us, but I guess you could call it was.
18 BY MR. CABALLERO:
19    Q.   Was it still in the factory when --
20    A.   Yes.
21    Q.   -- when you made the decision --
22        Hold on.  Hold on.  Give me -- give me a
23 chance to get the question out.
24        Was the Statement boat still in the
25 factory, under completion, when you decided to -- to

Page 32

1 go ahead and purchase it?
2    A.   Yes.
3        MR. RYAN:  Object to form.
4        THE WITNESS:  The boat was under
5    construction when we decided to buy it.
6 BY MR. CABALLERO:
7    Q.   I'm sorry.  Just to be clear, was it --
8    was -- Did you just say the boat was under
9 construction when you decided to buy it?
10    A.   Correct.
11    Q.   Okay.  In terms of the input, did you also
12 have input in terms of the options that you wanted
13 the boat outfitted with?
14    A.   Correct.
15        MR. CABALLERO:  I'm going to show you --
16    and I'll mark this as Plaintiffs' Exhibit 1 --
17    the Bill of Sale.
18        (Thereupon, the document/item referred
19 to was marked for identification as Plaintiffs'
20 Exhibit 1.)
21 BY MR. CABALLERO:
22    Q.   I'll show you the four-page document,
23 Mr. Knight, so you can take a look at it.
24        Does this look familiar?
25    A.   It looks like the invoice for the boat.

Page 33

1    Q.   And it indicates a variety of optional
2 equipment.  Apparently, the boat was -- It's a -- a
3 38-foot hull, correct?
4    A.   Correct.
5    Q.   And it had triple Suzuki 350s on there?
6    A.   Correct.
7    Q.   And then it identifies a variety of
8 options for the vessel, some of which are, obviously,
9 fishing-related, and then some of which are
10 electronics, and some of which are just kind of
11 general purpose features, right?
12    A.   Correct.
13    Q.   Were you personally involved in selecting
14 the various options?
15    A.   No.
16        MR. RYAN:  Object to form.
17        THE WITNESS:  Actually, Captain Coover
18    was involved in that process more than I was.
19 BY MR. CABALLERO:
20    Q.   Did you authorize him to -- to select the
21 optional equipment for the vessel?
22    A.   Pretty much.  We discussed it, but he was
23 dealing with the man -- with the boat-builder on a
24 weekly basis.
25    Q.   And then it indicates that it was -- the

9 (Pages 30 - 33)

Page 34

1  purchase order was signed by someone named, what
2  looks like Susan Scott; is that right?
3      A.   Yes.
4      Q.   And she apparently held a power of
5  attorney on your behalf for the purchase; do you see
6  that?
7      A.   I believe so, yeah.
8      Q.   Who is Ms. Susan Scott?
9      A.   I -- That, actually that, I don't -- I
10 don't recognize that.
11     Q.   I think the power of attorney is in the
12 back.
13          Susan H. Scott of Statement Marine.  Did
14 you have any interactions with her?
15     A.   If I do -- Obviously, I don't remember.
16 I don't recall.
17     Q.   Okay.  And then it had a purchase price I
18 think, of -- with all the options, of I believe it's
19 363 -- 363,000, correct?
20     A.   Correct.
21     Q.   With regard to the -- the Statement
22 vessel, on September 2nd, 2019, was there any -- was
23 there any malfunction or malfunctioning equipment on
24 the vessel?
25          MR. RYAN:  Object to form.

Page 35

1          THE WITNESS:  In reference to what
2      equipment?
3  BY MR. CABALLERO:
4      Q.   I'm being as broad as I can.
5          Was there anything on the boat that wasn't
6  functioning in accordance to spec?
7          MR. RYAN:  Object to form.
8          THE WITNESS:  We had been --  We had
9      been constantly having problems with the --
10     the Garmin screens turning on and off.  That
11     was the only issue that the boat had at the
12     time.
13 BY MR. CABALLERO:
14     Q.   How back --  How far back did that problem
15 date, prior to September 2nd, 2019?
16     A.   It could have -- Probably -- probably a
17 couple months back.  But it was very intermittent at
18 the time, but continued to get worse and worse.
19     Q.   Would it be fair to say that the first
20 time you started to notice the Garmin screens turning
21 on and off would have been, roughly, the -- the early
22 summer of 2019?
23          MR. RYAN:  Object to form.
24          THE WITNESS:  I can't remember.  I can't
25     recall exactly.  But there was definitely an

Page 36

1      intermittent problem with them prior to
2      September.
3  BY MR. CABALLERO:
4      Q.   And focusing you now to the September 2019
5  time period.
6          So, the -- the day of our incident,
7  September 2nd, 2019, when you turned on the boat, at
8  the very -- way before this incident ever happened,
9  you first turn on the boat and try to get the
10 electronics going, was the Garmin screens turning on
11 and off from that initial time?
12     A.   No, they --  They appeared to be working
13 that day, the best of my recollection.
14     Q.   So, let's be clear.  To the best of your
15 knowledge and recollection, on September 2nd, 2019,
16 from the time you turn on the Statement, until the
17 time of this incident, the Garmin screens were
18 working appropriately?
19     A.   Correct.
20          MR. RYAN:  Object to form.
21 BY MR. CABALLERO:
22     Q.   I'm sorry?
23     A.   Correct.
24     Q.   Other than the Garmin screens turning on
25 and off, on September 2nd, 2019, to your knowledge,

Page 37

1  was there anything else on the boat that was not
2  working in accordance to specification?
3      A.   No.
4          MR. RYAN:  Object to form.
5  BY MR. CABALLERO:
6      Q.   I'm sorry.  The answer was?
7      A.   No.
8      Q.   In terms of the vessel itself, it looks
9  like the, the -- some of the optional equipment
10 included --  Apparently, you had a Seakeeper unit in
11 there, correct?
12     A.   Correct.
13     Q.   And describe what the Seakeeper unit does.
14     A.   It stabilizes the boat.  So when you're
15 out fishing in rough water, it keeps the boat
16 centered.
17     Q.   When you operated the Statement, did you
18 have the Seakeeper on continuously?
19     A.   No.
20     Q.   In terms of the Garmin equipment, can you
21 describe what Garmin equipment the boat was
22 featured -- had featured?
23     A.   I don't remember the exact model numbers.
24     Q.   Do you recall if the boat had the Garmin
25 8000 series modules?

10 (Pages 34 - 37)

Page 38

1    A.   If that's what the paperwork says.
2         I don't -- I don't recall the exact model,
3  but I know they're made by Garmin.
4    Q.   Was the boat outfitted with a Garmin radar
5  system?
6    A.   Yes.
7    Q.   Do you know what particular system was
8  used?
9    A.   No.  I know the electronic patches --
10 package was all Garmin.  Don't know the model
11 numbers.
12   Q.   Was the boat outfitted with an electronic
13 compass?
14   A.   It's built into the Garmins.
15   Q.   In terms of the vessels you have and own,
16 Mr. Knight, is there one vessel in this time
17 period -- and I'm taking you back now to the 2019
18 time period before the September 2nd incident -- is
19 there a particular vessel, of the ones you -- you
20 owned at that time that you would use more than
21 others?
22        MR. RYAN:  Object to form.
23        THE WITNESS:  It would typically either
24   be my Nor-Tech or the Statement.  Those are
25   the two primary boats I used.

Page 39

1  BY MR. CABALLERO:
2    Q.   Between those two, which one would you say
3  you used more frequently?
4    A.   Probably the Statement.
5    Q.   And can you describe --
6         So, taking you back, September 2nd, 2019,
7  going back to the -- through the 2019 year, what was
8  the, the use you had with the boat?  Like, would you
9  principally use it for cruising?  Would you
10 principally use it for fishing?  Was there something
11 you did more than the other?
12        MR. RYAN:  Object to form.
13        THE WITNESS:  A combination of both.
14 BY MR. CABALLERO:
15   Q.   Do you think, in the 2019 time period,
16 prior to September 2nd, you roughly split the usage
17 of the Statement between fishing and cruising?
18        MR. RYAN:  Object to form.
19        THE WITNESS:  It all depends on the
20   fishing cycle to -- But I would say, yeah, I
21   would say fairly well split, to the best of my
22   recollection.
23 BY MR. CABALLERO:
24   Q.   Was there anyone, other than you, who
25 would operate the Statement in this time period, the

Page 40

1  2019 time period, before the September 2nd incident?
2    A.   Yes.
3    Q.   Who is that?
4    A.   The captains had access to it, as well as
5  my oldest son.
6    Q.   And -- And what's your oldest son's name,
7  sir?
8    A.   Sean Knight.
9    Q.   Is that S-h-a-w-n?
10   A.   S-e-a-n.
11   Q.   -e-a-n.
12        During the fishing trips that you would do
13 with the Statement, before September 2nd, 2019,
14 during that year, would you be the one operating the
15 vessel during the fishing outings?
16   A.   Sometimes.  Sometimes not.
17   Q.   If it's not you, who would it have been
18 that would have been operating it?
19   A.   It would have been either one of the
20 captains.
21   Q.   Prior to September 2nd, 2019, the outing
22 that you had that day --  Which, would it be fair to
23 describe it as you and Ms. Kintz were out, basically,
24 cruising on Labor Day with the Statement?
25        MR. RYAN:  Object to form.

Page 41

1         THE WITNESS:  We were actually going
2    to -- We were -- we were going downtown
3    Saint Pete to have lunch with friends.  We
4    were going a specific location.
5  BY MR. CABALLERO:
6    Q.   Okay.  So prior to the September 6 -- 2nd,
7  2019 outing with Ms. Kintz, where you're taking the
8  vessel to dock it at a restaurant, from what you're
9  describing -- Right?
10   A.   Okay.
11        MR. RYAN:  Object to form.
12        THE WITNESS:  We were going --
13 BY MR. CABALLERO:
14   Q.   Right?
15   A.   Oops.
16   Q.   I'm sorry?  I wasn't able to hear you.
17   A.   Yes.  We were -- We were going to
18 downtown Saint Pete to meet friends for lunch.
19   Q.   Okay.  Prior to that September 2nd, 2019
20 outing, when was the last time that boat had been
21 used?
22   A.   Well, it probably could have been within a
23 couple days.
24   Q.   And was that a fishing outing or some
25 other type of outing?

11 (Pages 38 - 41)

Page 42

1    A.   Ah.  I don't recall.
2    Q.   Who is responsible for setting up the
3 electronics for the boat, for the Statement?  And I'm
4 talking now for -- for the September 2nd, 2019 day.
5 Were you the one that would have set that up or was
6 it already preprogrammed from days before?
7    A.   It's preprogrammed when it was delivered.
8 So, it's pretty automated.  Turn the boat on, it all
9 turned on.
10    Q.   Okay.  Have you ever, in the entire time
11 you owned the Statement, did you ever change any of
12 the settings of the electronics?
13    A.   No, I typically never messed with any of
14 that.
15    Q.   Have you ever read the manual for your
16 particular Garmin unit that was on the Statement on,
17 on -- equipped on September 2nd, 2019?
18    A.   No.
19    Q.   Have you ever looked at any type of
20 instructional YouTube-type videos about how to use
21 that Garmin unit?
22    A.   No.
23    Q.   Have you ever had any interactions with
24 any of the captains where you asked them to show you
25 how to use that Garmin unit?

Page 43

1    A.   Yes.  That would have been Captain Coover.
2    Q.   But would it be fair to say that other
3 than to kind of use it in a -- in a basic level, you
4 were not sophisticated in terms of how to use it for
5 all its features?
6        MR. RYAN:  Object to form.
7        THE WITNESS:  (No response)
8 BY MR. CABALLERO:
9    Q.   That would be the responsibility of the
10 captains you had, right?
11        MR. RYAN:  Object to form.
12        THE WITNESS:  Yes, I -- I did not go
13     through the manual and know how all the
14     features work.
15 BY MR. CABALLERO:
16    Q.   Okay.  So let me ask the question again.
17     Would it be accurate to say that your
18 level of knowledge, in terms of the Garmin, was for
19 all intents and purposes on a basic, rudimentary
20 level?
21    A.   Correct.
22        MR. RYAN:  Object to form.
23 BY MR. CABALLERO:
24    Q.   Is that correct?
25    A.   Correct.

Page 44

1    Q.   With regard to the electronics on the
2 vessel, did you know how to operate the radar with
3 the Garmin unit?
4    A.   Yes, I knew how to use all the basic
5 functions.  I knew how to put in a waypoint, knew how
6 to turn on the radar, knew how to use the bot- -- the
7 bottom machine.
8    Q.   Did you have the radar --
9        Well, tell me how -- how the radar would
10 appear on the Statement when you take it -- when you
11 took it out on September 2nd, 2019.
12    A.   Unless you activate the radar, it does not
13 come on.
14    Q.   Was the radar activated on September 2nd,
15 2019?
16    A.   No.  I typically do not use the radar when
17 I'm inshore.
18    Q.   Okay.  Was the radar, on September 2nd,
19 2019, functional?
20    A.   I believe so.
21    Q.   Would it be accurate to say that your
22 practice would be to, if you're inshore, not use the
23 radar?
24    A.   Correct.
25        MR. RYAN:  Object to form.

Page 45

1 BY MR. CABALLERO:
2    Q.   Correct?
3    A.   Correct.
4    Q.   And the radar is operable, you just choose
5 not to use it when you're inshore?
6        MR. RYAN:  Object to form.
7        THE WITNESS:  Correct.
8 BY MR. CABALLERO:
9    Q.   Has that been your historical practice,
10 not only on September 2nd, 2019, but before that?
11    A.   I have used the radar inshore, depending
12 on the weather conditions.
13    Q.   Assuming you do not have tumultuous
14 weather -- if we can describe it as that -- would it
15 be accurate to say that you do not use the radar
16 otherwise, when --
17    A.   Correct.
18        MR. RYAN:  Object to form.
19 BY MR. CABALLERO:
20    Q.   When you're inshore, to be fair?
21    A.   Correct.
22    Q.   Walk us --  Walk us back to the
23 September 2nd, 2019 date.
24        And I know you indicated, Mr. Knight, that
25 the purpose of the -- of that afternoon trip was to

12 (Pages 42 - 45)

Page 46

1 go to a restaurant, to meet some friends, and have
2 lunch. And I think the restaurant, from our
3 understanding, is The Big Salt Creek, right?
4         MR. RYAN: Object to form.
5         THE WITNESS: I believe the name of it
6 is The Big Catch.
7 BY MR. CABALLERO:
8     Q.   The Big Catch. I'm sorry. I'm sorry.
9 The Big Catch.
10        And walk us back to how that came about to
11 do this particular outing.
12    A.   We got --
13        MR. RYAN: Object to form.
14        THE WITNESS: -- call early that
15 morning --
16        CERTIFIED REPORTER: I'm sorry. Could
17 you repeat that?
18        THE WITNESS: We got a call that
19 morning, and I forget exactly how. But, got a
20 call from one of my friends, said that they
21 were going to be downtown. And Tara and I
22 were -- It was a beautiful day out. Well, or
23 not beautiful, but we wanted to go boating.
24        So, she came over to the house and we
25 loaded up, and headed that way.

Page 47

1 BY MR. CABALLERO:
2     Q.   What was the name of the friend that
3 called you that morning?
4     A.   Jon LaBudde.
5     Q.   How do you spell that last name?
6     A.   L-u-b-b-a-d, I believe.
7     Q.   How long have you known Mr. LaBudde?
8     A.   Twenty-five years.
9     Q.   At what time did you get the call?
10    A.   Probably mid -- early midmorning.
11    Q.   Did you have plans, before you got that
12 call, of going out boating with Ms. Kintz that day?
13    A.   I know we had talked about it but I don't
14 think we had made anything -- any plans in
15 particular.
16    Q.   And where were you when you got the call,
17 Mr. Knight?
18    A.   I would -- I would think at my house.
19    Q.   Do you recall?
20    A.   Best of my recollection, yes.
21    Q.   Did he tell you what time, Mr. LaBudde, at
22 what time he and his -- the group that he was with
23 was going to be at The Big Catch?
24    A.   I think we discussed that we would try and
25 be down there early afternoon.

Page 48

1     Q.   Where was the Statement vessel located
2 when you got the call?
3     A.   At -- At our -- my address in Redington
4 Shores.
5     Q.   Was the boat kept on a lift, in the water?
6     A.   On a lift.
7     Q.   Were you at the Redington Shores location
8 or were you at -- somewhere else?
9     A.   I was at my other house. I believe I
10 drove over there.
11    Q.   What -- What was the address of the other
12 house?
13    A.   2268 Kings Point Drive.
14    Q.   Was there anyone else --
15    A.   I know the boat, obviously, was at the
16 house at the Redington location, but was there anyone
17 else there at that location?
18    A.   Well, my family all lives there, but I
19 don't believe anybody was -- I don't remember seeing
20 anybody that day.
21    Q.   Where was Ms. Kintz at this time?
22    A.   She -- She was coming from her house, in
23 Saint Pete.
24    Q.   I know you got the call from Mr. LaBudde
25 at midmorning, roughly, to go meet at The Big Catch.

Page 49

1 But did you have plans that were not to go -- other
2 plans with Ms. Kintz, to do something else, when you
3 got that call?
4         MR. RYAN: Object to form.
5         THE WITNESS: No. Not really.
6 BY MR. CABALLERO:
7     Q.   When you get the call from Mr. LaBudde,
8 you then speak to Ms. Kintz, and you guys come
9 together on the idea of going out on the boat to meet
10 your friends at The Big Catch. That's kind of the --
11 the synopsis of this, right?
12    A.   Right.
13        MR. RYAN: Object to form.
14 BY MR. CABALLERO:
15    Q.   At what time do you think you left your
16 house at Kings Point?
17    A.   My best recollection is sometime after
18 noon, or after 12. Early afternoon.
19    Q.   Did you take anything with you from your
20 house at Kings Point that you were going to have with
21 you on the boat?
22    A.   Yeah, we had a small cooler of some waters
23 and some Red Bulls.
24    Q.   Did you make any stops between the time
25 you left the Kings Point location to the house in

13 (Pages 46 - 49)

Page 50

1 Redington, where the Statement vessel was located?
2    A.   No.  We make this trip on a regular basis.
3    Q.   What trip is that, from the Redington
4 location to The Big Catch?
5    A.   To the downtown area.  There are several
6 places that we go eat -- we'll go to eat there.
7    Q.   When you --  When you left the Kings Point
8 location to the Redington house -- to go to the
9 Redington house, how long did it take to, to make
10 your way to that location?
11   A.   How long does it take to get to --
12   Q.   Yeah.  From Kings Point house, from that
13 house to the Redington house, where the boat was?
14   A.   Oh, ten minutes.
15   Q.   Were you already at the Redington house,
16 where the boat was, when Ms. Kintz arrived?
17   A.   Yes.
18   Q.   When you got to the house at Redington,
19 what did you do at that point?
20   A.   Got the boat off the lift and tied it up
21 behind the big boat, waiting on her.
22   Q.   Was there anybody there to help you?
23   A.   No.
24   Q.   How long did you wait for Ms. Kintz before
25 you guys got underway?

Page 51

1    A.   I'm not sure.  She's never on time.
2    Q.   Do you have a, a rough approximation?
3 Like, was it a few minutes, or was it --
4    A.   Oh, no, I -- I was probably there a half
5 hour, 40 minutes before she showed up.
6    Q.   Did Ms. Kintz have anything with her when
7 she -- when she arrived, that she was going to have
8 with her on the -- on the boat?
9    A.   No.  Just her purse.
10   Q.   I know you indicated you were -- the plan
11 was to go to The Big Catch and have lunch.  Was there
12 a plan to do anything after that?
13   A.   No.  We -- we would have --
14        We would have got -- came back home,
15 because we -- we would want to get home before dark.
16   Q.   Can you recall what you did the night
17 before the September 2nd, 2019 day?
18   A.   Not particularly.
19   Q.   Did you have a -- a cell phone that you
20 used in that time period?
21   A.   Yes, I have a cell phone.
22   Q.   What was the cell phone number?
23   A.   My cell phone number?
24   Q.   Yeah.
25   A.   (727) 423-0971.

Page 52

1    Q.   Is that the same number you had back in
2 September 2nd, 2019?
3    A.   Yes.
4    Q.   And who is the carrier for that cell?
5    A.   I believe it's Verizon.
6    Q.   Are there any other cellular phones you --
7 you use?
8        MR. RYAN:  Object to form.
9        THE WITNESS:  No.
10 BY MR. CABALLERO:
11   Q.   I know you indicated, when you arrived at
12 the Redington house where the boat was located, that
13 you had to get the boat off the lift and get it ready
14 to go.
15        Can you walk us through everything that
16 you did to -- to do that process?
17        MR. RYAN:  Object to form.
18        THE WITNESS:  I lowered the lift down,
19        got in the boat, started the engines.  Moved
20        it around to the other dock, or, really,
21        the -- Parked it, tied it up behind the --
22        the yacht, and I waited for Tara to get there.
23 BY MR. CABALLERO:
24   Q.   At what --
25        Roughly around what time do you think

Page 53

1 you -- you got underway to head towards The Big
2 Catch?
3    A.   Sometime after midnight-- after --
4        After 12 o'clock, my -- Best of my --
5 best of my recollection.
6    Q.   Once you got underway, Mr. Knight, give us
7 a sense of what your game plan was in terms of the
8 route you were going to take to get to The Big Catch.
9    A.   Typical -- The typical route we take every
10 time.
11   Q.   And what's that?
12   A.   We leave the house, go to the Intracoastal
13 Waterway, go down to Johns Pass Inlet --
14        CERTIFIED REPORTER:  I'm sorry.  You
15        need to repeat that.  You're echoing.
16        THE WITNESS:  I said we departed the
17        house, headed south to Johns Pass Inlet.  Went
18        from there out into the ocean, down to
19        Tierra Verde, came in that inlet.  Joined back
20        up with the Intracoastal Waterway, heading
21        east to Tampa Bay.
22        From there, you take that channel all
23        the way down through the Misener Bridge, and
24        that opens you up into the mouth of Tampa Bay,
25        and follow the channel out around the corner

1    to downtown Saint Pete.
2         MR. CABALLERO:  Let me see if I can show
3    you -- So, I'll mark this as Exhibit --
4    Plaintiffs' Exhibit B [sic].
5         (Thereupon, the document/item referred
6    to was marked for identification as Plaintiffs'
7    Exhibit 2.)
8    BY MR. CABALLERO:
9    Q.    It's just a general map.  And this depicts
10   the general area of -- of where you were traveling on
11   September 2nd, 2019, right, Mr. Knight?
12   A.    Correct.
13   Q.    So I know you indicated -- Let me see if
14   I can --
15         So you start from where, out here
16   somewhere (indicating)?
17   A.    Well, at that point, we come in -- we
18   go -- We're farther north, up at Johns Pass Inlet.
19   Q.    So you're, you're --
20         You're up this way (indicating)?
21   A.    Yeah.  Where we departed from, Redington,
22   is north.
23   Q.    So you're -- Do you make your way down
24   this way here (indicating)?
25   A.    No.  We -- We're out in the ocean.

1    Q.    Okay.  You're out in the ocean.  So --
2         MR. RYAN:  Are you going to -- Sorry to
3    interrupt him.  Have you marked this?
4         MR. CABALLERO:  Yeah.  It's Plaintiffs'
5    Exhibit B [sic].
6         MR. RYAN:  Okay.  I -- I'm going to
7    object to this being used as what I think is a
8    nautical chart.  It doesn't have --
9         MR. CABALLERO:  No, it's not being used
10   as a nautical chart.
11        So, this is Plaintiffs' Exhibit 2.  It's
12   just a -- a general map of the area.  So --
13        MR. RYAN:  So --
14   BY MR. CABALLERO:
15   Q.    So, Mr. Knight, walk us -- walk me through
16   where you come in.  Because this is where you
17   ultimately go through to make your -- your way
18   towards Tampa Bay and -- go to The Big Catch out
19   here somewhere (indicating).
20        But I'm trying to get a sense of where
21   you -- you ultimately enter through here.  Do you
22   come in through --
23   A.    Well, yeah, right -- Right down where it
24   says "Pass-a-Grille Historic District," the very
25   bottom.

1    Q.    Yes?
2    A.    Yeah, that's the inlet right there.
3    Q.    You -- You come in through here, go
4    around Tierra Verde and then start making your way
5    towards Tampa Bay (indicating)?
6    A.    Correct.
7         MR. RYAN:  Object to form.
8    BY MR. CABALLERO:
9    Q.    Is this a fair and accurate depiction of
10   what your typical route, once you enter the inlet
11   towards Tampa Bay, looks like when you do this
12   particular passage?
13        MR. RYAN:  Object --
14        THE WITNESS:  Correct.
15        MR. RYAN:  -- to form.
16   BY MR. CABALLERO:
17   Q.    Correct?
18   A.    Yes.
19   Q.    How many times do you think you've run
20   that route?
21        MR. RYAN:  Object to form.
22   BY MR. CABALLERO:
23   Q.    Prior to September 2nd, 2019?
24   A.    Hundreds over the years.
25        I need to plug my computer in.

1         MR. CABALLERO:  Well, why don't we do
2    this.  We've been going for about an hour.
3    Let's take a quick, three, four-minute break,
4    bathroom break, and then we'll jump back --
5    back to it.
6         THE WITNESS:  Okay.
7         THE VIDEOGRAPHER:  All right.  The time
8    is now 11:17 a.m. and we are off the record.
9         (Recess taken in the proceedings from
10   11:17 a.m. to 11:25 a.m., after which the following
11   proceedings were had:)
12        THE VIDEOGRAPHER:  All right.  The time
13   is now 11:25 a.m., and we are back on the
14   record.
15   BY MR. CABALLERO:
16   Q.    So, Mr. Knight, I know you indicated,
17   before we broke, that you've taken this route from
18   the -- from offshore, leading through, around Tierra
19   Verde, and into the channel pass Misener Bridge to
20   Tampa Bay you said hundreds of times, is what you
21   said, right?
22   A.    Over -- Over my lifetime of boating here,
23   I would say every bit of a hundred times.
24   Q.    Okay.  Once you get -- Is there --
25        By the way, do you call the channel a

Page 58

1 particular name that channel that leads to the
2 Misener Bridge?
3    A.   No.
4    Q.   Okay.
5    A.   The Intracoastal Waterway.
6    Q.   Right, right.  So other than -- than the
7 Intracoastal Waterway, you don't have, like, a
8 particular name you use for it?
9    A.   No.
10       MR. RYAN:  Object to form.
11 BY MR. CABALLERO:
12    Q.   Can you describe, once you get around
13 Tierra Verde and enter that channel that leads
14 ultimately through the Misener Bridge, that stretch
15 of the Intracoastal Waterway, can you describe the
16 environmental conditions in and around that waterway?
17       MR. RYAN:  Object to form.
18       THE WITNESS:  I don't understand the
19    question.
20 BY MR. CABALLERO:
21    Q.   Okay.  Off the top of your head, do you
22 have a sense of what that area looks like in terms of
23 depth, and land masses, and what's around that
24 channel?
25       MR. RYAN:  Object to form.

Page 59

1       THE WITNESS:  Yeah.  I mean, obviously,
2    there are some marsh islands out there off to
3    the south.  There's definitely some shallow
4    spots that are more to the north of the
5    channel, and it seems to be deeper water more
6    to the south.
7       MR. CABALLERO:  So, I'm going to show
8    you an image of the area from the nautical
9    charts from the National Oceanic and
10    Atmospheric Administration.
11       We will mark this as Plaintiffs'
12    Exhibit 3.
13       MR. BUTLER:  Hey, Cosme.  It's Frank
14    Butler.  You were --
15       MR. CABALLERO:  Yes?
16       MR. BUTLER:  I think, originally --
17    I think, originally, you were going
18    numbers, but you can check with the court
19    reporter on that.  I, I mean --
20       MR. CABALLERO:  Yeah, that's -- That's
21    what I'm going to do.  The Exhibit B will be
22    Exhibit 2, and Exhibit -- This will be
23    Plaintiffs' Exhibit 3.  Thank you, Frank.
24       MR. BUTLER:  Yep.
25       (Thereupon, the document/item referred

Page 60

1 to was marked for identification as Plaintiffs'
2 Exhibit 3.)
3 BY MR. CABALLERO:
4    Q.   So, we have a nautical chart of --
5 depicting the area.  Do you see that, Mr. Knight?
6    A.   Yes.
7    Q.   And you come in from this point here,
8 right around Tierra Verde, and enter this --
9       Let me see if I can give us a little
10 reference point.  So, this is your path of travel
11 leading towards Tampa Bay, correct (indicating)?  You
12 go --
13       MR. RYAN:  Object to form.
14 BY MR. CABALLERO:
15    Q.   You go through this channel here, with the
16 Misener Bridge being this -- this item here, correct
17 (indicating)?
18    A.   Correct.
19    Q.   The -- The area around this channel that
20 we're looking at, all of this area here is
21 essentially just marshland, shoals, right?
22       MR. RYAN:  Object to form.
23       THE WITNESS:  Yes.
24 BY MR. CABALLERO:
25    Q.   Yes?

Page 61

1    A.   Yeah, based upon what I'm looking off the
2 chart, yes.
3    Q.   And you know how to read a chart, right?
4    A.   Yes.
5    Q.   Okay.  So, when we look at this area of
6 the channel --
7       And, by the way, this channel going
8 eastbound, towards Tampa Bay -- This channel going
9 eastbound, towards Tampa Bay, this actually
10 intersects with another channel that goes north and
11 south and actually enters the, the -- these
12 commercial areas by Maximo Point, and Frenchman's
13 Creek, and other areas up towards this area up here,
14 right (indicating)?
15    A.   Correct.
16       MR. RYAN:  Object to form.
17 BY MR. CABALLERO:
18    Q.   And we see the intersection right here,
19 correct (indicating)?
20    A.   Correct.
21    Q.   The area near this channel, as you get
22 towards the intersection, is actually very shallow in
23 the south and very shallow towards the north of the
24 channel as well (indicating)?
25       MR. RYAN:  Object to form.

16 (Pages 58 - 61)

Page 62

1      THE WITNESS: Well, are you estimating
2   that in meters or feet?
3 BY MR. CABALLERO:
4      Q.   I believe this one is in meters.
5      A.   Right.  So, if it's -- That's not very
6 shallow if it's in -- if it's two-and-a-half meters.
7      Q.   And what's --
8      Right around here, you're looking at half
9 a meter, more or less?
10      And by the way, these nautical charts,
11 just so we get an understanding of what we're looking
12 at, they give you the -- the depth, they can either
13 be in meters, like we're seeing it, or in feet, right
14 (indicating)?
15      MR. RYAN:  Object to form.
16      THE WITNESS:  (No response)
17 BY MR. CABALLERO:
18      Q.   True?
19      A.   Yes.
20      Q.   And your Garmin, by the way, did you have
21 it set up for feet?
22      A.   Yes.
23      Q.   So, this area that we're looking at here,
24 as you make your way towards the channel, and the --
25 and the Misener Bridge, is an area where the safest

Page 63

1 path of travel is within the channel, true?
2      MR. RYAN:  Object to form.
3      THE WITNESS:  Always.
4 BY MR. CABALLERO:
5      Q.   It's in -- The channel represents an area
6 that's designated and for permitted travel in these
7 areas here, correct (indicating)?
8      MR. RYAN:  Object to form.
9      THE WITNESS:  Correct.
10 BY MR. CABALLERO:
11      Q.   With this channel, Mr. Knight, given your
12 experience having gone through this route many, many
13 times, is this a channel that is routinely trafficked
14 by vessels that want to go towards the Tampa Bay area
15 (indicating)?
16      MR. RYAN:  Object to form.
17      THE WITNESS:  Yes, that's highly
18   traveled.  I think there's a lot of traffic.
19   Depending on the day.
20 BY MR. CABALLERO:
21      Q.   So, if we can --
22      Can we characterize it, based on your
23 experience, that this channel that we're looking at
24 that leads towards the -- across the Misener Bridge
25 towards Tampa Bay, in your own words, is a highly

Page 64

1 trafficked channel, depending on the day?
2      MR. RYAN:  Object to form.
3      THE WITNESS:  It can be, yes.
4 BY MR. CABALLERO:
5      Q.   What kinds of days have you seen where
6 this is a highly trafficked channel?
7      MR. RYAN:  Object to form.
8      THE WITNESS:  On a very nice, sunny day
9   on a weekend.
10 BY MR. CABALLERO:
11      Q.   Maybe a holiday, like Labor Day?
12      A.   It all depends on the weather.
13      Q.   On September 2nd, 2019, that was obviously
14 Labor Day for that year, correct?
15      A.   Correct.
16      Q.   Do you have a recollection of what the
17 traffic was like on that channel?
18      A.   On that particular day?  Other than
19 passing the initial cabin cruiser as we came through
20 the Tierra Verde Bridge, we didn't -- I did not see
21 a lot of traffic.
22      Q.   So, walk me through, once you get past the
23 Tierra Verde Bridge --
24      Well, before that, for a second.  When
25 we're looking at Plaintiffs' Exhibit 3, again, when

Page 65

1 you're looking at --
2      And you were coming in through this area
3 here, correct (indicating)?
4      A.   Correct.
5      MR. RYAN:  Object to form.
6 BY MR. CABALLERO:
7      Q.   Okay.  What was your speed as you begin
8 the turn around Tierra Verde, and you enter the
9 channel and start to make your way towards the
10 Misener Bridge?  And I'm --
11      MR. RYAN:  Object to form.
12 BY MR. CABALLERO:
13      Q.   -- talking right around the -- the
14 depiction we're seeing here.  What was your speed
15 through this part (indicating)?
16      A.   Idle speed.
17      Q.   And then once you get past the Tierra
18 Verde Bridge, what -- what was your speed?
19      MR. RYAN:  Object to form.
20      THE WITNESS:  Basically, is when we are
21   allowed to get back up on plane again, just
22   past the bridge.
23 BY MR. CABALLERO:
24      Q.   Okay.  So the bridge, would it be fair to
25 say, the Tierra Verde Bridge, is a speed-restricted

17 (Pages 62 - 65)

1  area?
2      A.   Correct.
3          MR. RYAN:  Object to form.
4  BY MR. CABALLERO:
5      Q.   Yes?
6      A.   Yes.
7      Q.   It was like that on September 2nd, 2019 as
8  well, correct?
9          MR. RYAN:  Object to form.
10         THE WITNESS:  It's always like that.
11 BY MR. CABALLERO:
12     Q.   Once you get passed the Tierra Verde
13 Bridge, on September 2nd, 2019, what did you do in
14 terms of the speed of the vessel?
15         MR. RYAN:  Object to form.
16         THE WITNESS:  Put the boat on plane and
17     started heading east.
18 BY MR. CABALLERO:
19     Q.   And when you say you put the boat on plane
20 once you got past the Tierra Verde Bridge, what --
21 what speed are we talking about to get the Statement
22 on plane?
23         MR. RYAN:  Object to form.
24         THE WITNESS:  The best of my knowledge
25     is probably 30, 35 miles an hour.

1  BY MR. CABALLERO:
2      Q.   Were there any vessels in front of you
3  that you could see as you were making your way
4  towards the Misener Bridge?
5      A.   Yes.  Like I stated in my police report,
6  there was a large motor yacht out in front of us.
7  Once we came through the bridge, we got on plane and
8  passed that boat off the starboard side.
9      Q.   A large --
10     A.   That was the only -- That was the only
11 vessel, at the time, that we had seen.
12     Q.   I understand.
13         Let me focus in on the large motor yacht.
14 When you say "a large motor yacht," describe it.
15     A.   Probably 45- to 55-foot in length.  Looked
16 like an old Chris-Craft.  Motor yacht.
17     Q.   How tall was the vessel?
18         MR. RYAN:  Object to form.
19 BY MR. CABALLERO:
20     Q.   The height of it?
21     A.   Don't know.
22     Q.   Was the vessel blocking your view ahead of
23 it?
24     A.   Yeah.  The vessel was much taller than the
25 center console.

1      Q.   Had you seen the large motor --
2          Well, let me back up for a minute.
3          Can you describe how fast the large -- the
4  large motor yacht was traveling on the ICW?
5      A.   I don't know exactly, but they were on
6  plane.
7      Q.   When you passed the large motor yacht on
8  that boat's port side, did you sound your horn?
9      A.   No, they were -- They were several --
10 They were -- They were a large distance away.  They
11 were basically on the far right-hand side of the
12 channel.  That's why we passed them on the left.
13     Q.   So, when you overtook the large motor
14 yacht, you did not sound your horn twice to alert
15 them you were passing on the port side, correct?
16         MR. RYAN:  Object to form.
17         THE WITNESS:  Correct.
18 BY MR. CABALLERO:
19     Q.   Yes?
20     A.   Correct, I did not -- I did not sound my
21 horn.
22     Q.   How far back -- When you got past the
23 Tierra Verde Bridge, that you began to increase
24 speed, were you able to see the large motor yacht in
25 the channel even from that point of view?

1          MR. RYAN:  Object to form.
2          THE WITNESS:  Yes, I could see it as
3      soon as we came through the Tierra Verde
4      Bridge.
5  BY MR. CABALLERO:
6      Q.   As soon as you came through the
7  Tierra Verde Bridge and saw the large motor yacht,
8  were you able to appreciate the fact that the boat
9  was much taller than your center console Statement?
10         MR. RYAN:  Object to form.
11         THE WITNESS:  It was definitely a larger
12     vessel, yes.
13 BY MR. CABALLERO:
14     Q.   Were you able to appreciate, as soon as
15 you got past the Tierra Verde Bridge and decided to
16 put your boat on plane, that you could not see past
17 that large motor yacht because of its dimensions?
18         MR. RYAN:  Object to form.
19         THE WITNESS:  Oh, I -- I could see past
20     it.  I could see clearly in front of me.
21 BY MR. CABALLERO:
22     Q.   Could you see in front of you --
23     A.   I could --
24     Q.   I'm sorry.  Go ahead.  I didn't mean to
25 interrupt you.

18 (Pages 66 - 69)

1    A.   Nah.  You -- you go ahead.  I don't
2 understand the question.
3    Q.   Could you see in front of the large motor
4 yacht?
5         MR. RYAN:  Object to form.
6         THE WITNESS:  Yes.  We were both heading
7 in the eastern direction.  So it was not
8 interfering with my direct line of sight going
9 forward.
10 BY MR. CABALLERO:
11   Q.   When you decided to put the boat on plane
12 and increase speed --
13        Well, let me -- Let me strike that and
14 move back and ask you a different kind of question
15 first.
16        Would it be fair to say that, assuming
17 there was a smaller-sized vessel in front of that
18 large motor yacht, based on its size, you would not
19 be able to see it from where you were located once
20 you passed the Tierra Verde Bridge?
21        MR. RYAN:  Object to form.
22        THE WITNESS:  If the boat was riding
23 directly alongside that boat at the same speed
24 would be the only way I wouldn't have been
25 able to see it.

1 BY MR. CABALLERO:
2    Q.   The only way you would have?
3    A.   I don't understand the question.
4    Q.   Obviously, Mr. Knight, you know that there
5 was a pontoon boat in front of that large motor
6 yacht; you're aware of that, right?
7         MR. RYAN:  Object to form.
8         THE WITNESS:  The pontoon boat was not
9 in front -- We did not see the pontoon boat
10 in front of the motor yacht.
11 BY MR. CABALLERO:
12   Q.   Were you --
13        Assuming the pontoon boat was in front of
14 the large motor yacht, would it be accurate to say
15 that you had no visibility of that small pontoon boat
16 at any point that you were traveling --
17   A.   Well --
18   Q.   -- on the Intercoastal?
19   A.   -- we had passed --
20        We passed the --
21        MR. RYAN:  Object to form.
22        THE WITNESS:  -- motor yacht very
23 shortly coming straight out of the bridge.
24        So, the -- the pontoon boat was not
25 there because we were -- we had pass-- We

1 had --
2         We had gone substantially by the motor
3 yacht, and we were in the middle of the
4 channel.  So, at that point in time, we did
5 not see the pontoon boat.  So it wasn't right
6 in front of the motor yacht.
7 BY MR. CABALLERO:
8    Q.   Okay.  So -- So show me, more or less, on
9 Plaintiffs' Exhibit 3, approximately where you think
10 you passed the large motor yacht.
11        Do you think you passed it closer towards
12 the Tierra Verde Bridge?
13   A.   Yes.
14   Q.   So --
15   A.   Somewhere around where it bends.
16   Q.   So somewhere around here, you believe you
17 passed the large motor yacht (indicating)?
18        MR. RYAN:  Object to form.
19        THE WITNESS:  Yes.
20        MR. BUTLER:  Cosme, if I may suggest
21 one -- one question -- one interjection.
22 Because it's going to read on the transcript
23 "here," and we're not going to know where
24 "here" is.
25        MR. CABALLERO:  Oh, I'm sorry.  Yeah.

1         MR. BUTLER:  Can the witness estimate
2 your -- If he agrees with that circle, can
3 he estimate how far that is east of the
4 Tierra Verde Bridge?
5         MR. DAVANT:  No.  He's not going to
6 estimate and guess for you guys.  He's going
7 to answer questions as to his personal
8 knowledge.  So we'll object to the form of
9 those types of questions.
10        MR. CABALLERO:  Understood.
11        MR. DAVANT:  We'll deal --
12        MR. CABALLERO:  So --
13        MR. DAVANT:  -- with it later.  Okay?
14        MR. CABALLERO:  So -- So, that's fine.
15 Thank you.
16 BY MR. CABALLERO:
17   Q.   So, Mr. Knight, we're looking at
18 Plaintiffs' Exhibit 3.
19        I have an area that I've circled in red on
20 this exhibit.  Is this the approximate area where you
21 believe you passed the large motor yacht on your way
22 towards the Misener Bridge?
23   A.   To the --
24        MR. DAVANT:  Objection.  Form.
25        THE WITNESS:  -- best of my

19 (Pages 70 - 73)

Page 74

1 recollection, yes.
2      CERTIFIED REPORTER:  And, sir, could you
3 please let the objection happen before your
4 answer?  Thank you.
5      MR. CABALLERO:  And we'll save this for
6 everybody.
7 BY MR. CABALLERO:
8    Q.    So after, Mr. Knight, you passed the large
9 motor yacht, would it be accurate to say that you
10 traveled some significant amount of distance towards
11 the Misener Bridge before the collision?
12    A.    Correct.
13      MR. RYAN:  Object to form.
14 BY MR. CABALLERO:
15    Q.    Between the time of the collision and
16 the -- time you passed the large motor yacht,
17 were -- did you see any other vessels in that channel
18 between those two incidents?
19    A.    Not to my -- Not to my recollection, no.
20    Q.    And I think, based on what you said,
21 the -- the large motor yacht was on plane when you
22 passed it near the Tierra Verde Bridge location that
23 we mentioned before?
24      MR. RYAN:  Object to form.
25      THE WITNESS:  Correct.

Page 75

1 BY MR. CABALLERO:
2    Q.    When you were operating the vessel, at the
3 time you got past the large motor yacht and overtook
4 it, where were you located physically on the boat?
5    A.    Where was I located?
6    Q.    Yes.
7    A.    Straight behind the wheel.
8    Q.    Were you sitting, standing?  What was your
9 physical appearance?
10    A.    I -- A combin-- I have a tendency to do
11 both, stand and sit.  So, it could have been
12 either/or.
13    Q.    At the time of the collision, do you
14 recall if you were standing or sitting?
15    A.    I was --  At the time of the collision, I
16 was actually -- Tara had asked me something.  I think
17 she was trying to tune the stereo.  And I had looked
18 down to talk to her when the actual collision
19 happens.
20    Q.    In the moments prior to the collision
21 happening, what were you doing?
22    A.    I had referenced my --
23      I had looked at the -- reference back and
24 forth between my chart and the bridge, made sure I
25 was lined up in the middle of the channel prior to

Page 76

1 that.
2    Q.    On the boat, were you wearing sandals,
3 shoes?  Were you barefoot?  What was your attire?
4    A.    I had my boat shoes on.
5    Q.    You had your boat shoes on, you said?
6    A.    Yes.
7    Q.    Do you have any knowledge --  Well, first
8 let me ask it this way.  Strike that.
9      At any point that you were in this
10 channel, on September 2nd, 2019, did you see the
11 pontoon boat --
12    A.    No.
13    Q.    -- prior -- prior to the collision?
14    A.    No.
15    Q.    At any point, while you were in the
16 channel leading towards the Misener Bridge, before
17 the collision, did Ms. Kintz, to your knowledge, see
18 the pontoon boat?
19      MR. RYAN:  Object to form.
20      THE WITNESS:  No.
21 BY MR. CABALLERO:
22    Q.    In looking at this situation, do you have
23 any understanding or belief as to why you didn't see
24 the pontoon boat?
25      MR. RYAN:  Object to form.

Page 77

1      THE WITNESS:  Because they weren't in
2 the channel.  That's where I was focused, my
3 attention.
4 BY MR. CABALLERO:
5    Q.    Where --  Where do you believe the pontoon
6 boat was, if it was not in the channel?
7      MR. RYAN:  Object to form.
8      THE WITNESS:  Coming from the southeast.
9 South, southeast.
10 BY MR. CABALLERO:
11    Q.    So we're looking at Plaintiffs' Exhibit 3
12 again, Mr. Knight.  It's a nautical chart of the --
13 of the area near the incident.
14      Can you identify, and kind of give me a
15 sense of where you think the pontoon boat was prior
16 to the collision?
17      MR. RYAN:  Object to form.
18      THE WITNESS:  Somewhere back a little
19 bit more.
20 BY MR. CABALLERO:
21    Q.    So we have Cow Key here.  So where, around
22 here (indicating)?
23    A.    Some -- Somewhere back in that area
24 (indicating).
25      MR. RYAN:  Object to form.

20 (Pages 74 - 77)

Page 78

1 BY MR. CABALLERO:
2    Q.   So we're looking at --
3         So, on Plaintiffs' Exhibit 3, which
4 we'll -- we'll save a new one and call it Plaintiffs'
5 Exhibit 4, we have an area that I've circled in red.
6         Do you see that, Mr. Knight (indicating)?
7    A.   Yes.
8         (Thereupon, the document/item referred
9 to was marked for identification as Plaintiffs'
10 Exhibit 4.)
11 BY MR. CABALLERO:
12    Q.   Is it accurate to say that it's your
13 belief the pontoon boat was in this -- roughly this
14 area that we've circled in ref- -- in red in
15 Plaintiffs' Exhibit 4?
16         MR. RYAN:  Object to form.
17         THE WITNESS:  Well, I know they weren't
18    in the channel, so I can't really tell you
19    where they were at.
20 BY MR. CABALLERO:
21    Q.   So you don't -- You don't know where the
22 pontoon boat was before the impact?
23    A.   No, I never -- I --
24         As I stated before, we were directly in
25 the center of the channel, headed to the bridge.

Page 79

1 And, at that point, I had not laid eyes on the
2 pontoon boat prior to the collision.
3    Q.   From the time you passed the large motor
4 yacht near the Tierra Verde Bridge, as you testified,
5 to the time of the incident, would it be accurate to
6 say that the -- the channel was completely clear
7 through that entire time?
8         MR. RYAN:  Object to form.
9         THE WITNESS:  I would tell you that we
10    did not see any vessels directly in front of
11    us, and we were right in the middle of the
12    channel, headed towards the bridge.
13 BY MR. CABALLERO:
14    Q.   Would it be accurate to say that after you
15 passed the large motor yacht, as you just testified,
16 that you were --  And you were making your way
17 towards the Minor -- Misener Bridge, during that
18 entire time, were you on plane with the Statement?
19    A.   Yes.
20    Q.   And I think you --  I want to go back for
21 a moment.
22         I think you indicated, when you were
23 headed towards the Misener Bridge, after you overtook
24 the large motor yacht, there were moments where you
25 were looking at your electronics to -- to do what?

Page 80

1    A.   I remember Tara was trying to do something
2 with the stereo, and it's all run through the Garmin.
3         So, between referencing what she was
4 trying to do and, you know, typically, just looking
5 at the GPS or the chart and, you know, basically
6 lining up with the center of the bridge, that's what
7 I was doing.
8    Q.   Would it be accurate to say, Mr. Knight,
9 based on what you've just described in terms of the
10 activities that you had when you were headed towards
11 the Misener Bridge, past -- once you passed the large
12 motor yacht, that there were times during this
13 endeavor that you were not looking out towards the
14 ocean?
15         MR. RYAN:  Object to form.
16         THE WITNESS:  No, I referenced back and
17    forth between directly in front of me and the
18    screens.
19 BY MR. CABALLERO:
20    Q.   Prior to the collision, would it be
21 accurate to say that you did not have continuous
22 visibility of what was out in front of your boat that
23 entire time?
24         MR. RYAN:  Object to form.
25         THE WITNESS:  Obviously when I

Page 81

1    referenced down to the screens is when the
2    incident occurred, so, yes.
3 BY MR. CABALLERO:
4    Q.   And I think you also indicated you were
5 assisting, prior to the collision, you were assisting
6 Ms. Kintz with trying to get the radio set up through
7 the Garmin?
8         MR. RYAN:  Object to form.
9         THE WITNESS:  Well, yes.
10 BY MR. CABALLERO:
11    Q.   Yes?
12    A.   She asked me a question, yes.
13    Q.   And during that interaction, you were
14 obviously not paying attention to what was out in
15 front of the boat either, correct?
16         MR. RYAN:  Object to form.
17         THE WITNESS:  Correct.  I was right in
18    the middle of the channel, and I had just
19    looked up to make sure we were going in the
20    right direction and where the boat was
21    positioned when I referenced down to a
22    question she had.
23         MR. CABALLERO:  I'm going to show you
24    your sworn statement.  Give me one second.
25    I'll mark this as Plaintiffs' Exhibit, I think

21 (Pages 78 - 81)

1   it's 5.
2       (Thereupon, the document/item referred
3   to was marked for identification as Plaintiffs'
4   Exhibit 5.)
5   BY MR. CABALLERO:
6       Q.   Do you recall this?
7       A.   Yes.
8       Q.   What's marked as Plaintiffs' Exhibit 5, do
9   you recall seeing this document?
10      A.   Yes.
11      Q.   Is that your handwriting on --
12      A.   Yes.
13      Q.   -- on this sworn statement?
14      A.   Yes.
15      Q.   And is that your signature at the bottom,
16  Mr. Knight?
17      A.   Yes.
18      Q.   And then, obviously, you understood that
19  you were provided your Miranda rights prior to
20  filling out and then signing this sworn statement?
21          MR. RYAN:  Object to form.
22          THE WITNESS:  Right.
23  BY MR. CABALLERO:
24      Q.   Yes?
25      A.   Correct.

1       Q.   And you voluntarily decided to write this
2   sworn statement after you were provided with the
3   Miranda warning?
4           MR. RYAN:  Object to form.
5           THE WITNESS:  Correct.
6   BY MR. CABALLERO:
7       Q.   Can you read what the statement says,
8   Mr. Knight?
9       A.   We were heading east in the ICW and
10  passed a large boat there on the left, when
11  looked down to check on our GPS when the other
12  boat came across our bow.  We stopped.  Turned
13  around to help.
14      Q.   This seems to indicate -- and you can
15  correct me if I'm wrong -- that the incident happened
16  much closer to the time you passed that large motor
17  yacht?
18          MR. RYAN:  Object to form.
19          THE WITNESS:  It doesn't seem that way
20  to me.  It just says I passed the motor yacht.
21  BY MR. CABALLERO:
22      Q.   So you feel this is consistent with what
23  you just testified to, in terms of the way the
24  incident happened?
25      A.   Yes.

1           MR. RYAN:  Object to form.
2   BY MR. CABALLERO:
3       Q.   And then your sworn statement that's
4   marked as Plaintiffs' Exhibit 5, further confirms
5   that you had taken your eyes off of the -- the
6   direction of travel prior to the incident occurring,
7   correct?
8           MR. RYAN:  Object to form.
9           THE WITNESS:  Correct.
10          (Thereupon, the document/item referred
11  to was marked for identification as Plaintiffs'
12  Exhibit 6.)
13  BY MR. CABALLERO:
14      Q.   I'm going to show you what I'll mark as
15  Plaintiffs' Exhibit 6.  It's a photograph that was
16  taken of your GPS, and it's annexed to the FWC
17  report.  Have you ever seen this before?
18      A.   I believe so.
19      Q.   This is a photo that -- that the police
20  folks, the FWC guys took of the GPS track leading up
21  to the time of the incident, right?
22      A.   Correct.
23      Q.   And we see the track.  Let me see if I can
24  zoom in a little bit.
25          We can see the track leading from this

1   point we're looking at is down here, towards where
2   I'm going to mark.  So I have a --
3       I'm going to mark with a small circle
4   towards the bottom of the -- of the document.  This
5   location leads toward Tierra Verde, right
6   (indicating)?
7           MR. RYAN:  Object to form.
8           THE WITNESS:  Yeah, that -- That would
9       be towards the Tierra Verde Bridge.
10  BY MR. CABALLERO:
11      Q.   Okay.  And the GPS track on Plaintiffs'
12  Exhibit 6 is the line that is black and white or
13  checkered that demarcates the path of travel of the
14  Statement vessel up and leading towards the time of
15  the incident, correct?
16      A.   Correct.
17      Q.   What the -- What the track shows is that
18  your vessel, the Statement boat, was essentially
19  hugging the starboard side or the easternmost side of
20  that Intracoastal Waterway almost all the way until
21  you get to the intersection, correct?
22          MR. DAVANT:  Objection.
23          MR. RYAN:  Objection.
24          MR. DAVANT:  Form.  Are -- are you
25      asking him a question or are you making a

1  statement, Counselor?
2  BY MR. CABALLERO:
3     Q.   That's what it shows, right, Mr. Knight?
4        MR. DAVANT: I'm asking:  Are you asking
5  him a question or are you making a statement
6  that you want him to confirm?
7        MR. CABALLERO:  Everything that I say to
8  Mr. Knight is a question.
9  BY MR. CABALLERO:
10    Q.   Correct?
11       MR. DAVANT:  Okay.  Objection to form to
12  the use of the word "hugging."  I'm not sure
13  what that means.
14  BY MR. CABALLERO:
15    Q.   Do you know what the word "hugging" means,
16  Mr. Knight?
17    A.   To me, the track looks like I'm pretty
18  much in the middle of the channel.
19    Q.   The red line through the white --
20       There's a -- a white path that we see.
21  And I'm going to delineate it.
22       This white path in between here, that
23  we're looking on Plaintiffs' Exhibit 6, that goes
24  towards the intersection, that's the Waterway,
25  correct (indicating)?

1        MR. DAVANT:  Objection.  Form.
2        THE WITNESS:  Yes.
3  BY MR. CABALLERO:
4     Q.   The red line in between the white path is
5  the center of the Intracoastal Waterway, correct?
6     A.   Yes.  I'm -- I'm operating on the -- on
7  the right side.  When you're heading east, I'm
8  supposed to be on that side of the channel, within
9  the channel, is the appropriate place for me to be.
10    Q.   Fair enough.  But what I'm saying,
11  Mr. Knight, is this GPS track --
12       And you know how to read GPS tracks,
13  right?
14    A.   Yes.
15    Q.   This GPS track shows the --
16    A.   Shows me a little left of center.
17    Q.   You believe this is a little left of
18  center?
19    A.   Yes.  Because I'm still in the channel, in
20  reference to the channel markers.
21    Q.   With regard to Plaintiffs' Exhibit 6, by
22  the way, we see the track where it comes in from the
23  bottom of the page, from Tierra Verde, leading
24  towards the channel.  Do you believe you passed the
25  large motor yacht in this location here (indicating)?

1        MR. DAVANT: Hold on.  Objection.  Lack
2  of foundation.  Predicate.
3        You can answer if you understand the
4  question, Mr. Knight.
5        THE WITNESS:  No.
6  BY MR. CABALLERO:
7     Q.   Okay.  Do you --
8     A.   Prior to that.
9     Q.   -- believe --
10       Do you believe you passed the large motor
11  yacht off the page down towards the bottom, much
12  closer to the Tierra Verde Bridge?
13       MR. DAVANT:  Hold on.
14       THE WITNESS:  Correct.
15       MR. DAVANT:  Object.  Hold on.
16       Mr. Knight, please wait until I make an
17  objection before you answer questions.
18       Objection.  Lack of predicate.  Lack of
19  foundation.
20       You can answer the question if you
21  understand.
22       THE WITNESS:  Yes.
23  BY MR. CABALLERO:
24    Q.   So, we see on Plaintiffs' Exhibit 6 the
25  track that leads from Tierra Verde to the

1  intersection of the two channels where the incident
2  occurred, correct?
3        MR. DAVANT:  Objection.  Predicate.
4  Foundation.
5  BY MR. CABALLERO:
6     Q.   Correct?
7        MR. DAVANT:  Same objection.
8  BY MR. CABALLERO:
9     Q.   Mr. Knight?
10       MR. DAVANT:  Same objection.
11       THE WITNESS:  I see -- I don't see where
12  the -- I see the GPS line, and it seems to
13  stop at the green channel -- at the green
14  marker prior to the intersection.
15  BY MR. CABALLERO:
16    Q.   So, you don't see any further track going
17  this way (indicating)?
18       MR. DAVANT:  Objection.  Form.
19  BY MR. CABALLERO:
20    Q.   On -- On Plaintiffs' Exhibit 6, towards
21  the intersection?
22       MR. DAVANT:  Same objection.
23       THE WITNESS:  Based upon the drawing
24  you're showing me, it stops at that green
25  channel marker.

23 (Pages 86 - 89)

Page 90

1 BY MR. CABALLERO:
2     Q.   Okay.  In Plaintiffs' Exhibit 6, would it
3 be accurate to say, Mr. Knight, that once you entered
4 the channel on September 2nd, 2019 --
5         And we'll say the channel starts here; is
6 that fair (indicating)?
7         MR. DAVANT:  No.  Objection.  Form.
8 BY MR. CABALLERO:
9     Q.   Mr. Knight?
10    A.   The channel starts way back at the bridge,
11 Counsel.
12    Q.   No, I understand.  I understand.
13        But let's say we -- we use this as the
14 reference point, okay (indicating)?
15        MR. DAVANT:  Objection.  Form.  It's an
16    improper hypothetical.
17 BY MR. CABALLERO:
18    Q.   All right.  Let's go back and even go
19 further.
20        So, once we have --  Assuming this to be
21 the track from your boat on the date in question,
22 would it be accurate to say that from the -- the very
23 moment we see this track at the bottom of the page,
24 until the time of the incident, which happened close
25 to the intersection --  Correct?

Page 91

1         MR. DAVANT:  Objection.  Form.  Calls
2     for speculation.
3 BY MR. CABALLERO:
4     Q.   Mr. Knight?
5     A.   Correct.
6         MR. DAVANT:  Same objection.
7 BY MR. CABALLERO:
8     Q.   So, we have the intersection here, we have
9 the track beginning here on Plaintiffs' Exhibit 6.
10 And I've marked them both between -- with red.
11        During this entire stretch, between the
12 intersection and where the tracks start on
13 Plaintiffs' Exhibit 6, would it be accurate to say
14 that, based on your knowledge and recollection, there
15 was no other vessel in front of your Statement boat
16 during this entire time that you're making your way
17 towards the intersection?
18        MR. DAVANT:  Ob- -- Objection.  Form.
19        THE WITNESS:  I do not recall, other
20     than the motor yacht that I passed, any other
21     boat.
22 BY MR. CABALLERO:
23    Q.   In terms of the pontoon boat, were you
24 able to see, when you were making your way towards
25 the intersection, once you passed the large motor

Page 92

1 yacht, were you able to see towards the starboard
2 side of your boat?
3     A.   Yeah, I was -- I was probably focused just
4 on going straight forward to the bridge and the
5 intersection.
6     Q.   Was there anything blocking your vision
7 towards the starboard side of your vessel that
8 prohibited you from seeing any other either obstacle
9 or oncoming vessel, anything towards the starboard
10 side of your vessel?
11        MR. DAVANT:  Objection.  Form.
12        THE WITNESS:  Not that I recall.
13 BY MR. CABALLERO:
14    Q.   Was there anything blocking you from
15 seeing any vessels towards the port side of your boat
16 as you were traveling towards the intersection
17 leading to Misener Bridge?
18    A.   Not that I recall.
19    Q.   Was there anything blocking your
20 visibility towards the front of your vessel, towards
21 the bow, that would block your ability to see vessels
22 directly in front of you while you were making your
23 way towards Misener Bridge?
24    A.   Not that I recall.
25    Q.   Where was Ms. Kintz located when you were

Page 93

1 traveling towards Misener Bridge, after you passed
2 the large motor yacht?
3     A.   She was sitting on the bench seat right
4 next to me.
5     Q.   Does she assist in keeping a lookout while
6 you guys travel?
7     A.   I would say from time to time, but she --
8         She's very short, so --  So, if she's
9 sitting down, you know, her --  There is no direct
10 line of sight for her.
11    Q.   At any point, did you see any type of
12 pontoon boat traveling erratic within the channel?
13    A.   I saw no other boat in the channel.
14    Q.   Did you see the pontoon boat in any of the
15 marshlands adjacent to the -- to the channel?
16    A.   I did not see the boat at all.
17    Q.   Did you see the pontoon boat traveling on
18 the northbound channel, towards Maximo Point, at any
19 point?
20    A.   No.
21    Q.   Did you see the pontoon boat traveling
22 south on that north/south channel, from Maximo Point
23 leading out towards the water?
24    A.   No, I did not.
25        (Thereupon, the document/item referred

24 (Pages 90 - 93)

Page 94

1 to was marked for identification as Plaintiffs'
2 Exhibit 7.)
3 BY MR. CABALLERO:
4    Q.   I'm going to mark as Plaintiffs' Exhibit 7
5 your answers to interrogatories, Mr. Knight.
6         I think you indicated you had reviewed
7 these prior to the deposition, correct?
8    A.   Correct.
9    Q.   You've seen these before, right?
10   A.   Yes.
11   Q.   And I think it's -- We have your
12 signature at the bottom?
13   A.   Correct.
14   Q.   You were asked in interrogatory number 4
15 to: "Describe in detail each act or omission
16 on the part of any party to this action that
17 you contend constituted negligence that was a
18 contributing legal cause of the incident in
19 question."
20        Do you recall that?
21   A.   Yes.
22   Q.   Your answer was that: "Erwin Rusli was
23 at fault for operating his pontoon boat without
24 a proper lookout and turning his vessel to port
25 in a narrow channel at a time when he was

Page 95

1 required to give way to my vessel."
2         Do you see that?
3    A.   Yes.
4    Q.   Would it be accurate to say that you never
5 saw Mr. Rusli turn the boat to port?
6         MR. DAVANT:  Objection.  Form.  Asked
7    and answered.
8         You can answer again, Mr. Knight.
9         THE WITNESS:  No, I never saw him turn.
10   I didn't see the boat.  But, obviously,
11   he turned in front of me based upon where
12   he -- we collided.
13 BY MR. CABALLERO:
14   Q.   And in terms of the way you collided with
15 Mr. Rusli's pontoon boat, it was essentially what we
16 could call, in effect, a T-bone collision?
17        MR. DAVANT:  Objection.  Form.
18 BY MR. CABALLERO:
19   Q.   Correct?
20   A.   I don't know if --
21        MR. DAVANT:  Objection to form.
22        THE WITNESS:  -- it was a T-bone
23   collision, but it was -- it was definitely a
24   collision based upon him -- him crossing the
25   front of my path.

Page 96

1         MR. DAVANT:  Mr. Caballero, you need to
2    let the witness answer the question and stop
3    asking him, "Correct, Mr. Knight," because
4    it's interrupting the objection.  And I'm
5    going to continue to have to interpose another
6    objection to that same question.
7         So, the witness is thinking about the
8    answer.  Please give him time to answer.
9    Okay?
10        MR. CABALLERO:  Well, I don't -- I don't
11   know if -- if we know he's thinking about it
12   or not, but --
13        MR. DAVANT:  Well, he is.
14        You giving him five seconds to answer
15   the question isn't sufficient.  So, please,
16   stop badgering him, stop harassing him, and
17   please let him answer the question in the time
18   that he is allowed to take under the Rules of
19   Civil Procedure.
20        MR. CABALLERO:  No one is harassing
21   Mr. Knight.  Give me a break.
22 BY MR. CABALLERO:
23   Q.   So, Mr. Knight, your assessment of what
24 happened is just based on an after the fact guess as
25 to how this incident happened, right?

Page 97

1         MR. DAVANT:  Objection.  Form.
2    Argumentative.  Speculative.  Misstates facts
3    in evidence.
4         You can answer, Mr. Knight.
5         THE WITNESS:  My assumption is the fact
6    that we were in the -- in the middle of the
7    channel, and obviously, they came from outside
8    of the channel and apparently crossed our
9    path, and that's when the incident occurred.
10 BY MR. CABALLERO:
11   Q.   But that's an assumption that you have no
12 factual basis for, other than you're just speculating
13 about how this could have happened, true?
14        MR. DAVANT:  Objection.  Form.
15   Argumentative.  Asked and answered.
16 BY MR. CABALLERO:
17   Q.   You can answer.
18   A.   I told you what I think happened.
19   Q.   And my question to you is: Is that just
20 speculation, where you're putting the pieces together
21 after the fact?
22        MR. DAVANT:  Objection.  Form.
23   Argumentative.  Asked and answered.
24        THE WITNESS:  I just told you that's
25   what I think happened.

25 (Pages 94 - 97)

1 BY MR. CABALLERO:
2　Q.　So, walk us through when you -- when you
3 make -- When the collision occurs, what happens
4 then?
5　A.　When -- I was -- I was thrown around.
6 Tara managed to stay in her seat.
7　　And then, as soon as we got our bearings,
8 we realized that, you know, the collision had
9 happened.  I had Tara call.  We turned around
10 immediately to, you know, go back to the vessel.  And
11 Tara had called 9-1-1.  I told her to call 9-1-1
12 right away.
13　　We pulled up alongside the vessel, and at
14 that point in time, the driver didn't seem to be
15 capable of driving.  He was not physically hurt, but
16 due to the situation, they requested help.
17　　Tara got on their boat, and she drove
18 their pontoon boat back to the dock.
19　Q.　What was the -- your recollection of the
20 physical status of -- of the passengers on the
21 pontoon boat?
22　A.　The -- Three people, the driver and two
23 other ladies were sitting in the back seat, that they
24 were not injured at all.  And the one -- the other
25 passenger, she was knocked unconscious at the time

1 when we pulled up.
2　Q.　At any point, was there the need to do any
3 type of life-saving measures to any of the
4 passengers?
5　A.　No.  It was more -- At that point in
6 time, we just reacted to try and get them back to the
7 dock to make sure she got any medical assistance she
8 needed.
9　Q.　The woman who was knocked unconscious,
10 who -- who was that; do you know?
11　A.　I don't know.
12　Q.　Was she unconscious the entire time
13 that -- that the -- that the boat, the pontoon boat
14 was being taken back to the marina?
15　A.　I believe so, but I was not there.  I
16 don't know.
17　Q.　Did you speak to Ms. Kintz after the
18 incident occurred on that same day?
19　A.　Yes, we -- We obviously went -- We came
20 back home after the incident.
21　Q.　Did Ms. Kintz communicate to you that the
22 woman who was unconscious was seriously injured?
23　A.　She did not know.  She was focused on
24 getting the boat there.
25　　And the paramedics were -- were already

1 there and waiting.  So, she obviously gave her
2 statement to -- to the police, but they all -- the --
3　　The three other people on the boat all
4 were -- You know, obviously walked off -- walked off
5 under their own power.  They got into the ambulance,
6 and they all left very quickly from the time they got
7 back to the dock.
8　Q.　Were you present when the fire rescue
9 folks came in, and to help these passengers?
10　A.　No, I had -- I -- I had lost both motors,
11 and I was on a single engine.  So, it took me a while
12 to idle back at -- idle back to the dock.
13　　They were already gone, and then the --
14　　I pulled up, and the Sheriff's Office, and
15 then soon after, the -- the marine or the fishing --
16 FWC came on my boat, went -- questioned me, went
17 through, searched the boat, and went through my GPS.
18　　(Thereupon, the document/item referred
19 to was marked for identification as Plaintiffs'
20 Exhibit 8.)
21 BY MR. CABALLERO:
22　Q.　I'm going to -- I'm going to mark as
23 Plaintiffs' Exhibit 8 a drawing.
24　　Do you have a recollection of -- of doing
25 this drawing for the police?

1　A.　Yes.
2　Q.　Does this look like the drawing?
3　A.　I believe so.
4　Q.　It -- it --  The drawing you put together
5 was on the day of the incident, right?
6　A.　Yes.
7　Q.　This drawing depicts that you passed the
8 large motor yacht much closer to the intersection
9 than to the Tierra Verde Bridge, correct?
10　　MR. DAVANT: Objection. Form.
11　　THE WITNESS: Yeah. Obvi-- obviously,
12　we were all shaken at the time.  So, you know,
13　when I drew that, that was --
14　　You know, they just told me to try and
15　draw, you know, my best -- what I remembered
16　best.  I mean, obviously, they said that that
17　had no relevance to distance.  Because I was
18　not sure.
19 BY MR. CABALLERO:
20　Q.　This drawing that's marked as Plaintiffs'
21 Exhibit 8 is not consistent with your testimony today
22 about where you passed that large motor yacht,
23 correct?
24　　MR. DAVANT: Objection. Form.
25　Argumentative.

26 (Pages 98 - 101)

Page 102

1      THE WITNESS:  Like I said, all I know is
2   that I -- I drew whatever, you know, at that
3   time.  It was not to scale.
4  BY MR. CABALLERO:
5      Q.   Were you trying to be honest with the
6   depiction of, of -- of the way this incident
7   happened, when you drew this?
8      MR. DAVANT:  Objection to form.
9      THE WITNESS:  All I was trying to depict
10   is what I had told them, that we had passed a
11   motor yacht initially, and then were lined up
12   heading directly towards the bridge.
13  BY MR. CABALLERO:
14      Q.   And the --
15      So that you're saying, actually, is that
16   the -- this would be the large motor yacht, what I've
17   circled here, right, in red --
18      A.   Yes.
19      Q.   -- on Plaintiffs' Exhibit 8 (indicating)?
20      A.   Yes.
21      Q.   What you're saying is the large motor
22   yacht actually belongs more along the -- the second
23   circle here (indicating)?
24      A.   No.  Probably somewhere in between the two
25   circles.

Page 103

1      Q.   So that the large motor yacht belongs, in
2   this drawing, somewhere along here, where -- where
3   it's circled in red (indicating)?
4      MR. DAVANT:  Objection to form.
5      THE WITNESS:  To the best of my
6   recollection, yes.
7      MR. CABALLERO:  And I'll mark as
8   Plaintiffs' Exhibit 8 [sic] the drawing with
9   the circle, with the red circle depicting
10   the -- the location where the red motor -- the
11   large motor yacht apparently should be.
12      MR. DAVANT:  And I'll object to that
13   marking.
14      (Thereupon, the document/item referred
15   to was marked for identification as Plaintiffs
16   Exhibit 9.)
17      MR. DAVANT:  How much longer do you
18   have, Mr. Caballero?
19      MR. CABALLERO:  Not too much longer, and
20   then I'll hand it off to Mr. Butler.
21      MR. DAVANT:  All right.  It's 12:30.
22   So, we've only taken one break in
23   two-and-a-half hours.
24      MR. CABALLERO:  Well, why don't we do
25   this.  Let's take a quick five minute, and

Page 104

1   then I'll finish up rather quickly after that.
2      MR. DAVANT:  All right.
3      THE VIDEOGRAPHER:  All right.  All
4   right.  The time is now 12:25 p.m., and we are
5   off the record.
6      (Recess taken in the proceedings from
7   12:25 p.m. to 12:35 p.m., after which the following
8   proceedings were had:)
9      CERTIFIED REPORTER:  Just while we are
10   still off, just to let you know, the last
11   document was actually marked as Exhibit 9, the
12   last document referred to.
13      MR. CABALLERO:  Okay.
14      THE VIDEOGRAPHER:  The time is now
15   12:35 p.m. and we are off -- sorry -- we are
16   on the record.  Thank you.
17  BY MR. CABALLERO:
18      Q.   Do you agree, Mr. Knight, that on
19   September 2nd, 2019, when you were operating the
20   Statement boat, that you were required to comply with
21   the rules of the road for boating?
22      MR. DAVANT:  Objection.  Form.  Calls
23   for a legal conclusion.
24      THE WITNESS:  I don't understand the
25   question.

Page 105

1  BY MR. CABALLERO:
2      Q.   Do you know what -- what the rules of the
3   road are for boaters?
4      A.   Correct.
5      Q.   And when you were operating the Statement
6   boat on September 2nd, 2019, at all times that you
7   were at the helm, you were required to comply with
8   the rules of the road, correct?
9      MR. DAVANT:  Objection.  Form.  Calls
10   for a legal conclusion.  You can answer,
11   Mr. Knight.
12      THE WITNESS:  Correct.
13  BY MR. CABALLERO:
14      Q.   When you were operating the Statement boat
15   in the channel leading up to the time of the incident
16   on September 2nd, 2019, you were required at all
17   times to maintain a proper lookout for other vessels,
18   correct?
19      MR. DAVANT:  Objection.  Form.  Legal
20   conclusion.
21      THE WITNESS:  Correct.
22  BY MR. CABALLERO:
23      Q.   And the reason you are required to do that
24   is so that you can avoid a collision with other
25   vessels in the waterway, true?

27 (Pages 102 - 105)

1       MR. DAVANT: Objection. Form.
2  Speculation.
3       THE WITNESS: True.
4 BY MR. CABALLERO:
5    Q.  These concepts that we're talking about
6 are concepts that you implement every time you're out
7 on the water, true?
8       MR. DAVANT: Objection. Form.
9       THE WITNESS: Correct.
10 BY MR. CABALLERO:
11   Q.   And the rules of the road are boating
12 practices and standards that you've implemented since
13 you first began boating as a young man, true?
14       MR. DAVANT: Objection. Form.
15       THE WITNESS: Yes. I have a lot of
16  experience, and I'm a very safe boater.
17 BY MR. CABALLERO:
18   Q.   In this situation, assuming you failed to
19 keep a proper lookout when you took your eyes off the
20 proverbial road and water, that would be a violation
21 of the rules of the road, true?
22       MR. DAVANT: Objection. Vague.
23  Ambiguous. Calls for speculation. It's an
24  improper hypothetical.
25       You can answer if you understand the

1  question, Mr. Knight.
2       THE WITNESS: No. I was still operating
3  properly. I'm allowed to reference my gauges
4  and a line of sight. So, I feel that I was
5  operating properly in the channel.
6 BY MR. CABALLERO:
7    Q.   When you're --
8       When you were operating the Statement boat
9 on September 2nd, 2019, at all times you were
10 required to proceed at a safe speed so that you could
11 take proper and effective action to avoid a collision
12 if that situation arose when you were out on the
13 water, true?
14       MR. DAVANT: Objection. Form. Calls
15  for a legal conclusion.
16       You can answer if you understand,
17  Mr. Knight.
18       THE WITNESS: Yes, we were operating at
19  a safe speed.
20 BY MR. CABALLERO:
21   Q.   When you were out on the water operating
22 the -- the Statement boat on September 2nd, 2019, you
23 were required to use all available means, available
24 to you, to determine if a risk of collision exists
25 while you were on the boat in the waterway, true?

1       MR. DAVANT: Objection. Vague.
2  Ambiguous. Calls for a legal conclusion.
3       THE WITNESS: I don't understand what
4  you mean.
5 BY MR. CABALLERO:
6    Q.   Is it -- Assume --
7       Well, I'll ask you this first.
8       Do you agree that you have to make use,
9 when you were out on the water on September 2nd,
10 2019, of your radar equipment?
11       MR. DAVANT: Are you done with the
12  question, Mr. Caballero?
13       MR. CABALLERO: Yes.
14       MR. DAVANT: Objection. Form. Vague.
15  Ambiguous. Incomplete hypothetical.
16       THE WITNESS: I do not know that it's
17  required for me to have my radar on in order
18  to operate my vessel.
19 BY MR. CABALLERO:
20   Q.   The radar equipment that you had out on
21 the boat on September 2nd, 2019 was fully
22 operational, correct?
23   A.   Correct.
24   Q.   And as you sit here today, even today, you
25 do not know if the rules of the road require you to

1 use your radar equipment if it's fitted and
2 operational for your boat?
3       MR. DAVANT: Objection. Form.
4  Argumentative. And it misstates the witness's
5  prior testimony.
6       You can answer if you understand,
7  Mr. Knight.
8       THE WITNESS: Yes, I don't know of any
9  Coast Guard rule that requires me to turn my
10  radar on every time I get in my boat. If
11  that's the question you're asking me.
12 BY MR. CABALLERO:
13   Q.   Do you know if the use of the radar can
14 assist in avoiding collisions with other vessels?
15       MR. DAVANT: Objection. Form. Vague.
16  Ambiguous. Speculative.
17       THE WITNESS: The radar has multiple
18  uses, for navigation, for weather, and for
19  avoiding, obviously, collisions.
20 BY MR. CABALLERO:
21   Q.   With the Garmin unit, the radar that was
22 installed for the boat, the Statement boat that you
23 had on September 2nd, 2019, do you know if there was
24 a way to set the radar range on that radar?
25   A.   I'm sure you can tell the range on the

Page 110

1 radar.
2    Q.   But, obviously, you were not using the
3 radar on September 2nd, 2019 to -- for any purpose,
4 correct?
5    A.   Correct.
6    Q.   On September 2nd, 2019, when you were
7 operating the Statement boat, you did not use the
8 radar, that was operational, on the Statement to
9 assist you in seeking to avoid potential collisions
10 with other vessels while you were on the -- the
11 water?
12       MR. DAVANT: Objection. Form. Calls
13    for legal conclusion, and it's argumentative.
14       You can answer, Mr. Knight.
15       THE WITNESS: The radar was not on.
16 BY MR. CABALLERO:
17    Q.   So the answer to my question is yes,
18 correct?
19       MR. DAVANT: Objection to form. Asked
20    and answered.
21       THE WITNESS: I did not have the radar
22    on, correct.
23 BY MR. CABALLERO:
24    Q.   Did you believe that the -- the radar
25 could assist you in potentially avoiding collisions

Page 111

1 with other vessels on the water on September 2nd,
2 2019?
3       MR. DAVANT: Objection. Form.
4    Speculative.
5       THE WITNESS: The radar doesn't work
6    very good inland, by the way. So, I never use
7    it. So, I couldn't tell you. I don't know.
8 BY MR. CABALLERO:
9    Q.   Did you take any type of action, evasive
10 action, to try to avoid the collision with the
11 pontoon boat?
12    A.   No. I did not see the pontoon boat as it
13 drove across our path, so I was not able to take any
14 evasive action.
15    Q.   When you hit the pontoon boat, did you
16 even know that you had hit a vessel with people on
17 it?
18       MR. DAVANT: Objection. Form. It
19    mischaracterizes the witness's testimony and
20    the facts in evidence.
21       THE WITNESS: Obviously, at impact, we
22    realized we hit another vessel.
23 BY MR. CABALLERO:
24    Q.   At the time you hit the pontoon boat, you
25 knew you had hit a boat?

Page 112

1    A.   Well, at that split second --
2       MR. DAVANT: Objection. Form.
3       THE WITNESS: -- that --
4       MR. DAVANT: Hold on. Hold on.
5    Mr. Knight. Hold on. Hold on. Hold on.
6       Objection. Form. Mischaracterizes the
7    witness's testimony. Assumes facts not in
8    evidence.
9       You can answer, Mr. Knight.
10       THE WITNESS: We knew that we hit
11    another -- We knew that we had hit something
12    and it was a vessel.
13 BY MR. CABALLERO:
14    Q.   Did you hear any people scream or anything
15 like that when you hit the pontoon boat?
16    A.   No.
17    Q.   Do you agree that when you overtake a
18 vessel, Mr. Knight, you're required to take
19 substantial and early action to make your presence
20 known that you're doing the overtaking maneuver?
21       MR. DAVANT: Objection. Form.
22    Incomplete hypothetical. Speculative. Calls
23    for a legal conclusion.
24       You can answer, Mr. Knight.
25       THE WITNESS: Any time you are

Page 113

1    taking -- overtaking a vessel in the
2    Intracoastal, you are always supposed to
3    keep a safe distance.
4 BY MR. CABALLERO:
5    Q.   Do you agree, Mr. Knight, that on -- that
6 at all times that you've operated your boat,
7 including on September 2nd, 2019, your job as the
8 operator of the boat, when you're at the helm, is to
9 see what's there to be seen in front of you, so you
10 can take whatever preventative action you need to to
11 avoid a collision?
12       MR. DAVANT: Objection. Form.
13       THE WITNESS: Of course. Any time
14    you're operating a boat, you always do your
15    utmost to ensure that you don't hit another
16    boat or another object.
17 BY MR. CABALLERO:
18    Q.   And whenever you overtake another vessel,
19 you are required to -- to keep out of the way of the
20 vessel you are overtaking, correct?
21       MR. DAVANT: Objection. Form.
22       THE WITNESS: Yes. You are always
23    supposed to try and give as much room as
24    poss- -- as possible when you are navigating
25    around another vessel you are overtaking.

29 (Pages 110 - 113)

Page 114

1 BY MR. CABALLERO:
2    Q.   And that is equally applicable on
3 September 2nd, 2019, correct, when you were on the
4 water?
5    A.   Of course.
6    Q.   And then do you agree that when you
7 overtake another vessel, you are required to sound
8 the horn twice if you are going to pass on the port
9 side?
10    A.   If the vessel is in the channel, to the
11 best of my knowledge.
12    Q.   And the whole purpose of sounding off
13 twice is so that the overtaken vessel can respond
14 that it's okay to pass by sound- -- by responding
15 with two short blasts to give you that okay to go;
16 true?
17        MR. DAVANT: Objection. Form.
18        THE WITNESS: If you're talking maritime
19        rules, that -- that, to the best of my
20        knowledge, that's correct.
21 BY MR. CABALLERO:
22    Q.   Did the Statement boat you were operating
23 on September 2nd, 2019 have an operational horn?
24    A.   Yes.
25    Q.   With regard to the maritime rules of the

Page 115

1 road, would it be accurate to say, Mr. Knight, that
2 at all times that you've operated a boat and in -- in
3 the waters of the United States, including inland and
4 in international waters --
5        Well, I'll ask it a different way.
6        Would it be accurate to say, Mr. Knight,
7 that on September 2nd, 2019, the rules of the road
8 are part and parcel of the way you conduct yourself
9 as a boat operator?
10        MR. DAVANT: Objection. Form. Vague.
11        Ambiguous.
12        THE WITNESS: I always operate a boat in
13        a safe manner per the navigational rules.
14 BY MR. CABALLERO:
15    Q.   The navigational rules, Mr. Knight, are
16 not just legal rules, but they are the manner in
17 which you must practice good seamanship when you're
18 out on the boat, true?
19        MR. DAVANT: Objection. Form. Calls
20        for a legal conclusion.
21        THE WITNESS: Yes, I believe all boat
22        drivers have to do that.
23 BY MR. CABALLERO:
24    Q.   I know you indicated that the -- you felt
25 like the, the -- the radar doesn't work so good in

Page 116

1 inland waters.  Do you remember that?
2    A.   Yes.
3    Q.   Prior to September 2nd, 2019, when was the
4 last time you used the radar in inland waters?
5    A.   I can't remember.
6    Q.   Prior to coming into the inlet leading to
7 Tierra Verde, were you operating your boat out in the
8 ocean, on --
9    A.   Yes.
10    Q.   -- on September 2nd, 2019?
11    A.   Yes.
12    Q.   Did you utilize your radar out on -- when
13 you were out on the ocean on September 2nd, 2019?
14    A.   No.
15    Q.   In looking back at the situation,
16 Mr. Knight, now that we've gone over the incident and
17 how it occurred and all that, looking back at the
18 situation, is there anything you would have done
19 differently?
20        MR. DAVANT: Objection to form.
21        THE WITNESS: No.
22 BY MR. CABALLERO:
23    Q.   In your mind, the way you operated the
24 vessel, from the time you left the property on
25 Redington until the time of the collision, was, in

Page 117

1 your mind, completely appropriate?
2        MR. DAVANT: Objection to form.
3        THE WITNESS: Correct.
4 BY MR. CABALLERO:
5    Q.   There's not one single thing you think
6 you would have done differently, even today,
7 correct?
8        MR. DAVANT: Objection. Form.
9        Speculative. Asked and answered.
10        Argumentative.
11        THE WITNESS: No, I feel I did
12        everything proper.
13 BY MR. CABALLERO:
14    Q.   Would it be accurate to say that you
15 will -- that following the September 2nd, 2019
16 incident, and through today, you've continued to
17 operate your boat in the same manner in which you
18 operated it on September 2nd, 2019?
19        MR. DAVANT: Objection to form.
20        THE WITNESS: I always operate my boat
21        in a safe manner.
22 BY MR. CABALLERO:
23    Q.   Which is the way you -- you believe you
24 operated it on September 2nd, 2019?
25        MR. DAVANT: Same objection. Form.

30 (Pages 114 - 117)

Page 118

1     THE WITNESS: Correct.
2     MR. CABALLERO: All right. I really
3  don't have any other questions.
4     Mr. Butler will have a few for you, and
5  then I may have a few minor follow-ups after
6  that. But thank you for your patience.
7     MR. BUTLER: I do. I do. I'm ready.
8         DIRECT EXAMINATION
9  BY MR. BUTLER:
10    Q.   Mr. Knight, I'm familiar with that
11 intersection out there by Misener Bridge.
12    Would you agree with me that there's no
13 sawgrass out there, no mangroves out there, no stilt
14 houses out there within a hundred yards of this
15 intersection?
16    A.   Yeah, I'd -- I'd agree to that.
17    Q.   Okay. So, when this 22-foot pontoon boat
18 is somewhere there in proximity to your vessel, how
19 could you not see it?
20    MR. DAVANT: Objection. Form.
21 Argumentative.
22    THE WITNESS: Because I was focused on
23 just what was in front of me in the channel,
24 and I did not see them because they were not
25 in the channel.

Page 119

1  BY MR. BUTLER:
2     Q.   But I believe, sir, did you not testify
3  that you were, one, distracted by Tara Kintz with
4  regard to the stereo, right?
5     MR. DAVANT: Objection. Form.
6  Misstates the witness's prior testimony.
7     THE WITNESS: Briefly, for a second,
8     yes. But I had been watching exactly where
9     we -- We were obviously lined up right in the
10    middle of the channel, headed towards the
11    Misener Bridge.
12 BY MR. CABALLERO:
13    Q.   And did you not also say that you were
14 distracted and looking down at your GPS at the time
15 of the collision?
16    MR. DAVANT: Objection. Form.
17    THE WITNESS: Correct.
18 BY MR. BUTLER:
19    Q.   Do you even know where this pontoon boat
20 came from prior to the collision?
21    A.   Obviously, it came out -- out of the --
22 out -- out of the southeast side of the channel
23 crossing. And --
24    Q.   You mean -- You mean this pontoon boat
25 was outside of the channel prior to you coming up to

Page 120

1  the intersection?
2     A.   Correct.
3     Q.   Okay. Did you see it there?
4     A.   No. I didn't see it in the channel. So,
5  obviously, it wasn't -- If it wasn't in the channel,
6  it had to be outside the channel.
7     Q.   Okay. You, in relation to one of
8  Mr. Caballero's questions, you said that you believe
9  you have the right to look down at your gauges,
10 right?
11    A.   To reference, yes.
12    Q.   Yeah. Is one of those gauges the stereo?
13    A.   Well, I was looking at --
14    I was answering a question for her and
15 then referencing my GPS.
16    Q.   Isn't it true, Mr. Knight, that at the
17 time of the collision, neither you nor Ms. Kintz had
18 your eyes on the road, right, on the waterway?
19    MR. DAVANT: Objection to form.
20    THE WITNESS: I don't understand the
21    question.
22 BY MR. BUTLER:
23    Q.   I'll restate it for you.
24    Isn't it true --
25    A.   Okay.

Page 121

1     Q.   -- that, at the time of the collision,
2  neither you nor Ms. Kintz had your eyes on the
3  waterway, on the roadway in front of you?
4     MR. DAVANT: Objection to form.
5     THE WITNESS: No, I had -- I had -- I --
6     As I stated before, I had referenced
7     down to the GPS and the gauges, and that's
8     when the incident occurred. So, correct.
9  BY MR. BUTLER:
10    Q.   So my question --
11    So my question is accurate, that you did
12 not have your eyes on the roadway, right?
13    MR. DAVANT: Objection.
14    THE WITNESS: At the time of --
15    MR. DAVANT: Form. Hold on.
16    Objection. Form. Misstates the
17    witness's testimony.
18    THE WITNESS: Correct.
19 BY MR. BUTLER:
20    Q.   Now, I know Mr. Caballero has established
21 with you that you've testified you did not have the
22 radar on, but if you did have the radar on, would it
23 not have picked up this pontoon boat in that close of
24 proximity to you?
25    MR. DAVANT: Objection. Form.

31 (Pages 118 - 121)

Page 122

1    Speculation.
2         THE WITNESS: I don't know if it would
3    have picked it up at that speed. I can't --
4    BY MR. BUTLER:
5         Q.   At what speed?
6         A.   -- tell you.
7              At the cruising speed I was at.
8         Q.   What cruising speed were you at?
9              At the time of the collision, what
10   cruising speed were you at?
11        A.   I already stated, I estimated 30, 35 miles
12   an hour.
13        Q.   Has it been your experience that the radar
14   on that vessel does not work when you're going 30 to
15   35 miles an hour?
16        A.   In close range? The only time I've used
17   the radar is when we're offshore.
18        Q.   No, I understand that.
19             But if you came from Tierra Verde and had
20   the radar on and you approached the channel, doesn't
21   it logically follow that the radar on your vessel
22   would have picked up that pontoon boat?
23             MR. DAVANT: Objection. Form.
24             THE WITNESS: I --
25             MR. DAVANT: Speculation.

Page 123

1              THE WITNESS: I don't use the radar
2        inshore, so I can't tell you if it would work.
3    BY MR. BUTLER:
4         Q.   Okay. Does the radar have any kind of
5    warning on it when you get close to something? Is
6    there any kind of warning that goes off?
7         A.   Not to my knowledge.
8         Q.   I'm not real clear on your answer when
9    Mr. Caballero asked you. At the time of the
10   collision, were you sitting or standing, if you
11   recall?
12        A.   I don't recall.
13        Q.   What's your height, Mr. Knight?
14        A.   Five-eight.
15        Q.   When your boat is on plane and you're
16   looking forward to the bow, are you able to see over
17   the console?
18        A.   Yes.
19        Q.   Even when you're sitting?
20        A.   Yes.
21        Q.   I believe you testified that Ms. Kintz is
22   not able to see, because she's short enough, that her
23   vision is blocked? Am I saying that accurately?
24        A.   Yes.
25        Q.   What's her height?

Page 124

1         A.   Five foot.
2         Q.   I believe you testified that where the
3    crash occurred, you are in -- you were in the middle
4    of the channel? Am I saying that correctly?
5         A.   Yes, middle -- Left center of the
6    channel. Or, I'm sorry. Right center of the
7    channel.
8         Q.   Okay. And is it accurate to say that, as
9    you were approaching the collision point, you are on
10   the west side of -- of the crossing of those two
11   channels?
12        A.   Yes.
13        Q.   Okay. And you believe you were in the
14   middle of that channel on the west side of the -- the
15   crossing of those two channels, correct?
16        A.   Pretty much so, yes.
17        Q.   Okay. What's the width of that channel?
18   The one that you were in, what's the width of it?
19             MR. DAVANT: Objection to form.
20             You can answer if you know.
21             THE WITNESS: It varies, but I would
22        say, you know, several hundred yards.
23   BY MR. BUTLER:
24        Q.   Okay. Several hundred yards.
25             And you -- This is a channel you've been

Page 125

1    in hundreds of times, correct?
2         A.   Correct.
3         Q.   And so can you tell me how the pontoon
4    boat made up hundreds of yards or half of hundreds of
5    yards to get to the collision site by the time the
6    collision occurred?
7              MR. DAVANT: Objection. Form.
8         Speculation. Asked and answered. And
9        argumentative.
10             THE WITNESS: Well, obviously, if the
11        pontoon boat was on plane, that does -- at
12        whatever speed it was traveling.
13             He came outside the channel, and
14        obviously thought he could get across our
15        path, and misjudged the speed, and that's when
16        the collision happened.
17   BY MR. BUTLER:
18        Q.   Okay. If you would, listen to my
19   question.
20             Please tell me, when you're in the middle
21   of the channel on the west side of those two crossing
22   channels how this 22-foot pontoon boat made it all
23   the way to the middle of the channel to collide with
24   you.
25             MR. DAVANT: Objection. Form.

32 (Pages 122 - 125)

Page 126

1      Mr. Butler, he did listen to your
2  question. Your statement that -- asking him
3  to implies that he didn't the last time.
4      Your question calls for speculation,
5  it's argumentative, and it misstates his prior
6  testimony, and it has been asked and answered.
7      Mr. Knight can answer it for you again.
8      THE WITNESS: Well, I'm telling you,
9  just like I told you the last -- my last
10  statement.
11  BY MR. BUTLER:
12  Q.  Is that your answer?
13  A.  Yeah, my answer is, I just gave it to you
14  previous.
15  Q.  Mr. Knight, prior to this incident
16  occurring, how long were you looking down at the GPS?
17  A.  Just as a reference.
18  Q.  How long?
19  A.  Well, not even 60 seconds.
20  Q.  Okay. Would you say, then, that your eyes
21  were off the waterway for 60 seconds while you were
22  looking at the GPS?
23      MR. DAVANT: Objection. Form.
24  Misstates his testimony.
25      THE WITNESS: Yes. Referencing my

Page 127

1      gauges, looked down, and that's when the
2      impact happened.
3  BY MR. BUTLER:
4  Q.  And that was a yes to my question?
5      MR. DAVANT: Objection.
6      THE WITNESS: Yes.
7      MR. DAVANT: Form.
8  BY MR. BUTLER:
9  Q.  I'm going in sort of reverse order here
10  from the questions that Mr. Caballero asked you.
11      And one of them is, just to clean up some
12  things for me. Maybe -- maybe it was apparent.
13      But he asked you who is your cell phone
14  provider. And my question is: Who was your cell
15  phone provider as of the date of this incident in
16  September of 2019?
17  A.  I believe it was Verizon.
18  Q.  Okay. You also referenced a house that
19  you own over at Redington. You said relatives live
20  there. Which relative lived there?
21  A.  We have three houses. My son lives in
22  one, my niece lives in one, and my sister lives in
23  one.
24  Q.  So, Sean is your son. And I think you
25  told us your niece's name, but I don't remember.

Page 128

1  A.  That's Megan Barnes.
2  Q.  They live in separate -- three separate
3  houses?
4  A.  Yes. There's three houses in a
5  cul-de-sac.
6  Q.  Okay. So, the one where the Statement
7  is -- was kept during that time frame, who lives at
8  that residence?
9  A.  My sister.
10  Q.  What's your sister's name?
11  A.  Bonnie Barnes.
12  Q.  I didn't quite catch the gentleman's last
13  name that you were going to go meet, but I will just
14  call him Jon. You were going to meet Jon.
15      What time were you supposed to meet Jon at
16  The Big Catch?
17  A.  It was early afternoon.
18  Q.  Was there not a specific time --
19  A.  No. He's --
20  Q.  -- agreed on?
21  A.  He's the owner. So, he's typically there
22  most of the day.
23  Q.  I want to get an idea, so we'll know and
24  the Judge will know, how many hours did you have
25  operating the Statement before this crash occurred?

Page 129

1  A.  A lot. I would say a couple hundred
2  hours.
3  Q.  Okay. So, did you feel like there was any
4  part of the vessel you weren't accustomed to?
5  A.  No.
6  Q.  Now, in the FWC report, they indicate that
7  your speed at the time of the crash was 45 miles per
8  hour. Is that something you indicated to them?
9  A.  Well, I don't -- I don't recall, no.
10  Q.  Okay. Let's see here.
11      If I understand you correctly, just --
12      And this isn't about relationship or
13  anything. But Ms. Kintz doesn't live with you,
14  correct?
15  A.  Correct.
16  Q.  And she didn't back then --
17  A.  Correct.
18  Q.  -- on the date of the incident?
19  A.  No.
20  Q.  Once you got to the Redington house to
21  pick up the Statement, did you have any alcohol?
22  A.  No.
23  Q.  Did you have any alcohol before that time
24  frame?
25  A.  No.

33 (Pages 126 - 129)

Page 130

1   Q.   Do you know about what time this crash
2 occurred?
3   A.   I would say early afternoon.
4   Q.   Okay.  According to the FWC report, it was
5 about 2 p.m.  Does that sound consistent with your
6 recollection?
7   A.   Early afternoon, yes, sir.
8   Q.   Okay.  And on the vessel, when you and
9 Ms. Kintz finally got on and started heading towards
10 Saint Pete, was there any alcohol on the vessel?
11   A.   No.
12   Q.   Okay.  And, so, just to be clear, prior
13 to the collision, you had not consumed any alcohol?
14   A.   No.
15   Q.   And -- Okay.  I know you said you had
16 Red Bull and water with you?
17   A.   Yes.
18   Q.   And that made it on the vessel?
19   A.   Yes.
20   Q.   I have friends who bring that when they're
21 going to go drink.  Is, is -- Is --
22       Was that why you guys brought those two
23 specific fluids?
24   A.   No.
25       MR. DAVANT:  Objection.

Page 131

1       THE WITNESS:  Well, I --
2       MR. DAVANT:  Argumentative, speculative,
3   and misstates his testimony.
4 BY MR. BUTLER:
5   Q.   Go ahead.
6       MR. DAVANT:  And asked and answered.
7   He told you he hasn't drank alcohol that
8   day and he didn't.
9 BY MR. BUTLER:
10   Q.   Go ahead.
11       MR. DAVANT:  Go ahead, Mr. Knight.
12   Answer again for Mr. Butler.
13       THE WITNESS:  I like to drink Red Bull.
14 BY MR. BUTLER:
15   Q.   Okay.  Do you drink alcohol, sir?
16   A.   Occasionally.
17   Q.   Okay.  Prior to today, when is the last
18 time you drank alcohol?
19       MR. DAVANT:  Objection.  What's the
20   relevance of that, Mr. Butler?
21       MR. BUTLER:  I'm getting to the
22   relevance of that.
23       MR. DAVANT:  Okay.
24       Go ahead, Mr. Knight.  You can answer.
25       THE WITNESS:  Probably over the

Page 132

1       Thanksgiving holiday.
2 BY MR. BUTLER:
3   Q.   Okay.  Did you drink alcohol the day
4 before this incident?
5   A.   Not to my recollection.
6   Q.   Okay.  Have you ever had any DUIs?
7   A.   Obviously, yes.
8   Q.   How many?
9   A.   Two.
10   Q.   How many times have you been arrested for
11 DUI?
12   A.   You mean how many times have I been pulled
13 over?
14   Q.   Okay.  How many times have you been pulled
15 over for DUI?
16   A.   Three.
17   Q.   When was the last?
18       MR. DAVANT:  I'm just going to object to
19   all of this line of questioning and move to
20   strike it from the record.
21       It's completely irrelevant, and it's
22   harassing, and it's argumentative with this
23   witness.
24       Go ahead and answer your questions,
25   Mr. Butler -- ask your questions.

Page 133

1       MR. BUTLER:  I did.  I asked him when
2   was the last one.
3       THE WITNESS:  Ten years ago.
4 BY MR. BUTLER:
5   Q.   Okay.  And in relation to those DUIs, did
6 you have to take any alcohol counseling programs?
7   A.   No.  They were both first-time offenses,
8 and I had to do driving school.
9   Q.   They were both first-time offenses?
10   A.   They were considered that.
11   Q.   Okay.  All right.  Have you received any
12 citations while you were boating?
13   A.   No.
14   Q.   Okay.  For this particular incident, you
15 received two citations from Fish and Wildlife,
16 correct?
17       MR. DAVANT:  Objection to form.
18       Are you talking about the ones that are
19   dismissed?
20       What citations are you referring to,
21   Mr. Butler?
22       MR. BUTLER:  My question pends -- is
23   pending.
24       MR. DAVANT:  Please rephrase --
25       Please answer your -- ask your question

34 (Pages 130 - 133)

Page 134

1    again.
2  BY MR. BUTLER:
3       Q.   Do you understand my question, sir?
4          MR. DAVANT: Madam Court --
5          THE WITNESS: Do I have any citation --
6          MR. DAVANT: -- Reporter --
7          No, no, no.  Stop.
8          THE WITNESS: I don't have any
9    citations.
10         MR. DAVANT: Mr. Knight, stop.
11   Mr. Knight, stop.
12         (Audio Interruption from some external
13   source: "... move your toe back to the natural
14   position.  Also help keep your toes in place
15   and ...)
16         MR. DAVANT: Mr. Knight, just a second.
17   Madam Court Reporter, can you read back
18   the question?
19         (Thereupon, the portion referred to was
20   read by the reporter as follows: "Question: For
21   this particular incident, you received two citations
22   from Fish and Wildlife, correct?")
23         MR. DAVANT: Objection to form.
24         Go ahead, Mr. Knight.
25         THE WITNESS: Yes, I believe that both

Page 135

1    parties were issued tickets.
2  BY MR. BUTLER:
3       Q.   Okay.  And one was for a violation of --
4    of -- of the navigational rules, improper lookout,
5    correct?
6          MR. DAVANT: Objection to form.
7          THE WITNESS: Yes.
8  BY MR. BUTLER:
9       Q.   And the other one was for careless
10   operation of the vessel, correct?
11         MR. DAVANT: Objection to form.
12         THE WITNESS: Well, I was issued a
13   citation but they were removed.
14  BY MR. BUTLER:
15      Q.   So that's a yes, careless operation of a
16   vessel?
17      A.   No, I do not --
18         MR. DAVANT: Objection to form.  Asked
19   and answered.
20         Go ahead, Mr. Knight.
21         THE WITNESS: No, I do not have any
22   citation for failure to -- for careless
23   operation of a vessel.
24  BY MR. BUTLER:
25      Q.   No.  My question is this.

Page 136

1          It is simply:  Were you issued a citation
2  for careless operation of the vessel?
3          MR. DAVANT: Objection.  Form.  Asked
4    and answered.
5          Go ahead and answer it for him again,
6    Mr. Knight.
7          THE WITNESS: Yes.
8  BY MR. BUTLER:
9       Q.   Okay.  And at the hearing, those were
10   dismissed because the FWC did not have an eyewitness
11   there, correct?
12         MR. DAVANT: Objection.  Form.  Calls
13   for speculation.
14         You can answer if you know, Mr. Knight.
15         THE WITNESS: No, I was not at the
16   hearing.
17  BY MR. BUTLER:
18      Q.   Okay.  You were the driver of the vessel
19   at the time of this collision, correct?
20      A.   Correct.
21      Q.   So, prior to this limitation action being
22   filed, you understood that FWC had once issued two
23   citations against you, correct?
24         MR. DAVANT: Objection to form.
25         THE WITNESS: Correct.

Page 137

1  BY MR. BUTLER:
2       Q.   I just want to make sure we're ruling out
3    any other possible causes here.
4          Is it your claim or contention that any
5    other vessel -- not talking about the Rusli vessel,
6    the pontoon vessel -- but that any other vessel was
7    involved in causing this collision?
8          MR. DAVANT: Objection to form.
9          THE WITNESS: I don't -- I don't believe
10         there was any other vessel involved that
11         caused it.
12  BY MR. BUTLER:
13      Q.   Okay.  Do you believe there were any other
14   conditions that may have been in play which helped
15   contributed -- contribute to this collision; by that
16   I mean what I've already said, some obstruction, the
17   weather, waves, anything?
18      A.   Well --
19         MR. DAVANT: Objection to form.
20         THE WITNESS: Go ahead, Charlie.
21         MR. DAVANT: No.  I just said objection
22   to form.
23         You -- you can answer, Mr. Knight.
24         THE WITNESS: I would --
25         Mr. Butler, I can tell you that I do

35 (Pages 134 - 137)

Page 138

1    remember that the weather was semi-overcast
2    and it wasn't the best that -- weather that
3    afternoon.
4  BY MR. BUTLER:
5    Q.   But you knew what the weather was, right?
6    A.   Yes, mm-hmm.
7    Q.   And you had made that trek plenty of
8  times?
9         MR. DAVANT: Objection to form.
10 BY MR. BUTLER:
11   Q.   Right?
12   A.   Correct.
13   Q.   Okay. Did it contribute in any way to
14 this incident occurring?
15   A.   Well, I can tell you that it wasn't the
16 best of -- It wasn't the best visibility, correct.
17   Q.   Do you know, before this collision
18 occurred, was the pontoon boat to your starboard?
19        MR. DAVANT: Objection. Form. Asked
20   and answered.
21        Answer it again, please, Mr. Knight.
22        THE WITNESS: Obviously, based upon the
23   impact and where the two boats collided, they
24   obviously came from the southeast side of the
25   channel. And where my boat hit their boat, it

Page 139

1    was obvious they came from that direction.
2        The only way the impact could occur.
3  BY MR. BUTLER:
4    Q.   So the answer is, yes, they were on your
5  starboard?
6    A.   Yes.
7         MR. DAVANT: Objection to form.
8  BY MR. BUTLER:
9    Q.   All right. And --
10        MR. DAVANT: Misstates his testimony.
11 BY MR. BUTLER:
12   Q.   What part of your vessel and their vessel
13 came together?
14   A.   The bow of my vessel and the front right
15 corner of their vessel.
16   Q.   Say that again, now.
17   A.   The bow of my vessel and the front
18 right -- front left corner of their vessel.
19   Q.   Okay. So, front port of their vessel?
20   A.   Correct.
21   Q.   Okay. And just to be clear, you didn't
22 see the actual collision?
23   A.   Correct.
24   Q.   Let's talk about those GPS units. Am I
25 right that there are two on the vessel?

Page 140

1    A.   Correct.
2    Q.   Okay. And I just want to make sure. I
3  know it's kind of late in the -- the deposition here
4  to be talking about the date, but I'm always talking
5  about the date, as Mr. Caballero was, of
6  September 2nd, 2019, right? That's the date of the
7  crash. Okay?
8    A.   Yes.
9    Q.   Okay. So, this collision occurs on
10 September 2nd, 2019, and on that date, you had two
11 GPS units on the vessel, right?
12   A.   Correct.
13   Q.   Okay. Now, did you get a letter from my
14 office asking you to retain the information on your
15 electronics?
16   A.   I didn't receive one personally, but, yes,
17 there was one delivered to my office. Yes.
18   Q.   Okay. In other words, it wasn't put in
19 your hands directly, but you got it, right?
20   A.   Yes. I got a letter from you, and I
21 turned that over to our insurance carrier at the
22 time.
23   Q.   Okay. And what did you do to preserve the
24 information on the GPS units?
25   A.   The -- the G- -- Everything is stored

Page 141

1  into the -- the database in the GPS units.
2    Q.   Okay. Again, this incident occurring in
3  September of 2019. You took those GPS units off your
4  vessel in June of 2020, didn't you?
5    A.   Yes. There was a total factory recall on
6  the units. And they paid -- my other captain got on
7  the phone with Garmin, he downloaded all the data to
8  the SIM card, which we had turned over to our
9  attorneys, and took the old units, sent them back,
10 and then they replaced them with new units.
11   Q.   And that was in June of 2020 that that was
12 done?
13   A.   Yes.
14   Q.   Okay. And so just to be clear, it was
15 June of 2020 that the units were taken off the
16 vessel, correct?
17   A.   Correct.
18   Q.   June of 2020, you said, I think you called
19 it a SIM card was used to try to back up data?
20   A.   Correct.
21   Q.   Okay. Did you do anything in September of
22 2019 to try to back up data?
23        MR. DAVANT: Objection. Form. It has
24   been asked and answered.
25        THE WITNESS: No, I --

36 (Pages 138 - 141)

Page 142

1    The day of the incident, the Sheriff's
2  Office and FWC came on the boat.  They went
3  through the GPS themselves.  They filmed it
4  all, which I would assume you guys have.
5    And I asked them, "Is there anything
6  else I need to do?"
7    They said, "No."
8    And, at that point, the data was already
9  stored into the machines.  So, once I got your
10  letter, I didn't -- I didn't feel like I had
11  to do anything other than if you guys wanted
12  to come down and get the data out, you were
13  more than welcome to.
14  BY MR. BUTLER:
15    Q.   Okay.  Was it ever explained to you that
16  the data could be pushed out the back, I think as
17  your expert witness called it?
18    A.   Well, I didn't realize that you could
19  download it into the -- to the card until Garmin was
20  replacing the units.
21    Q.   Yeah.  And I appreciate that.  Maybe not a
22  good question on my part.
23    Did you recognize, in September of 2019,
24  that if you continued to use those GPS units, they
25  only have so much capacity, and so the information

Page 143

1  for the crash date would be overwrit -- overwritten?
2    A.   No, I did not know that.
3    Q.   Okay.  You continued to use those GPS
4  units, even though you got my letter saying preserve
5  the data, right?
6    A.   Yes.  Like I said, the data was taken --
7    The information was taken from the law
8  enforcement officers at the dock.  And as far as I
9  was concerned, all the data was stored into the
10  machine.
11    Q.   After this incident occurred, did you go
12  back and look at the GPS to try to figure out what
13  the heck happened?
14    A.   I think we went back and looked a while
15  after that -- afterwards, and all it showed was, you
16  know, basically where the incident took place.
17    Q.   Okay.  Did it show your speed?
18    A.   No.  Just showed --  All we looked at was
19  the track line.
20    Q.   Okay.  Do you know if that -- that Garmin
21  has the capability to go back, if you look at it the
22  same day, that you can see how fast you were going at
23  any particular time?
24    A.   No, not to my knowledge.
25    Q.   Okay.  Did you ask anybody about that,

Page 144

1  whether that was a possibility?
2    A.   No.
3    Q.   Am I right that the Garmin shows, if
4  you -- if you get to the information quickly enough,
5  it shows the direction you were going?
6    A.   Well, I think that --
7    To the best of my knowledge, it -- that
8  they use the track line to show you your direction.
9  You should --
10    Q.   Right.  So, you're -- you're able to, on
11  that -- on those two units, to go back, if it's
12  recent enough, and see the line that you've gone,
13  right, the track that you've gone?
14    A.   Yeah, I know that they --  It tracks all
15  those lines.
16    Q.   But that's something you never saved,
17  right?
18    A.   It's saved in the computer.
19    Q.   Your belief is that even when you removed
20  those GPSs in June of 2020, that that information
21  from September 2nd of 2019 would still be on there?
22    A.   I believe whatever information was on
23  there was downloaded into the SIM card provided by
24  Garmin, yes.
25    Q.   Okay.  Has anybody confirmed that for you?

Page 145

1    A.   I believe that my captain did, who -- who
2  actually did the transfer, because he was on with
3  tech support from Garmin.  And I believe that was all
4  verified.
5    Q.   Okay.  Your --
6    A.   Through our attorneys as well.
7    Q.   I don't want to know what your
8  attorneys -- any conversation --
9    A.   Well --
10    Q.   -- between you and your attorneys.
11    So, but the download you're talking about
12  was June of 2020, right?
13    A.   Yes.
14    Q.   Okay.  And has anybody specifically
15  confirmed for you that, yeah, the data is still there
16  from September 2nd, 2019?
17    A.   No.  I -- All I know is what was down- --
18    They downloaded any data that was in those
19  machines.
20    Q.   All right.  I'm going to try to show an
21  exhibit here, hopefully.  Okay.  Maybe not.
22    Just one second.  Hold on.
23    (Mr. Butler's assistant entered his
24  office.)
25    MR. BUTLER:  Oh, it just took a while to

37 (Pages 142 - 145)

Page 146

1  populate?
2      ASSISTANT TO MR. BUTLER:  Mm-hmm.
3      MR. BUTLER:  Hopefully.
4      MR. DAVANT:  Frank, if you're going to
5  be a little while more, can we take about, you
6  know, 20 minutes to grab some lunch?  It's
7  already 1:30.
8      MR. BUTLER:  Yeah.  I think I'll finish
9  by 2.
10     MR. DAVANT:  Okay.  But you've got Tara
11 set at 2, right?
12     MR. BUTLER:  Yeah, but if you guys want
13 to push that back by a few minutes.  I'm going
14 to have [Zoom distortion] -- if Cosme is.
15     MR. DAVANT:  What?  If you don't mind,
16 can we take maybe 20 minutes now, and that way
17 you can get sorted out, and --
18     Because, you know, Cosme might have more
19 questions.  So I don't know that we'll end
20 right at 2.
21     MR. BUTLER:  Cosme, are you going to
22 have more questions?
23     MR. CABALLERO:  Right now, it doesn't
24 seem like it.  But, you know, I -- I can't
25 say yes definitively or no.  But right now,

Page 147

1  I'm -- I'm -- I don't have really anything.
2      MR. BUTLER:  I could be done by 1 -- by
3  2 o'clock if you guys -- if you guys can hang
4  out on that.
5      MR. DAVANT:  Yeah.  I mean, I'd -- I'd
6  prefer to take a break.  It's -- it's 1:30.
7  So I would like to take a break.
8      MR. BUTLER:  Okay.
9      THE VIDEOGRAPHER:  All right.
10     MR. DAVANT:  I'm -- I'm happy to do --
11 like come back at 2?  Just 30 minutes.
12     MR. BUTLER:  Yeah.  Charlie, are you
13 guys able to see the screen?  Can you see it?
14     MR. DAVANT:  Yeah, I can see it.  I can
15 see it, Frank.
16     MR. BUTLER:  All right.  Good deal.
17 Thank you.
18     MR. DAVANT:  All right.  So we'll come
19 back at 2?
20     MR. BUTLER:  2.
21     MR. DAVANT:  Thanks.
22     THE VIDEOGRAPHER:  All right.  The time
23 is now 1:31 p.m., and we are off the record.
24     (Lunch recess taken in the proceedings
25 from 1:31 p.m. to, 2:03 p.m. after which the

Page 148

1  following proceedings were had:)
2      MR. CABALLERO:  Whenever you are ready,
3  Ms. Court Reporter, we can go back on.
4      THE VIDEOGRAPHER:  Wait.  Let me start
5  the video.  It is now 2:03 p.m., and we are
6  back on the record.
7      MR. BUTLER:  Okay.  Frank Butler, back
8  on the record after about a 25, 30 minute
9  break here.
10     (Thereupon, the document/item referred
11 to was marked for identification as Deposition
12 Exhibit G.)
13 BY MR. BUTLER:
14     Q.  Mr. Knight, can you see the -- the exhibit
15 that's on the screen?
16     A.  Yes.
17     Q.  Okay.  It was going to be, originally,
18 Exhibit G, which we premarked them, so I'm stuck with
19 Exhib- -- with Exhibit G.
20     You see this is the letter dated
21 September 5th, 2019?
22     A.  Yes.
23     Q.  Okay.  And that's addressed to you at the
24 Ulmerton Road address?
25     A.  Correct.

Page 149

1      Q.  Okay.  And that 6056 Ulmerton Road, that's
2  a business address for you, isn't it?
3      A.  That's one of many.
4      Q.  Okay.  And was this letter received by
5  process server at that address?
6      MR. DAVANT:  Objection to form.
7      THE WITNESS:  I'm -- I'm not sure.  I
8  believe it was delivered to that address.
9  BY MR. BUTLER:
10     Q.  Okay.  Is it a letter that you received,
11 if not directly, from someone who accepted it, and it
12 eventually got in your hands?
13     A.  Yes.  I believe it was -- It was received
14 at that address and then our -- My other office is
15 up in -- at -- not at that location.
16     So, eventually, it did make it up to the
17 other office.
18     Q.  Okay.  This letter is dated, again,
19 September 5th, 2019, which is three days after the
20 incident that we've been talking about today.  You
21 recognize that?
22     A.  Yes.
23     Q.  All right.  And if you see, it has bold
24 print there, it says "Notification of Claim"?
25     A.  Yes.

38 (Pages 146 - 149)

Page 150

1    Q.   All right.  And did you read this letter
2 once you got it in your hands?
3    A.   Ah, I -- I don't -- I'm --
4         Not particularly.  I think it was
5 forwarded on directly to the insurance carrier.
6    Q.   Okay.  This letter states, amongst other
7 things -- and I'll just go through the first
8 paragraph:
9         "Please be advised that this maritime law
10    office has been retained by Erwin and Nadine
11    Rusli as a result of being struck by a 38-foot
12    outboard-driven vessel owned and operated by
13    you on September 2nd, 2019."
14    Do you see that?
15    A.   Yes.
16    Q.   It also says that:
17        "In this casualty, the 38-foot vessel
18    operated by you, crashed into the pontoon
19    boat's forward port side and caused extensive
20    physical injuries to Nadine Rusli."
21    Do you see that?
22    A.   Correct.
23    Q.   You had this letter in your hands, right?
24        MR. DAVANT:  Objection.  Form.
25        THE WITNESS:  I physically never had

Page 151

1    that letter in my hands.
2 BY MR. BUTLER:
3    Q.   You didn't?  You never read it?
4    A.   It was -- It was delivered to my other
5 office.  It was sent up and, then, it was immediately
6 sent over to the insurance company.
7    Q.   By you, correct?
8    A.   Not by me.  By my office manager at the
9 time.
10    Q.   Okay.  Well, did they tell you what --
11 what it was?
12    A.   Basically, yes.  It was in reference to --
13        It was a letter from an attorney in
14 reference to the boat incident.  And I said, "Well,
15 forward it directly to Stahl & Associates."
16    Q.   Okay.  You never asked your staff or
17 anyone else to send you a copy of it to see what it
18 said?
19    A.   At -- at that part, all I assumed, that
20 you were asking for all the insurance coverage and
21 everything that typically goes with any kind of
22 incident.
23    Q.   So the answer is no, you did not ask for a
24 copy of it to be put in your hands?
25    A.   No, I don't believe I did.

Page 152

1    Q.   Okay.  Furthermore, again picking up where
2 we just left off on that letter, it says:
3         "The injuries and monetary losses are
4    continuing in nature and appear they will
5    result in permanent injuries to Nadine Rusli."
6    Do you see that?
7    A.   Correct.
8    Q.   The last sentence of that first
9 paragraph says:
10        "The injuries may affect Ms. Rusli's
11    abilities to return to her work as a nurse."
12    Do you see that, too?
13    A.   Yes.
14    Q.   Although you received this letter, you had
15 it passed on to the insurance company, correct?
16    A.   Yes.
17    Q.   Okay.  After you received this letter, did
18 you do any investigation at all into what Ms. Rusli's
19 injuries were?
20    A.   No.  At that point, I -- I -- I'd followed
21 what the police had told me to do, and then once I
22 got the letter, I for- -- forwarded it to the
23 insurance company, which was, as far as I was
24 concerned, the appropriate action.
25    Q.   And when you say "the police," are you

Page 153

1 talking about the Fish and Wildlife people?
2    A.   I'm talking about both the Sheriff's
3 Office and the Fish and Game, at the day that -- the
4 day of the incident.
5         I asked them, "Is there anything else you
6 need me to do?"
7         They said, "No.  We've got all the
8 information.  If we need anything from you, we'll
9 notify you."
10        And the only thing they told me when I
11 left the dock is that -- that she was -- that her --
12 that she was hurt, but non-life -- All they could
13 say, that she had non-life-threatening injuries.
14    Q.   Okay.
15    A.   Per the -- per the law enforcement.
16        They said they would contact me if they
17 needed me.
18    Q.   Right.  You're not of the understanding
19 that my office is involved in law enforcement,
20 though, are you?
21    A.   Well, I -- All I can tell you is I was
22 going by what the officers told me.  And you sent me
23 a letter, and I sent it to the -- the insurance
24 company.
25    Q.   You've had a claim made against you

39 (Pages 150 - 153)

Page 154

1 before, haven't you, for injuries?
2       MR. DAVANT:  Objection to form.
3       For what, Mr. Butler?
4 BY MR. BUTLER:
5    Q.   For injuries?
6    A.   You mean a workman's comp claim?
7    Q.   No.  Injury case, boat-related.
8    A.   Not me, no.
9    Q.   Okay.  Was there not a death case
10 associated with one of your vessels in the past?
11    A.   That was the -- the -- sep- -- totally
12 separate company.
13    Q.   Okay.  All right.  Were you notified of a
14 claim in that case?
15    A.   The -- The boat, yes.  The company was
16 notified, and -- and, there again, turned it over to
17 the insurance company.
18       MR. BUTLER:  Okay.  All right.  Just
19    one second.  I'm going to change exhibits
20    here.  Hopefully.
21       Hold on one second.  Let me find my
22    exhibits.  One second.
23       (Discussion off the record)
24       (Thereupon, the document/item referred
25 to was marked for identification as Deposition

Page 155

1 Exhibit H.)
2 BY MR. BUTLER:
3    Q.   All right.  Okay.  Mr. Knight, can you see
4 the letter that is on the screen now, Exhibit H?
5    A.   Yes.
6    Q.   Okay.  And I previously, in questions
7 about the GPS and so forth, asked you whether you had
8 received a letter asking you to save whatever
9 electronic information was on your vessel.
10       Do you remember we talked about that?
11    A.   Yes.
12    Q.   All right.  And here is a letter also
13 dated September 5th, like the previous exhibit that
14 we had up there, Exhibit G.
15       Do you remember seeing this letter?
16    A.   No.
17    Q.   Okay.  Is this something you would have
18 just passed on to your insurance company?
19    A.   I'm sure I did.
20       MR. DAVANT:  Objection to form.
21 BY MR. BUTLER:
22    Q.   Okay.  And let me increase this is a
23 little bit here, so everyone can see it.
24       Again, we talk about representing Erwin
25 and Nadine Rusli for injuries to Ms. Rusli, and so

Page 156

1 forth.
2       And do you see we request, it says, this
3 is -- This letter is a formal demand that you
4 preserve and not alter the following, and then it has
5 that list of items right there?
6       Do you see that?
7    A.   Yes.
8    Q.   When you forwarded this over to your
9 insurance company, did you receive any feedback that
10 you better try to save this information, do something
11 about that?
12    A.   No.
13    Q.   Okay.  And that is:  Photographs of the
14 vessel, video of the vessel, witness names and so
15 forth, equipment.
16       Do you see all that?
17    A.   Yes.
18    Q.   Radar?  Do you see that, too?
19    A.   Yep.
20    Q.   And down about four from the bottom there
21 of that page, it says, "GPS."  Do you see that, too?
22    A.   Yep.
23    Q.   And I think we already established that
24 there was no effort made by you to preserve any of
25 this until June of 2020, right?

Page 157

1    A.   It was all preserved in the computer.
2    Q.   Okay.
3    A.   And it was all -- All this information
4 was collected by the law enforcement at the time.
5 And then, as far as we knew, all that data was in the
6 machine.
7    Q.   Yeah.  My one question, though, is:  In
8 September of 2019, you didn't do anything, take any
9 affirmative action to preserve data, right?
10    A.   Yes, I did.  I -- I made --
11       You know, all I could do is leave the
12 equipment in place.  And --
13    Q.   Well, it wasn't really --
14    A.   -- that's exactly what I did.
15    Q.   Sorry.  I didn't mean to talk over you
16 there.
17       It wasn't --
18    A.   Well --
19    Q.   -- only what you could do, in the respect
20 of, you could have downloaded the information from
21 that one day onto what you call a SIM card, right?
22    A.   I -- I was not aware that could be done
23 until the units had to be exchanged, just like I told
24 you previously.
25    Q.   Yeah.  Did you ask anybody about even

40 (Pages 154 - 157)

1  trying to do something like that?
2      A.   No.
3          MR. BUTLER:  Okay.  All right.  If I do
4      this correctly, I'll get the next exhibit up
5      here, and that is Exhibit I.
6          (Thereupon, the document/item referred
7  to was marked for identification as Deposition
8  Exhibit I, a composite exhibit.)
9  BY MR. BUTLER:
10     Q.   Okay.  And this is a second letter dated
11 September 16th, 2019, Exhibit I.
12         Do you see that?
13     A.   Yes.
14     Q.   Okay.  Now, you've talked about having
15 houses at Redington Shores.  And this particular one
16 is addressed to 17439.  Which relative lived in that
17 house as of September of 2019?
18     A.   It would have been my son.
19     Q.   So, that's Sean?
20     A.   Yes.
21     Q.   Okay.  And did Sean make you aware that he
22 had received this letter at the Redington Shores
23 house?
24     A.   I believe so.  And he brought it in and
25 gave it to Donna, and Donna forwarded it to the

1  insurance company.
2      Q.   Who is Donna?
3      A.   She was basically my office manager at the
4  time.
5      Q.   At which location?
6      A.   She worked for Knight Enterprises.
7      Q.   Is that the one that was headquartered on
8  Ulmerton?
9      A.   No.  On 301 Missouri Avenue.
10     Q.   What's Donna's last name?
11     A.   Bentley.
12     Q.   Do you know if she's still in the area?
13     A.   Yes, she still lives in town.
14     Q.   She doesn't work with your companies
15 anymore?
16     A.   No.  She's retired.
17     Q.   Do you know in what city she lives?
18     A.   The Madeira Beach area.
19     Q.   Did your son give you an idea of what the
20 letter concerned?
21     A.   No.  And he didn't read it, to the best of
22 my knowledge.
23     Q.   Okay.  Do you know if the letter remained
24 sealed and was given to Donna Bentley?
25     A.   I -- I don't know.

1      Q.   Did Ms. Bentley convey to you what the
2  context of the letter was?
3      A.   Other than that she received another
4  document in reference to the boat accident, and said
5  she had already forwarded it on to Stahl &
6  Associates.
7      Q.   Did she save a copy for you?
8      A.   I -- She may have, but I -- I don't
9  remember reviewing it.
10     Q.   Did you tell her you wanted to review it?
11     A.   No.  At that point, I believe it was
12 all -- it was --  It was all in the insurance
13 company's hands.
14     Q.   Okay.  If you see this letter dated,
15 again, September 16th.  So we're about two weeks
16 after --  We're exactly two weeks after the incident
17 date.
18         The context of this letter in the first
19 paragraph is, we're telling you that on
20 September 6th, we sent you a notification letter by
21 process server and haven't received any response from
22 you, and here is the second notification.  All right?
23         And so if we look down at the enclosures
24 with that second letter, here is a copy of the first
25 letter of September 5th.  Do you see that?

1      A.   Yep.
2      Q.   And then as we go farther down, here's
3  also that letter of September 5th, the second one,
4  that talks about keeping all that data.
5          Do you see that?
6      A.   Correct.
7      Q.   And here is another letter dated
8  September 5th, which asks for your insurance
9  information.  You never saw this one either?
10     A.   Nope.  Everything was sent directly to the
11 insurance company.
12     Q.   And when you say "insurance company,"
13 that's Stahl, right?
14     A.   Stahl & Associates.
15     Q.   All right.  And here are the UPS
16 confirmations that that was delivered to the --
17         This is the --  This is the first one that
18 was sent, that shows it was delivered to the Ulmerton
19 address.
20         Did you have an employee over there by the
21 name of Noble?
22     A.   There could have been.  I'm not sure.
23     Q.   All right.  Again another copy of that
24 same first letter.  And this is going to be the
25 package that was sent to the Redington address.  And

Page 162

1 we'll see what the UPS notification says on this one.
2 Proof of Delivery, delivered on 9/17.
3          Do you have a Korey over there?
4 K-o-r-e-y?
5      A.   It doesn't sound familiar.  But,
6 obviously, he must work there.  He signed for it.
7      Q.   Okay.  All right.  Good enough.
8          So you're not denying that this
9 information got to you; you contend you just didn't
10 look at it, right?
11         MR. DAVANT:  Objection.  Form.
12         THE WITNESS:  Yeah, the information was
13    delivered and passed on to the insurance
14    carrier.  Correct.
15 BY MR. BUTLER:
16     Q.   All right.  Let me just review my notes
17 here.  I think Mr. Caballero knocked out about
18 90 percent of what I was going to ask, so I won't try
19 to duplicate it.
20         One thing I will ask you is that, after
21 the crash you brought your boat alongside so
22 Ms. Kintz could jump over into the pontoon boat,
23 correct?
24     A.   Correct.
25     Q.   So, you saw the property damage to the --

Page 163

1 to the Bennington pontoon boat, didn't you?
2      A.   I saw it there and at the -- at the boat
3 ramp, when the officers were photographing all the
4 vessels.
5      Q.   Okay.  And you also had a chance to see
6 the occupants of the pontoon boat as well, right?
7      A.   Correct.
8      Q.   And the Fish and Wildlife report indicates
9 that Ms. Rusli was 30 as of the time of the incident.
10         Does that sound about right, as to what
11 you observed?  She was the lady in the front port
12 seating.
13     A.   Yes.  I mean, that was the lady that --
14 that seemed that --  You know, that was the one that
15 was hurt.
16     Q.   And you would agree, she was in the age
17 range of about 30?
18     A.   I would think so, yes.
19     Q.   Okay.  Now, she was a nurse, and her
20 husband is a doctor, and he was the one driving.
21         And when my notification letter got to
22 you, you never opened it to see that there was a
23 possibility, based on her injuries, that she was not
24 going to be able to return to work as a nurse, right?
25         MR. DAVANT:  Objection to form.

Page 164

1          THE WITNESS:  Yes, I never read that
2    letter.
3 BY MR. BUTLER:
4      Q.   Okay.  Did Stahl & Associates ever call
5 you back and say:  Hey, you know, we've got a
6 situation here.  This lady appears to be -- have some
7 serious injuries.  What do you know?
8      A.   No, I was not questioned by the insurance
9 company.
10     Q.   Okay.  At any time, did you ever follow up
11 to see how anybody was doing on the pontoon boat?
12     A.   Like I said, the only conv- --
13 communications I had were with the FWC officer and
14 the police, and I believe --
15     Q.   So, that's a no, you did not try to
16 contact --
17     A.   I did not personally reach out, no.
18         MR. DAVANT:  Hold on.  Can you let the
19    witness finish the answer?  Thanks.
20         MR. BUTLER:  Yeah.  I thought he was
21    finished.
22 BY MR. BUTLER:
23     Q.   If you weren't, Mr. Knight, I apologize
24 there.
25     A.   No, I did not personally reach out.  I

Page 165

1 felt that everything had been turned over between the
2 authorities and all -- and the insurance company.
3          So, like I said, I was told by law
4 enforcement that, you know, she did not have
5 life-threatening injur- -- injur- -- injur- --
6 injuries.  And that was -- that was it.
7          At that point ...
8      Q.   You said she was unconscious, right?  You
9 saw that at the scene?
10     A.   Correct.
11     Q.   Did you see her husband, a doctor, giving
12 her chest compressions?
13     A.   No.
14     Q.   How long did you stay at the scene -- Let
15 me strike that.  Let -- let me ask a different
16 question.
17         When you came alongside, Ms. Kintz jumps
18 over into the pontoon boat.  How long were those --
19 were the two boats side by side?
20     A.   For a brief --  Just along --
21         Just long enough for her to get onto the
22 boat, and she got behind the wheel and -- and drove
23 away immediately.
24     Q.   Okay.  Why was it immediately?
25     A.   Well, they were trying to get back to the

42 (Pages 162 - 165)

Page 166

1 dock.
2    Q.   Why was she driving?
3    A.   Well, because they asked for help, and at
4 that point, I told Tara -- Tara jumped on the boat
5 trying to assist them.  And she -- she drove the boat
6 back to the dock.
7    Q.   Well, wasn't Mr. Rusli capable of doing
8 that?
9    A.   He -- He implied that he wasn't.
10   Q.   Hmm.
11   A.   They asked for help and we gave it to
12 them.
13   Q.   Okay.
14   A.   Sorry we did that, if you're upset with
15 that.
16   Q.   Isn't the reason that she had to jump over
17 and get on his boat is because he was giving first
18 aid to the other three women on the vessel?
19        MR. DAVANT: Objection. Form. Asked
20   and answered.
21        THE WITNESS: I did not observe that at
22   all, other than he was, at that point,
23   comforting his wife or the lady that was --
24   appeared to be unconscious.  And Tara got on
25   the boat and, you know, proceeded to expedite

Page 167

1    them back to the dock as quickly as possible.
2 BY MR. BUTLER:
3    Q.   Did you see any head injury that
4 Ms. Rusli -- again, the passenger that was in the
5 front port seat -- did you see any head injury she
6 sustained?
7    A.   No.  I did not --
8    Q.   Did you see --
9    A.   -- see anything at the time.
10   Q.   Did you see the blood on the front port
11 seat?
12   A.   No.
13   Q.   Even when the pontoon vessel was turned --
14 was returned back to the dock and your boat was at
15 that same dock, did you see the blood that was on
16 the front port seat?
17   A.   I did not go over and inspect, physically
18 walk on the boat and inspect it.  I was just looking
19 at it from my point of view, where it was on the
20 other side of the -- tied up to the other dock.
21   Q.   Right.  So you didn't see any blood there?
22   A.   No.
23   Q.   Okay.  Ms. Kintz -- Well, let me strike
24 that.
25        What's the distance, do you believe, from

Page 168

1 the intersection there of those two channels back to
2 the dock?
3        MR. DAVANT: Objection. Form. Calls
4   for speculation.
5        THE WITNESS: How -- How long is that?
6 BY MR. BUTLER:
7    Q.   Yeah.  In --
8    A.   I don't know.
9    Q.   -- distance?  In distance?
10   A.   So, your guess is as good on mine.
11   Q.   My guess is about a mile.  Do you think
12 that sounds about right?
13        MR. DAVANT: Objection to form.
14        THE WITNESS: Based upon -- I --
15        Yeah.  Well, it's X amount of --
16        Yeah, there's a fairly good distance
17   between the channel and to the boat ramp.
18 BY MR. BUTLER:
19   Q.   Okay.  And the boat ramp that you guys
20 went to, was that at Maximo?
21   A.   No.  That's where they initially told her,
22 and she went in there, and then it wasn't where they
23 were at.
24        They went -- they went back out and
25 further down to the public boat ramp.  I believe they

Page 169

1 initially pulled in to Maximo Marine, but they --
2 Then they told them that -- I don't believe the
3 paramedics were there.  They went back out, and she
4 went down a little farther distance to where the
5 public boat ramp was there.
6    Q.   Do you remember what -- what outboard that
7 pontoon boat had on it?
8    A.   No, I don't.
9    Q.   Okay.  Did Ms. Kintz tell you, when she
10 was driving the boat back, that she got any kind of
11 indication as to what the -- what the extent of those
12 injuries were for these people on the pontoon boat?
13   A.   All she said is that the three -- the
14 gentleman, the driver, and the two other passengers,
15 like all of us, were a little shaken up, and that
16 the -- but, no -- Everybody walked off the boat,
17 gave their statements to the police, and that the --
18 the one -- The one passenger was the one that, you
19 know, that they obviously loaded into the ambulance
20 and took to the hospital.
21   Q.   That was Ms. Rusli they loaded up and took
22 to the hospital?
23   A.   Yes.
24   Q.   Yeah.  What did Ms. Kintz say about her
25 status?

43 (Pages 166 - 169)

Page 170

1    A.   She didn't know.
2    Q.   Okay.  Did Ms. Kintz ever say she saw that
3  this lady had a head injury?
4    A.   No.  She -- she said that -- that,
5  obviously, that there was some blood.  But I don't
6  believe ...
7        She was pretty much in shock, like all of
8  us.  So, I can't really tell you, other than, you
9  know, she did a good job of getting on the boat and
10 getting the boat back to the dock as quickly as
11 possible.
12   Q.   Okay.  And so --
13   A.   As -- as the paramedics were waiting.
14   Q.   All right.  Sorry.  I talked over you
15 there a little bit.
16       So, it's fair to say that after Ms. Kintz
17 drove the boat back to the dock, that she then talked
18 to you about the injuries that she perceived
19 Ms. Rusli had, right?
20   A.   No.  Actually, she was there long before I
21 was.  So, when I finally pulled up, she was being
22 interviewed by the -- by the police officers.
23   Q.   Right.  And I wasn't talking about that it
24 had to be within the first ten minutes of her getting
25 off the boat.

Page 171

1        What I meant to say was that on
2  September 2nd, or September 3rd, or sometime shortly
3  thereafter, did she not have a conversation with you
4  about that Ms. Rusli, you know, put blood on the boat
5  and looked like she was injured?
6    A.   Yes.  We knew she was injured, obviously.
7  We called 9-1-1.
8        MR. BUTLER:  Okay.  I'm not going to
9  have anything further.
10       MR. DAVANT:  Okay.
11       MR. CABALLERO:  Very briefly.  Oh.
12       MR. BUTLER:  Whoa.
13       MR. CABALLERO:  Are you guys able to
14 hear me?
15       MR. BUTLER:  Yes.  Go ahead.
16       MR. CABALLERO:  Okay.  Very brief
17 follow-up.
18       FURTHER DIRECT EXAMINATION
19 BY MR. CABALLERO:
20   Q.   You talked about, Mr. Knight, how you had
21 interactions with the FWC officers after the
22 incident; do you recall?
23   A.   Yes, I believe we had one or two
24 conversations.
25   Q.   Were you provided, or obtained somehow,

Page 172

1  the FWC Boating Accident Report after the incident?
2    A.   I did not receive it, no.
3    Q.   Okay.  With regard to -- to rendering aid
4  to the folks on the pontoon boat, would it be
5  accurate to say that you -- you were required, by
6  law, to render aid following the collision?
7        MR. DAVANT:  Objection to form.
8        THE WITNESS:  I don't know that.
9  BY MR. CABALLERO:
10   Q.   And then, final question.
11       Do you have any vision issues?
12   A.   No.
13   Q.   Do you wear glasses?
14   A.   Ah --  No.
15   Q.   Do you have --  Have you had Lasix done?
16   A.   No.
17   Q.   Do you wear contact lenses?
18   A.   No.
19   Q.   Do you see an eye doctor on a routine
20 basis?
21   A.   I haven't in a while, but, yes, I have in
22 the past.
23   Q.   And --  And for what reasons?
24   A.   Just part of my annual checkup.
25   Q.   Okay.

Page 173

1        MR. CABALLERO:  All right, sir.  I don't
2  have any other questions.  Thank you for your
3  time.
4        MR. DAVANT:  All right.  I've got a
5  couple of quick follow-ups.
6        CROSS-EXAMINATION
7  BY MR. DAVANT:
8    Q.   Mr. Knight, you indicated previously that
9  you -- you were keeping a safe lookout at the time of
10 the accident.  Did -- did I hear that correctly?
11       MR. CABALLERO:  Objection to form.
12       THE WITNESS:  Yes, I was -- we were --
13       MR. BUTLER:  Join the form.  Join form
14 objection.
15       MR. DAVANT:  What's the basis of the
16 form objection?
17       MR. BUTLER:  It has been asked and
18 answered.
19       MR. CABALLERO:  And you --  And you're
20 leading your own witness/client.
21 BY MR. DAVANT:
22   Q.   You can answer, Mr. Knight.
23   A.   Yes.  I was looking --  I was watching
24 forward as we were driving towards the bridge.
25   Q.   How is it that you were keeping a lookout?

44 (Pages 170 - 173)

Page 174

1    A.   Looking straight ahead.
2    Q.   Is that what you normally do?
3    A.   Yes.
4    Q.   Do you do anything else, besides looking
5  straight ahead?
6    A.   Well, typically, I look at anything that's
7  in the channel.
8    Q.   And you said --
9    A.   And I was --
10   Q.   -- you didn't see --
11   A.   I was --
12   Q.   -- anything?
13   A.   I was looking forward.
14       That, that -- That's typically how you
15  drive that boat.
16   Q.   And to be fair, I think you also stated
17  earlier that you were -- You looked down at gauges,
18  and then you looked back up at the water, and back
19  and forth, correct?
20   A.   Yes.
21       MR. BUTLER:  Object to the form.
22  BY MR. DAVANT:
23   Q.   And is that how you were keeping a -- a
24  lookout?
25   A.   Typically, yes, that's how, you know, you

Page 175

1  reference back and forth.
2       MR. BUTLER:  Same objection.
3  BY MR. DAVANT:
4    Q.   And is that what you were doing at the
5  time of the collision, referencing back and forth?
6    A.   Yes.
7       MR. BUTLER:  Object to the form.
8  BY MR. DAVANT:
9    Q.   Do you know how long it had been since you
10  looked at the water prior to the collision?
11   A.   I -- I don't know exactly.  I was just
12  looking back and forth.
13   Q.   Do you know where the pontoon boat was
14  immediately prior to the collision, or frankly, at
15  any time prior to the collision?
16       MR. CABALLERO:  Objection to the form.
17       THE WITNESS:  No.  Obviously, it was out
18  of my peripheral vision.  I didn't --
19  BY MR. DAVANT:
20   Q.   If you had --
21   A.   -- see it.
22   Q.   -- seen it, would -- would you have tried
23  to avoid --
24   A.   Of --
25   Q.   -- colliding with it?

Page 176

1    A.   Of course.
2       MR. DAVANT:  All right.  Thank you.
3  That's all I have.
4       MR. BUTLER:  I'll have a couple
5  questions if you don't, Cosme.
6       MR. CABALLERO:  No, go ahead, Frank.
7       And then if I -- If you don't touch on
8  it, I will.
9       MR. BUTLER:  Yeah.
10           REDIRECT EXAMINATION
11  BY MR. BUTLER:
12   Q.   Mr. Knight, when you were answering my
13  questions, did you answer truthfully?
14   A.   To the best of my knowledge, yes.
15   Q.   Okay.  Good.  Good, good.
16       And when I asked you about different
17  things of you looking down at the -- at the
18  electronics and so forth, you answered truthfully
19  there too, didn't you?
20       MR. DAVANT:  Objection to form.
21       THE WITNESS:  Yes.  I was referencing
22  back and forth, looking -- from looking
23  straight ahead and looking at the -- at the
24  electronics.
25

Page 177

1  BY MR. BUTLER:
2    Q.   So, the answers you gave me were truthful
3  when I asked you the question, weren't they?
4       MR. DAVANT:  Objection to form.
5       If you're referencing a specific
6  question, please ask it now so that the record
7  is clear, Mr. Butler.
8       MR. BUTLER:  My question is pending.
9       MR. DAVANT:  And my statement is
10  pending.
11  BY MR. BUTLER:
12   Q.   Mr. Knight?
13   A.   Yes?
14   Q.   Do you understand my question?
15   A.   Ask it to me again, please.
16   Q.   Certainly, I will.
17       When I asked you questions about you
18  looking at -- looking up, looking down at the
19  electronics, your answers to me were truthful,
20  weren't they?
21       MR. DAVANT:  Objection to form.
22       THE WITNESS:  To the best of my
23  recollection, yes.
24       MR. BUTLER:  Okay.  I -- I don't have
25  any further questions.

45 (Pages 174 - 177)

Page 178

1    MR. CABALLERO:  Just -- Just one
2  follow-up, Mr. Knight, and then we'll send you
3  on your way.
4    MR. DAVANT:  Nope.  I'll have a couple
5  more.  But go ahead, Mr. Caballero.
6         REDIRECT EXAMINATION
7  BY MR. CABALLERO:
8    Q.  Look -- Looking back at the --
9    I know we've gone over quite a bit of
10 material during your deposition.  And I just want to
11 ask you now, sort of looking at this and your
12 testimony, is there anything in your mind right this
13 moment, having testified, throughout this early
14 afternoon, that stands out in your mind as something
15 you need to correct in your testimony as to?
16    MR. DAVANT:  Object.  Objection to form.
17 BY MR. CABALLERO:
18    Q.  Or do you stand by your responses as you
19 gave them truthfully?
20    MR. DAVANT:  Same objection.
21    THE WITNESS:  I've given you all the --
22 everything I know to the best of my
23 recollection.
24    MR. CABALLERO:  Very good, sir.
25    No further questions.

Page 179

1         RECROSS-EXAMINATION
2  BY MR. DAVANT:
3    Q.  All right.  Let me just follow up,
4  Mr. Knight, since Mr. Butler didn't want to ask you
5  the question.
6    When -- When you were being asked
7  previously about -- You said something about 60
8  seconds, that you had been looking at your gauges.
9  And I -- I think it's unclear as to exactly what
10 Mr. Butler was asking you.
11   So, I -- I want to ask you, sir:  Do you
12 know the last time that you were looking up at the
13 water before the collision?
14    MR. DAVANT:  Object to form.
15    MR. DAVANT:  That's fine.
16    MR. BUTLER:  This is attorney testimony.
17 It's -- You're leading the witness --
18    MR. DAVANT:  Okay.
19    MR. BUTLER:  -- and --
20    MR. DAVANT:  Your form objection is
21 noted.  Thank you.
22    MR. CABALLERO:  Yeah, and --
23    MR. BUTLER:  I have not finished.
24 Excuse me, Counsel.  I have not finished my
25 objection.

Page 180

1    MR. DAVANT:  Okay.
2    MR. BUTLER:  Thank you.
3    MR. DAVANT:  You objected to form.  So
4  your -- your objection is preserved.
5    MR. BUTLER:  I'm telling you what the
6  objection is --
7    MR. DAVANT:  I, I -- I got it.
8    MR. BUTLER:  -- as to the object to
9  form.  Okay?  I'm telling you what the form
10 is.  That you are testifying and -- and you
11 are leading this witness, and you are
12 mischaracterizing prior testimony and the
13 question.
14    MR. DAVANT:  Okay.  Thank you.
15 BY MR. DAVANT:
16    Q.  Mr. Knight, go ahead and answer, please.
17    MR. CABALLERO:  No, hold -- Hold on,
18 please.  Just a --
19    MR. DAVANT:  Sure.
20    MR. CABALLERO:  -- quick -- quick
21 objection.
22    I object to form and move to strike this
23 question and answer.  It's completely --
24    MR. DAVANT:  Okay.
25    MR. CABALLERO:  -- inappropriate.  And

Page 181

1  it's --
2    MR. DAVANT:  Thank you.  And I oppose
3  that motion to strike.  And you can ask it
4  too, and you can make the motion too,
5  Mr. Butler, and I'll oppose it as well.  And
6  Mr. Knight can answer the question.
7    Thank you.
8  BY MR. DAVANT:
9    Q.  Go ahead.
10   A.  Please repeat -- repeat what the question.
11   Q.  Yeah, sure.
12   So, I'm just asking you again because
13 Mr. Butler didn't want to reference it.
14   He asked you a couple questions previously
15 about 60 seconds prior to the collision that you
16 hadn't looked up at the water.  Is that true?
17    MR. BUTLER:  Object to --
18    THE WITNESS:  I really don't --
19    MR. BUTLER:  -- form.
20    THE WITNESS:  -- know how long it was.
21    CERTIFIED REPORTER:  I'm sorry.  You're
22 both speaking at the same time.
23    MR. DAVANT:  Okay.
24    MR. BUTLER:  We need to able to get our
25 objections in --

46 (Pages 178 - 181)

Page 182

1   MR. DAVANT: Of course.
2   MR. BUTLER: -- our objections in.
3   MR. DAVANT: Of course.
4   MR. BUTLER: Number one, that was not
5 the question.
6   Number two, he has already asked and
7 answered that several times.
8   And this is attorney testimony. You are
9 leading the witness.
10   MR. DAVANT: Okay. That's fine.
11   MR. CABALLERO: Yeah.
12   MR. DAVANT: You got your objection.
13   MR. CABALLERO: I object to form as well
14 on the same basis. And these are -- This is
15 completely inappropriate, and I move to
16 strike --
17   MR. DAVANT: Okay.
18   MR. CABALLERO: -- this whole portion.
19   MR. DAVANT: Your objection is noted.
20   I'm not going to argue with you guys on
21 the record.
22 BY MR. DAVANT:
23   Q.   Mr. Knight, can you please answer the
24 question? I think you said you didn't know how long
25 it was that you had looked up at the water before the

Page 183

1 collision; is that --
2   MR. BUTLER: Object.
3 BY MR. DAVANT:
4   Q.   -- what I heard you say?
5   MR. BUTLER: Object to form.
6   MR. DAVANT: Sure.
7   MR. CABALLERO: Object to the form.
8 Move to strike. Completely inappropriate.
9   MR. DAVANT: Likewise.
10   THE WITNESS: I couldn't tell you the
11 exact time, how long it was.
12 BY MR. DAVANT:
13   Q.   All right. And is that the truth here
14 today?
15   A.   That's totally the truth.
16   MR. CABALLERO: Object to form. Move to
17 strike.
18   MR. DAVANT: Thank you. Thank you,
19 Mr. Knight.
20   MR. BUTLER: And -- and I'll follow-up
21 with a question.
22   MR. DAVANT: Sure.
23   REDIRECT EXAMINATION
24 BY MR. BUTLER:
25   Q.   Mr. Knight, back when I asked you that

Page 184

1 question about how long you had looked down, you gave
2 me a truthful answer, didn't you?
3   A.   I gave you an estimate.
4   Q.   Okay. You were there, you were the one
5 who did what you did, and when I asked you that
6 question, you gave me a truthful answer, right?
7   MR. DAVANT: Objection.
8   THE WITNESS: No, I gave you an
9   estimate. I didn't have a stopwatch.
10 BY MR. BUTLER:
11   Q.   And you believed it was 60 seconds,
12 correct?
13   A.   No, I don't know exactly what it was.
14   MR. BUTLER: Fine. Fine.
15   No further questions.
16   MR. CABALLERO: Brief follow-up.
17   REDIRECT EXAMINATION
18 BY MR. CABALLERO:
19   Q.   You gave a truthful estimate of the amount
20 of time that you were looking at your gauges and GPS,
21 correct?
22   MR. DAVANT: Objection to form.
23   THE WITNESS: I gave an estimate --
24 BY MR. CABALLERO:
25   Q.   Do you believe your --

Page 185

1   A.   -- of what I thought, but I don't know the
2 exact time.
3   Q.   Do you believe your --
4   A.   Truthfully.
5   Q.   Do you believe your estimate to be a
6 truthful statement and estimate of what you believe?
7   A.   I believe --
8   MR. DAVANT: Objection. Form.
9   THE WITNESS: -- that I was referencing
10 the gauges back and forth, and I don't know
11 exactly how long it took.
12 BY MR. CABALLERO:
13   Q.   Well, Mr. Knight, you said a moment ago
14 you gave an estimate. Was that truthful?
15   MR. DAVANT: Objection to form.
16   THE WITNESS: By the way, it's called an
17   estimate, gentlemen.
18 BY MR. CABALLERO:
19   Q.   Understood. Do you believe you --
20   A.   Understood.
21   Q.   Were you being honest when you gave the
22 estimate?
23   A.   I'm telling you that I gave you an
24 estimate. Estimate means I can't tell you the exact
25 time frame. It could have been 30 seconds or 60

47 (Pages 182 - 185)

Page 186

1 seconds. That's an estimate.
2        MR. CABALLERO: Fair enough.
3        MR. DAVANT: All right. Thank you.
4 We'll read.
5        MR. BUTLER: Okay.
6        MR. DAVANT: Should we jump over to the
7 other link?
8        THE WITNESS: Are we done?
9        MR. DAVANT: Yes.
10        MR. CABALLERO: Yes.
11        THE VIDEOGRAPHER: I'll go off -- go off
12 the record.
13        The time is now 2:42 p.m., and we are
14 now off the record. Or did you want the read
15 on the record, that request?
16        MR. CABALLERO: No, no. That's fine.
17 Just go off the record.
18        THE VIDEOGRAPHER: All right. 2:42 p.m.
19 Off the record.
20        (Thereupon, the taking of the deposition
21 was concluded at 2:43 p.m. Signature and
22 formalities were not waived.)
23
24
25

Page 188

1        ERRATA SHEET
2 RE   : Mad Toyz III/Jeffry Knight
   DEPO OF: JEFFRY KNIGHT
3 TAKEN : December 1, 2020
4 DO NOT WRITE ON TRANSCRIPT, ENTER ANY CHANGES HERE
5 Page # | Line #|  Change        | Reason
6 ____|_____|_____|_____
7 ____|_____|_____|_____
8 ____|_____|_____|_____
9 ____|_____|_____|_____
10 ____|_____|_____|_____
11 ____|_____|_____|_____
12 ____|_____|_____|_____
13 ____|_____|_____|_____
14 ____|_____|_____|_____
15 ____|_____|_____|_____
16 ____|_____|_____|_____
17 ____|_____|_____|_____
18 ____|_____|_____|_____
19 ____|_____|_____|_____
20 ____|_____|_____|_____
21 State of Florida
   County of    )
22
   Under penalties of perjury, I declare that I have
23 read my deposition transcript, and it is true and
   correct subject to any changes in form or
24 substance entered here.
   _____    _____
25 Date        JEFFRY KNIGHT

Page 187

1 RE   : Mad Toyz III/Jeffry Knight
   DEPO OF: JEFFRY KNIGHT
2 TAKEN : December 1, 2020
3
4        EXCEPT FOR ANY CORRECTIONS
        MADE ON THE ERRATA SHEET BY
5        ME, I CERTIFY THIS IS A TRUE
        AND ACCURATE TRANSCRIPT.
6        FURTHER DEPONENT SAYETH NOT.
7        _____
        JEFFRY KNIGHT
8
9
10 STATE OF FLORIDA   )
                ) SS:
11 COUNTY OF      )
12
13        Sworn and subscribed to before me this
14 _____ day of _____, 2020.
15 PERSONALLY KNOWN _____ OR I.D._____
16
17
18        _____
        Notary Public in and for
19        the State of Florida at
        Large.
20
21
22 My commission expires:
23
24
25

Page 189

1        CERTIFICATE OF OATH OF WITNESS
2
3 STATE OF FLORIDA   )
             ) SS:
4 COUNTY OF MIAMI-DADE)
5
6     I, NANCY GILBERT, Registered Merit Reporter,
7 Registered Diplomate Reporter, Certified Realtime
8 Reporter, Notary Public in and for the State of
9 Florida at Large, certify that the witness, JEFFRY
10 KNIGHT, appeared before me remotely via video
11 conference on December 1, 2020 and was duly sworn by
12 me, after producing photographic identification,
13 pursuant to Supreme Court of Florida Administrative
14 Order AOSC20-16 and AOSC20-23.
15        WITNESS my hand and official seal this 7th day
16 of December, 2020.
17
18
19        _____
        NANCY GILBERT, RMR, RDR, CRR
        Notary Public, State of Florida
20        at Large
21
22 Notary #GG 284830
23 My commission expires: 2/4/2023
24
25

48 (Pages 186 - 189)

Page 190

1          REPORTER'S DEPOSITION CERTIFICATE

2

3      I, NANCY GILBERT, NCRA-certified stenographic

4   reporter by testing, holding the Registered

5   Professional Reporter, Registered Merit Reporter,

6   Registered Diplomate Reporter and Certified Realtime

7   Reporter certificates, hereby certify that I was

8   authorized to and did stenographically report the

9   remote videoconference deposition of JEFFRY KNIGHT,

10   the witness herein; that a review of the transcript

11   was requested; that the foregoing pages numbered

12   from 1 to 192, inclusive, is a true and complete

13   record of my stenographic notes of the deposition by

14   said witness; and that this computer-assisted

15   transcript was prepared by myself and/or under my

16   direct supervision.

17      I further certify that I am not a relative,

18   employee, attorney or counsel of any of the parties,

19   nor am I a relative or employee of any of the

20   parties' attorneys or counsel connected with the

21   action.

22      The certification of this transcript

23   does not apply to any photocopy or reproduction

24   made by any person by any means outside of the

25   direct control and/or at the direction this

Page 191

1   certifying reporter.

2   DATED this 7th day of December, 2020.

3

4

5          NANCY GILBERT
           Registered Professional Reporter
           Registered Merit Reporter
6          Registered Diplomate Reporter
           Certified Realtime Reporter

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 192

1          VERITEXT LEGAL SOLUTIONS
2          One Biscayne Tower, Suite 2250
           Two South Biscayne Boulevard
3          Miami, Florida  33131
              (305) 376-8800
4

   December 7, 2020
5

   MR. JEFFRY KNIGHT
6   PATRICK J. RYAN, ESQUIRE
    DAVANT LAW, P.A.
7   401 East Las Olas Boulevard, Suite 1400
    Fort Lauderdale, Florida  33301
8

    RE   : Mad Toyz III/Jeffry Knight
9   DEPO OF: JEFFRY KNIGHT
       TAKEN  : December 1, 2020
10   READ & SIGN BY: January 7, 2021
    Attn: JEFFRY KNIGHT:
11

    This letter is to advise you that the transcript
12   of the deposition listed above is completed and
    is available for reading and signing.
13

    PLEASE CALL THE ABOVE NUMBER TO MAKE AN APPOINTMENT
14   to come to the Veritext office closest to you to read
    and sign the transcript.  Our office hours are from
15   8:30 a.m. to 4:30 p.m., Monday through Friday.
16   IN THE EVENT OTHER ARRANGEMENTS ARE MADE, please send
    us a list of any and all corrections, signed and
17   notarized, noting page and line numbers and the
    reason for such changes, so we can furnish all
18   counsel with a copy of same.  If the reading and
    signing has not been completed prior to the
19   referenced date, we shall conclude that you have
    waived the reading and signing of the deposition
20   transcript.  Your prompt attention to this matter is
    appreciated.
21

22

    NANCY GILBERT, RPR, RMR, RDR, CRR
24   cc: Counsel on Appearance page
25

Page 193

1          VERITEXT LEGAL SOLUTIONS
           One Biscayne Tower, Suite 2250
2          Two South Biscayne Boulevard
           Miami, Florida  33131
3             (305) 376-8800
4

5   December 7, 2020
6

    COSME CABALLERO, ESQUIRE
7   DEUTSCH & BLUMBERG, P.A.
    New World Tower - Suite 2802
8   100 North Biscayne Boulevard
    Miami, Florida  33132
9

    RE   : Mad Toyz III/Jeffry Knight
10   DEPO OF: JEFFRY KNIGHT
       TAKEN  : December 1, 2020
11   READ & SIGN BY:  caballero@deutschblumberg.com
12

    Dear Counsel:
13

14   The original transcript of the deposition listed
    above is enclosed for your file.  The witness
15   did not waive reading and signing and has been
    sent a letter notifying them to come in and read
16   and sign their deposition transcript.
17   The witness will be provided a copy of their
    deposition transcript for reading in our office
18   should they come in to review the transcript, and
    we will forward to you any corrections made by
19   the witness at that time, along with an original
    signature page which should be attached to the
20   original transcript which is in your possession.
21

22

24   NANCY GILBERT, RPR, RMR, RDR, CRR
25

49 (Pages 190 - 193)

**&**

**&**   2:12 5:17,21
20:15,20 22:6
151:15 160:5
161:14 164:4
192:10 193:7,11

**0**

**00911**   1:2

**1**

**1**   1:17 4:9 6:11
32:16,20 147:2
187:2 188:3 189:11
190:12 192:9
193:10
**100**   2:13 5:4 193:8
**103**   5:6
**10550**   2:19
**10:04**   1:16 7:20
**110**   29:15 31:5
**118**   3:6
**11:17**   57:8,10
**11:25**   57:10,13
**12**   49:18 53:4
**12:25**   104:4,7
**12:30**   103:21
**12:35**   104:7,15
**140**   28:15
**1400**   2:6 192:7
**148**   5:14
**15**   27:5
**154**   5:17
**158**   5:20
**16**   5:20 27:5
**16th**   158:11 160:15
**171**   3:7
**173**   3:8
**17439**   158:16
**176**   3:9
**178**   3:10

**179**   3:11
**18**   27:12 28:15
**183**   3:12
**184**   3:13
**187**   3:14
**188**   3:15
**189**   3:16
**19**   2:19 27:12
**190**   3:17
**192**   3:18 190:12
**1:30**   146:7 147:6
**1:31**   147:23,25
**1st**   7:19

**2**

**2**   4:12,19 6:16 15:6
54:7 55:11 59:22
130:5 146:9,11,20
147:3,11,19,20
**2/4/2023**   189:23
**20**   4:3 146:6,16
**2018**   1:6,10 4:9
30:25
**2019**   4:19 5:14,17
5:20 16:15 17:16
18:5 19:19 25:9
28:25 29:13 30:1,9
30:13 34:22 35:15
35:22 36:4,7,15,25
38:17 39:6,7,15
40:1,13,21 41:7,19
42:4,17 44:11,15
44:19 45:10,23
51:17 52:2 54:11
56:23 64:13 66:7
66:13 76:10 90:4
104:19 105:6,16
107:9,22 108:10,21
109:23 110:3,6
111:2 113:7 114:3
114:23 115:7 116:3
116:10,13 117:15

117:18,24 127:16
140:6,10 141:3,22
142:23 144:21
145:16 148:21
149:19 150:13
157:8 158:11,17
**2020**   1:17 7:19
141:4,11,15,18
144:20 145:12
156:25 187:2,14
188:3 189:11,16
191:2 192:4,9
193:5,10
**2021**   192:10
**22**   4:3 118:17
125:22
**2250**   192:1 193:1
**2268**   9:3 48:13
**2425**   189:18 191:3
192:22 193:23
**25**   148:8
**28**   17:4,4
**2802**   2:12 193:7
**284830**   189:22
**29**   17:4
**2:03**   147:25 148:5
**2:42**   186:13,18
**2:43**   1:16 186:21
**2nd**   18:5 30:9,13
34:22 35:15 36:7
36:15,25 38:18
39:6,16 40:1,13,21
41:6,19 42:4,17
44:11,14,18 45:10
45:23 51:17 52:2
54:11 56:23 64:13
66:7,13 76:10 90:4
104:19 105:6,16
107:9,22 108:9,21
109:23 110:3,6
111:1 113:7 114:3

114:23 115:7 116:3
116:10,13 117:15
117:18,24 140:6,10
144:21 145:16
150:13 171:2

**3**

**3**   4:14 59:12,23
60:2 64:25 72:9
73:18 77:11 78:3
**30**   26:9 66:25
122:11,14 147:11
148:8 163:9,17
185:25
**301**   159:9
**305**   2:14 192:3
193:3
**32**   4:9
**33131**   192:2 193:2
**33132**   2:13 193:8
**33301**   2:7 192:7
**33782**   2:19
**34**   29:17
**35**   66:25 122:11,15
**350s**   33:5
**358-6329**   2:14
**363**   34:19
**363,000**   34:19
**376-8800**   192:3
193:3
**38**   29:18 33:3
150:11,17
**380**   1:6,10
**38'**   1:6,10
**399-2222**   2:20
**3rd**   171:2

**4**

**4**   4:16 78:5,10,15
94:14
**40**   51:5

**401**   2:6 192:7
**414-0400**   2:7
**423-0971**   51:25
**45**   67:15 129:7
**4:30**   192:15

**5**

**5**   4:19 5:14,17 82:1
   82:4,8 84:4
**54**   4:12
**55**   67:15
**59**   4:14
**5th**   148:21 149:19
   155:13 160:25
   161:3,8

**6**

**6**   4:22 41:6 84:12
   84:15 85:12 86:23
   87:21 88:24 89:20
   90:2 91:9,13
**60**   126:19,21 179:7
   181:15 184:11
   185:25
**6056**   149:1
**6th**   160:20

**7**

**7**   4:24 94:2,4 192:4
   192:10 193:5
**727**   2:20 51:25
**78**   4:16
**7th**   189:15 191:2

**8**

**8**   3:5 4:9 5:4 100:20
   100:23 101:21
   102:19 103:8
**8000**   37:25
**82**   4:19
**84**   4:22
**8:20**   1:2

**8:30**   192:15

**9**

**9**   5:6 103:16 104:11
**9-1-1**   98:11,11
   171:7
**9/17**   162:2
**90**   162:18
**93**   4:24
**954**   2:7

**a**

**a.m.**   1:16 7:20 57:8
   57:10,10,13 192:15
**aas**   1:2
**abilities**   152:11
**ability**   92:21
**able**   9:18 41:16
   68:24 69:8,14
   70:19,25 91:24
   92:1 111:13 123:16
   123:22 144:10
   147:13 163:24
   171:13 181:24
**accepted**   149:11
**access**   40:4
**accident**   160:4
   172:1 173:10
**accommodate**   12:5
**accurate**   43:17
   44:21 45:15 56:9
   71:14 74:9 78:12
   79:5,14 80:8,21
   90:3,22 91:13 95:4
   115:1,6 117:14
   121:11 124:8 172:5
   187:5
**accurately**   123:23
**accustomed**   129:4
**acquire**   30:23
**act**   94:15

**action**   94:16
   107:11 111:9,10,14
   112:19 113:10
   136:21 152:24
   157:9 190:21
**activate**   44:12
**activated**   44:14
**activities**   25:5
   80:10
**actual**   6:3 75:18
   139:22
**address**   9:2 10:9
   48:3,11 148:24
   149:2,5,8,14
   161:19,25
**addressed**   148:23
   158:16
**adjacent**   93:15
**administer**   6:4,12
   6:20
**administered**   8:12
**administering**   6:6
**administration**
   59:10
**administrative**
   1:25 6:1 189:13
**admiralty**   1:2
**advise**   192:11
**advised**   150:9
**affect**   152:10
**affirmative**   157:9
**afternoon**   45:25
   47:25 49:18 128:17
   130:3,7 138:3
   178:14
**age**   27:16 163:16
**agent**   20:14,16
**ago**   11:10 20:6
   30:20 133:3 185:13
**agree**   104:18 108:8
   112:17 113:5 114:6

   118:12,16 163:16
**agreed**   128:20
**agrees**   73:2
**ah**   42:1 150:3
   172:14
**ahead**   32:1 67:22
   69:24 70:1 131:5
   131:10,11,24
   132:24 134:24
   135:20 136:5
   137:20 171:15
   174:1,5 176:6,23
   178:5 180:16 181:9
**ahold**   9:7
**aid**   166:18 172:3,6
**al**   7:24
**alcohol**   129:21,23
   130:10,13 131:7,15
   131:18 132:3 133:6
**alert**   68:14
**allowed**   65:21
   96:18 107:3
**alongside**   70:23
   98:13 162:21
   165:17
**alter**   156:4
**ambiguous**   106:23
   108:2,15 109:16
   115:11
**ambulance**   100:5
   169:19
**amount**   74:10
   168:15 184:19
**ann**   2:18
**annexed**   84:16
**annual**   172:24
**answer**   4:1 14:3
   21:2,19 26:4 37:6
   73:7 74:4 88:3,17
   88:20 94:22 95:8
   96:2,8,8,14,17 97:4

97:17 105:10
106:25 107:16
109:6 110:14,17
112:9,24 123:8
124:20 126:7,12,13
131:12,24 132:24
133:25 136:5,14
137:23 138:21
139:4 151:23
164:19 173:22
176:13 180:16,23
181:6 182:23 184:2
184:6
answered   95:7
97:15,23 110:20
117:9 125:8 126:6
131:6 135:19 136:4
138:20 141:24
166:20 173:18
176:18 182:7
answering   120:14
176:12
answers   4:24 94:5
177:2,19
anticipation   12:17
21:24 22:20
anybody   9:4 11:23
12:15,17 14:2,7
17:23 18:17 20:9
22:15 48:19,20
50:22 143:25
144:25 145:14
157:25 164:11
anymore   23:9
159:15
aol.com   2:20
aosc20-16   6:2
189:14
aosc20-23   6:2
189:14

apartment   26:1
apologize   164:23
apparent   127:12
apparently   30:22
33:2 34:4 37:10
97:8 103:11
appear   44:10 152:4
appearance   75:9
192:24
appearances   2:1
7:5
appeared   36:12
166:24 189:10
appearing   2:1
appears   10:2 164:6
applicable   114:2
apply   190:23
appointment
192:13
appreciate   69:8,14
142:21
appreciated   192:20
approached   122:20
approaching   124:9
appropriate   87:9
117:1 152:24
appropriately
36:18
approximate   73:20
approximately
72:9
approximation
51:2
appurtenances   1:8
1:11
area   4:12,14 27:15
28:3,6 50:5 54:10
55:12 58:22 59:8
60:5,19,20 61:5,13
61:21 62:23,25
63:5,14 65:2 66:1

73:19,20 77:13,23
78:5,14 159:12,18
areas   61:12,13 63:7
argue   182:20
argumentative
97:2,15,23 101:25
109:4 110:13
117:10 118:21
125:9 126:5 131:2
132:22
arose   107:12
arrangements
192:16
arrested   132:10
arrived   50:16 51:7
52:11
aside   14:8
asked   42:24 75:16
81:12 94:14 95:6
97:15,23 110:19
117:9 123:9 125:8
126:6 127:10,13
131:6 133:1 135:18
136:3 138:19
141:24 142:5
151:16 153:5 155:7
166:3,11,19 173:17
176:16 177:3,17
179:6 181:14 182:6
183:25 184:5
asking   7:4 11:20,23
85:25 86:4,4 96:3
109:11 126:2
140:14 151:20
155:8 179:10
181:12
asks   161:8
assert   20:25 21:18
assessment   96:23
assist   25:4 93:5
109:14 110:9,25

166:5
assistance   99:7
assistant   22:12
24:6,10 145:23
146:2
assisted   190:14
assisting   81:5,5
associated   154:10
associates   20:15,20
22:6 151:15 160:6
161:14 164:4
assume   17:2 108:6
142:4
assumed   13:10,11
151:19
assumes   112:7
assuming   45:13
70:16 71:13 90:20
106:18
assumption   97:5,11
atmospheric   59:10
attached   193:19
attachments   5:21
attention   77:3
81:14 192:20
attire   76:3
attn   192:10
attorney   4:10 8:4,7
34:5,11 151:13
179:16 182:8
190:18
attorneys   2:3,10,16
22:23 141:9 145:6
145:8,10 190:20
audio   6:9,13,18
9:23 134:12
authorities   165:2
authorize   33:20
authorized   190:8
automated   42:8

**available** 107:23,23
  192:12
**avenue** 159:9
**avoid** 105:24
  107:11 110:9
  111:10 113:11
  175:23
**avoiding** 109:14,19
  110:25
**aware** 71:6 157:22
  158:21

**b**

**b** 27:1 47:6,6 54:4
  55:5 59:21
**back** 17:15 19:18
  21:6 34:12 35:14
  35:14,17 38:17
  39:6,7 45:22 46:10
  51:14 52:1 53:19
  57:4,5,13 65:21
  68:2,22 70:14
  75:23 77:18,23
  79:20 80:16 90:10
  90:18 98:10,18,23
  99:6,14,20 100:7
  100:12,12 116:15
  116:17 129:16
  134:13,17 141:9,19
  141:22 142:16
  143:12,14,21
  144:11 146:13
  147:11,19 148:3,6
  148:7 164:5 165:25
  166:6 167:1,14
  168:1,24 169:3,10
  170:10,17 174:18
  174:18 175:1,5,12
  176:22 178:8
  183:25 185:10
**background** 25:18

**bad** 9:11
**badgering** 96:16
**barefoot** 76:3
**barnes** 25:2,3
  128:1,11
**based** 16:16 61:1
  63:22 70:18 74:20
  80:9 89:23 91:14
  95:11,24 96:24
  138:22 163:23
  168:14
**basic** 43:3,19 44:4
**basically** 17:18
  40:23 65:20 68:11
  80:5 143:16 151:12
  159:3
**basis** 13:2 24:7
  33:24 50:2 97:12
  172:20 173:15
  182:14
**bassett** 2:24 7:17
**bathroom** 57:4
**bay** 53:21,24 55:18
  56:5,11 57:20
  60:11 61:8,9 63:14
  63:25
**beach** 159:18
**bearing** 1:7,10
**bearings** 98:7
**beautiful** 46:22,23
**began** 68:23 106:13
**beginning** 91:9
**behalf** 1:22 34:5
**belief** 76:23 78:13
  144:19
**believe** 16:10 17:4
  22:21 34:7,18
  44:20 46:5 47:6
  48:9,19 52:5 62:4
  72:16 73:21 77:5
  84:18 87:17,24

88:9,10 99:15
  101:3 110:24
  115:21 117:23
  119:2 120:8 123:21
  124:2,13 127:17
  134:25 137:9,13
  144:22 145:1,3
  149:8,13 151:25
  158:24 160:11
  164:14 167:25
  168:25 169:2 170:6
  171:23 184:25
  185:3,5,6,7,19
**believed** 184:11
**belongs** 102:22
  103:1
**bench** 93:3
**bends** 72:15
**bennington** 163:1
**bentley** 159:11,24
  160:1
**best** 36:13,14 39:21
  47:20 49:17 53:4,5
  66:24 73:25 101:15
  101:16 103:5
  114:11,19 138:2,16
  138:16 144:7
  159:21 176:14
  177:22 178:22
**better** 156:10
**big** 16:2 46:3,6,8,9
  47:23 48:25 49:10
  50:4,21 51:11 53:1
  53:8 55:18 128:16
**bill** 32:17
**biscayne** 2:13
  192:1,2 193:1,2,8
**bit** 14:6 24:5 57:23
  77:19 84:24 155:23
  170:15 178:9

**black** 85:12
**blasts** 114:15
**block** 92:21
**blocked** 123:23
**blocking** 67:22
  92:6,14,19
**blood** 167:10,15,21
  170:5 171:4
**blumberg** 2:12
  193:7
**boat** 14:10 16:2
  24:24,25 28:8,12
  28:13,19 31:3,4,4,7
  31:24 32:4,8,13,25
  33:2,23 35:5,11
  36:7,9 37:1,14,15
  37:21,24 38:4,12
  39:8 41:20 42:3,8
  48:5,15 49:9,21
  50:13,16,20,21
  51:8 52:12,13,19
  66:16,19 67:8 69:8
  69:16 70:11,22,23
  71:5,8,9,13,15,24
  72:5 75:4 76:2,4,5
  76:11,18,24 77:6
  77:15 78:13,22
  79:2 80:22 81:15
  81:20 83:10,12
  85:18 90:21 91:15
  91:21,23 92:2,15
  93:12,13,14,16,17
  93:21 94:23 95:5
  95:10,15 98:17,18
  98:21 99:13,13,24
  100:3,16,17 104:20
  105:6,14 107:8,22
  107:25 108:21
  109:2,10,22,22
  110:7 111:11,12,15
  111:24,25 112:15

113:6,8,14,16
114:22 115:2,9,12
115:18,21 116:7
117:17,20 118:17
119:19,24 121:23
122:22 123:15
125:4,11,22 138:18
138:25,25 142:2
151:14 154:7,15
160:4 162:21,22
163:1,2,6 164:11
165:18,22 166:4,5
166:17,25 167:14
167:18 168:17,19
168:25 169:5,7,10
169:12,16 170:9,10
170:17,25 171:4
172:4 174:15
175:13
**boat's** 68:8 150:19
**boater** 106:16
**boaters** 105:3
**boating** 46:23
47:12 57:22 104:21
106:11,13 133:12
172:1
**boats** 16:3,3 28:10
28:20,21,25 29:6,7
29:10 31:9 38:25
138:23 165:19
**bob** 22:11
**bold** 149:23
**bone** 95:16,22
**bonnie** 128:11
**bot** 44:6
**bottom** 28:1 44:7
55:25 82:15 85:4
87:23 88:11 90:23
94:12 156:20
**boulevard** 2:6,13
192:2,7 193:2,8

**bow** 83:12 92:21
123:16 139:14,17
**break** 12:4,7 57:3,4
96:21 103:22 147:6
147:7 148:9
**bridge** 53:23 57:19
58:2,14 60:16
62:25 63:24 64:20
64:23 65:10,18,22
65:24,25 66:13,20
67:4,7 68:23 69:4,7
69:15 70:20 71:23
72:12 73:4,22
74:11,22 75:24
76:16 78:25 79:4
79:12,17,23 80:6
80:11 85:9 88:12
90:10 92:4,17,23
93:1 101:9 102:12
118:11 119:11
173:24
**brief** 165:20 171:16
184:16
**briefly** 119:7
171:11
**bring** 130:20
**broad** 35:4
**broke** 57:17
**broker** 20:13,19,21
20:23 21:23 22:5
**brought** 130:22
158:24 162:21
**broward** 29:15
31:5
**builder** 33:23
**buildings** 26:1
**built** 31:13,14,16
38:14
**bull** 130:16 131:13
**bulls** 49:23

**business** 10:17 19:4
19:15 23:21 28:18
149:2
**businesses** 24:11
25:14
**butler** 2:17,18 3:6
3:9,12 5:11,14,17
5:20 7:11 8:4,4
9:13 21:7 59:13,14
59:16,24 72:20
73:1 103:20 118:4
118:7,9 119:1,18
120:22 121:9,19
122:4 123:3 124:23
125:17 126:1,11
127:3,8 131:4,9,12
131:14,20,21 132:2
132:25 133:1,4,21
133:22 134:2 135:2
135:8,14,24 136:8
136:17 137:1,12,25
138:4,10 139:3,8
139:11 142:14
145:25 146:2,3,8
146:12,21 147:2,8
147:12,16,20 148:7
148:7,13 149:9
151:2 154:3,4,18
155:2,21 158:3,9
162:15 164:3,20,22
167:2 168:6,18
171:8,12,15 173:13
173:17 174:21
175:2,7 176:4,9,11
177:1,7,8,11,24
179:4,10,14,16,19
179:23 180:2,5,8
181:5,13,17,19,24
182:2,4 183:2,5,20
183:24 184:10,14
186:5

**butler's** 145:23
**buy** 31:8 32:5,9

**c**

**c** 7:17 15:20
**caballero** 2:11,12
3:5,7,10,13 7:1,6
8:2,2,22 9:14,18
10:7,12 17:9,22
19:22 21:3,5,20
22:2,3 24:15 25:8
26:7 27:13 29:5,12
30:18 31:18 32:6
32:15,21 33:19
35:3,13 36:3,21
37:5 39:1,14,23
41:5,13 43:8,15,23
45:1,8,19 46:7 47:1
49:6,14 52:10,23
54:2,8 55:4,9,14
56:8,16,22 57:1,15
58:11,20 59:7,15
59:20 60:3,14,24
61:17 62:3,17 63:4
63:10,20 64:4,10
65:6,12,23 66:4,11
66:18 67:1,19
68:18 69:5,13,21
70:10 71:1,11 72:7
72:25 73:10,12,14
73:16 74:5,7,14
75:1 76:21 77:4,10
77:20 78:1,11,20
79:13 80:19 81:3
81:10,23 82:5,23
83:6,21 84:2,13
85:10 86:2,7,9,14
87:3 88:6,23 89:5,8
89:15,19 90:1,8,17
91:3,7,22 92:13
94:3 95:13,18 96:1
96:10,20,22 97:10

97:16 98:1 100:21
101:19 102:4,13
103:7,18,19,24
104:13,17 105:1,13
105:22 106:4,10,17
107:6,20 108:5,12
108:13,19 109:12
109:20 110:16,23
111:8,23 112:13
113:4,17 114:1,21
115:14,23 116:22
117:4,13,22 118:2
119:12 121:20
123:9 127:10 140:5
146:23 148:2
162:17 171:11,13
171:16,19 172:9
173:1,11,19 175:16
176:6 178:1,5,7,17
178:24 179:22
180:17,20,25
182:11,13,18 183:7
183:16 184:16,18
184:24 185:12,18
186:2,10,16 193:6
193:11
**caballero's** 120:8
**cabin** 64:19
**cable** 25:23,24 26:2
26:5,6,21 28:7,18
**call** 15:5 22:22
31:17 46:14,18,20
47:9,12,16 48:2,24
49:3,7 57:25 78:4
95:16 98:9,11
128:14 157:21
164:4 192:13
**called** 8:18 26:24
31:9 47:3 98:11
141:18 142:17
171:7 185:16

**calls** 91:1 104:22
105:9 106:23
107:14 108:2
110:12 112:22
115:19 126:4
136:12 168:3
**capability** 143:21
**capable** 98:15
166:7
**capac** 19:6
**capacity** 10:25 19:8
142:25
**captain** 14:10
15:14,17 16:9,18
16:19,21 18:2
19:25 20:2,4 30:6
33:17 43:1 141:6
145:1
**captains** 40:4,20
42:24 43:10
**caption** 7:13
**card** 141:8,19
142:19 144:23
157:21
**careless** 135:9,15
135:22 136:2
**carrier** 52:4 140:21
150:5 162:14
**carry** 24:10
**case** 1:2 7:13 9:7
10:22 13:6 154:7,9
154:14
**cast** 22:15
**casting** 22:16
**casualty** 150:17
**catch** 46:6,8,9
47:23 48:25 49:10
50:4 51:11 53:2,8
55:18 128:12,16
**cause** 94:18

**caused** 137:11
150:19
**causes** 137:3
**causing** 137:7
**cc** 192:24
**ccaballero** 2:14
**cell** 51:19,21,22,23
52:4 127:13,14
**cellular** 52:6
**center** 18:4 29:7,9
29:16,16,17 67:25
69:9 78:25 80:6
87:5,16,18 124:5,6
**centered** 37:16
**ceo** 25:12
**certainly** 177:16
**certificate** 3:16,17
189:1 190:1
**certificates** 190:7
**certification**
190:22
**certified** 1:22 8:10
8:15 17:6 26:3
46:16 53:14 74:2
104:9 181:21 189:7
190:3,6 191:6
**certify** 187:5 189:9
190:7,17
**certifying** 191:1
**chance** 17:10 31:23
163:5
**change** 42:11
154:19 188:5
**changes** 188:4,23
192:17
**channel** 53:22,25
57:19,25 58:1,13
58:24 59:5 60:15
60:19 61:6,7,8,10
61:21,24 62:24
63:1,5,11,13,23

64:1,6,17 65:9
68:12,25 72:4
74:17 75:25 76:10
76:16 77:2,6 78:18
78:25 79:6,12
81:18 86:18 87:8,9
87:19,20,24 89:13
89:25 90:4,5,10
93:12,13,15,18,22
94:25 97:7,8
105:15 107:5
114:10 118:23,25
119:10,22,25 120:4
120:5,6 122:20
124:4,6,7,14,17,25
125:13,21,23
138:25 168:17
174:7
**channels** 89:1
124:11,15 125:22
168:1
**characterize** 63:22
**charge** 17:18
**charles** 2:4
**charlie** 8:8 137:20
147:12
**chart** 4:14,16 55:8
55:10 60:4 61:2,3
75:24 77:12 80:5
**charts** 23:3,4,5,7
23:14 59:9 62:10
**check** 59:18 83:11
**checkered** 85:13
**checkup** 172:24
**chest** 165:12
**children** 9:5
**choose** 45:4
**chris** 67:16
**circle** 4:16 5:6 73:2
85:3 102:23 103:9
103:9

**circled** 73:19 78:5
  78:14 102:17 103:3
**circles** 102:25
**circumstances**
  10:16
**citation** 134:5
  135:13,22 136:1
**citations** 133:12,15
  133:20 134:9,21
  136:23
**cited** 30:14
**city** 159:17
**civil** 96:19
**civilization** 26:14
**claim** 5:15 137:4
  149:24 153:25
  154:6,14
**claimants** 1:22,23
  2:10,16
**clean** 127:11
**clear** 32:7 36:14
  79:6 123:8 130:12
  139:21 141:14
  177:7
**clearly** 9:19 69:20
**clearwater** 27:11
  27:14 28:3,6,17,24
**client** 173:20
**clients** 25:14
**close** 90:24 121:23
  122:16 123:5
**closer** 72:11 83:16
  88:12 101:8
**closest** 192:14
**coast** 26:17 109:9
**collected** 157:4
**collide** 125:23
**collided** 95:12,14
  138:23
**colliding** 175:25

**collision** 30:11
  74:11,15 75:13,15
  75:18,20 76:13,17
  77:16 79:2 80:20
  81:5 95:16,23,24
  98:3,8 105:24
  107:11,24 111:10
  113:11 116:25
  119:15,20 120:17
  121:1 122:9 123:10
  124:9 125:5,6,16
  130:13 136:19
  137:7,15 138:17
  139:22 140:9 172:6
  175:5,10,14,15
  179:13 181:15
  183:1
**collisions** 109:14
  109:19 110:9,25
**color** 4:22
**colors** 31:15
**combin** 75:10
**combination** 39:13
**come** 9:15 21:5
  31:1 44:13 49:8
  54:17 55:16,22
  56:3 60:7 142:12
  147:11,18 192:14
  193:15,18
**comes** 87:22
**comforting** 166:23
**coming** 9:15 10:5
  12:10 23:1 48:22
  65:2 71:23 77:8
  116:6 119:25
**commence** 19:14
**commercial** 24:2
  27:9,19,23 28:1
  61:12
**commission** 187:22
  189:23

**communicate**
  99:21
**communicating**
  11:25
**communication**
  6:14,19
**communications**
  6:9 164:13
**comp** 154:6
**companies** 11:2
  24:17 159:14
**company** 15:8,10
  15:11,16,23,25
  16:10,20 20:10,12
  24:18 26:13,14,22
  26:25 31:9 151:6
  152:15,23 153:24
  154:12,15,17
  155:18 156:9 159:1
  161:11,12 164:9
  165:2
**company's** 160:13
**compass** 38:13
**complete** 190:12
**completed** 192:12
  192:18
**completely** 79:6
  117:1 132:21
  180:23 182:15
  183:8
**completion** 31:25
**comply** 104:20
  105:7
**composite** 5:20
  158:8
**compressions**
  165:12
**computer** 9:22
  23:11 56:25 144:18
  157:1 190:14

**computerized** 23:7
**concepts** 106:5,6
**concerned** 143:9
  152:24 159:20
**concerning** 20:10
  20:14 24:21 30:1
**conclude** 192:19
**concluded** 186:21
**conclusion** 104:23
  105:10,20 107:15
  108:2 110:13
  112:23 115:20
**conditions** 45:12
  58:16 137:14
**conduct** 115:8
**conference** 189:11
**confirm** 86:6
**confirmations**
  161:16
**confirmed** 6:22
  144:25 145:15
**confirms** 84:4
**connected** 190:20
**consent** 6:18
**considered** 133:10
**consistent** 83:22
  101:21 130:5
**console** 18:4 29:7,9
  29:16,17 67:25
  69:9 123:17
**constantly** 35:9
**constituted** 94:17
**construction** 11:2
  23:19 32:5,9
**consulting** 15:25
**consumed** 130:13
**contact** 22:9
  153:16 164:16
  172:17
**contend** 94:17
  162:9

**content**  21:14
**contention**  137:4
**context**  18:24
    160:2,18
**continue**  9:14 10:8
    96:5
**continued**  5:1
    35:18 117:16
    142:24 143:3
**continuing**  152:4
**continuous**  80:21
**continuously**  27:16
    37:18
**contractor**  28:7,18
**contribute**  137:15
    138:13
**contributed**  137:15
**contributing**  94:18
**control**  190:25
**conv**  164:12
**conversation**  145:8
    171:3
**conversations**
    171:24
**convey**  160:1
**cooler**  49:22
**coover**  15:18 17:25
    20:2,4 33:17 43:1
**coover's**  16:10,19
    16:19
**copy**  4:22 151:17
    151:24 160:7,24
    161:23 192:18
    193:17
**corner**  53:25
    139:15,18
**correct**  32:10,14
    33:3,4,6,12 34:19
    34:20 36:19,23
    37:11,12 43:21,24
    43:25 44:24 45:2,3

45:7,17,21 54:12
56:6,14,17 60:11
60:16,18 61:15,19
61:20 63:7,9 64:14
64:15 65:3,4 66:2,8
68:15,17,20 74:12
74:25 81:15,17
82:25 83:5,15 84:7
84:9,22 85:15,16
85:21 86:10,25
87:5 88:14 89:2,6
90:25 91:5 94:7,8
94:13 95:19 96:3
101:9,23 105:4,8
105:12,18,21 106:9
108:22,23 110:4,5
110:18,22 113:20
114:3,20 117:3,7
118:1 119:17 120:2
121:8,18 124:15
125:1,2 129:14,15
129:17 133:16
134:22 135:5,10
136:11,19,20,23,25
138:12,16 139:20
139:23 140:1,12
141:16,17,20
148:25 150:22
151:7 152:7,15
161:6 162:14,23,24
163:7 165:10
174:19 178:15
184:12,21 188:23
**corrections**  187:4
192:16 193:18
**correctly**  124:4
129:11 158:4
173:10
**cosme**  2:11 8:2
20:24 21:9,14
59:13 72:20 146:14

146:18,21 176:5
193:6
**counsel**  5:7 7:12,25
90:11 179:24
190:18,20 192:18
192:24 193:12
**counseling**  133:6
**counselor**  86:1
**county**  187:11
188:21 189:4
**couple**  13:7 35:17
41:23 129:1 173:5
176:4 178:4 181:14
**course**  113:13
114:5 176:1 182:1
182:3
**court**  1:1,24 6:1
8:12 59:18 134:4
134:17 148:3
189:13
**coverage**  151:20
**covers**  29:19
**cow**  77:21
**craft**  67:16
**crash**  124:3 128:25
129:7 130:1 140:7
143:1 162:21
**crashed**  150:18
**creek**  46:3 61:13
**criminal**  11:6
**cross**  3:8 173:6
**crossed**  97:8
**crossing**  95:24
119:23 124:10,15
125:21
**crr**  1:23 189:19
192:23 193:24
**cruiser**  64:19
**cruising**  39:9,17
40:24 122:7,8,10

**csd**  2:8
**cul**  128:5
**current**  9:2
**cut**  11:20,21,21,22
**cuts**  11:23
**cv**  1:2
**cycle**  39:20

**d**

**d**  2:17,18 27:1 47:6
**dad**  28:16
**dade**  189:4
**daily**  13:1 17:19
    24:7
**damage**  162:25
**damaged**  11:4
**dark**  51:15
**data**  141:7,19,22
    142:8,12,16 143:5
    143:6,9 145:15,18
    157:5,9 161:4
**database**  141:1
**date**  7:7,19 35:15
    45:23 90:21 127:15
    129:18 140:4,5,6
    140:10 143:1
    160:17 188:25
    192:19
**dated**  148:20
    149:18 155:13
    158:10 160:14
    161:7 191:2
**daughter**  30:22
**davant**  2:4,5 3:8,11
    8:8,8 73:5,11,13,24
    85:22,24 86:4,11
    87:1 88:1,13,15
    89:3,7,10,18,22
    90:7,15 91:1,6,18
    92:11 95:6,17,21
    96:1,13 97:1,14,22
    101:10,24 102:8

103:4,12,17,21
104:2,22 105:9,19
106:1,8,14,22
107:14 108:1,11,14
109:3,15 110:12,19
111:3,18 112:2,4
112:21 113:12,21
114:17 115:10,19
116:20 117:2,8,19
117:25 118:20
119:5,16 120:19
121:4,13,15,25
122:23,25 124:19
125:7,25 126:23
127:5,7 130:25
131:2,6,11,19,23
132:18 133:17,24
134:4,6,10,16,23
135:6,11,18 136:3
136:12,24 137:8,19
137:21 138:9,19
139:7,10 141:23
146:4,10,15 147:5
147:10,14,18,21
149:6 150:24 154:2
155:20 162:11
163:25 164:18
166:19 168:3,13
171:10 172:7 173:4
173:7,15,21 174:22
175:3,8,19 176:2
176:20 177:4,9,21
178:4,16,20 179:2
179:15,18,20 180:1
180:3,7,14,15,19
180:24 181:2,8,23
182:1,3,10,12,17
182:19,22 183:3,6
183:9,12,18,22
184:7,22 185:8,15
186:3,6,9 192:6

davant's  12:15
davantlaw.com  2:8
  2:8
dave  15:18,21
  17:25
david  9:1
day  17:20,20 21:6
  24:3,3 25:5,5 36:6
  36:13 40:22,24
  42:4 46:22 47:12
  48:20 51:17 63:19
  64:1,8,11,14,18
  99:18 101:5 128:22
  131:8 132:3 142:1
  143:22 153:3,4
  157:21 187:14
  189:15 191:2
days  13:7 41:23
  42:6 64:5 149:19
de  128:5
deal  73:11 147:16
dealing  33:23
dear  193:12
death  154:9
december  1:17
  7:19 187:2 188:3
  189:11,16 191:2
  192:4,9 193:5,10
decided  31:25 32:5
  32:9 69:15 70:11
  83:1
decision  31:21
declare  188:22
deeper  59:5
definitely  35:25
  59:3 69:11 95:23
definitively  146:25
delineate  86:21
delivered  42:7
  140:17 149:8 151:4
  161:16,18 162:2,13

delivery  162:2
demand  156:3
demarcates  85:13
denying  162:8
departed  53:16
  54:21
depending  45:11
  63:19 64:1
depends  39:19
  64:12
depict  102:9
depicting  60:5
  103:9
depiction  56:9
  65:14 102:6
depicts  54:9 101:7
depo  187:1 188:2
  192:9 193:10
deponent  187:6
deposed  10:13,19
  10:21,24 11:9
deposition  1:15,19
  1:24 3:17 4:12 5:7
  5:11 7:23 12:10,18
  13:3 19:24 21:10
  22:20 23:1 94:7
  140:3 148:11
  154:25 158:7
  178:10 186:20
  188:23 190:1,9,13
  192:12,19 193:14
  193:16,17
depositions  6:7
depth  58:23 62:12
describe  19:18
  37:13,21 39:5
  40:23 45:14 58:12
  58:15 67:14 68:3
  94:15
described  26:21
  80:9

describing  41:9
description  4:7 5:2
  5:12
designated  63:6
designed  31:6
detail  94:15
determine  107:24
deutsch  2:12 193:7
deutschblumberg...
  2:14 193:11
different  21:6 30:5
  70:14 115:5 165:15
  176:16
differently  116:19
  117:6
dimensions  69:17
dinghies  29:20
dinner  13:18
diplomate  189:7
  190:6 191:6
direct  3:5,6,7 8:21
  70:8 93:9 118:8
  171:18 190:16,25
direction  70:7
  81:20 84:6 139:1
  144:5,8 190:25
directly  20:11
  70:23 78:24 79:10
  80:17 92:22 102:12
  140:19 149:11
  150:5 151:15
  161:10
discuss  14:5
discussed  12:12
  13:8,16 20:7,11
  33:22 47:24
discussing  20:8
discussion  154:23
dismissed  133:19
  136:10

**displaying** 6:23
**disputes** 11:3
**distance** 68:10
 74:10 101:17 113:3
 167:25 168:9,9,16
 169:4
**distortion** 146:14
**distracted** 119:3,14
**district** 1:1,1 55:24
**divisions** 26:12
**dock** 41:8 52:20
 98:18 99:7 100:7
 100:12 143:8
 153:11 166:1,6
 167:1,14,15,20
 168:2 170:10,17
**doctor** 163:20
 165:11 172:19
**document** 32:18,22
 54:5 59:25 78:8
 82:2,9 84:10 85:4
 93:25 100:18
 103:14 104:11,12
 148:10 154:24
 158:6 160:4
**documents** 4:10
 22:19
**dog** 18:18
**doing** 18:7 25:10
 25:24 26:13,19
 75:21 80:7 100:24
 112:20 164:11
 166:7 175:4
**donna** 158:25,25
 159:2,24
**donna's** 159:10
**doover** 15:22 16:21
 18:2 19:25 20:2
**download** 142:19
 145:11

**downloaded** 141:7
 144:23 145:18
 157:20
**downtown** 41:2,18
 46:21 50:5 54:1
**dozen** 10:20 29:3
**drank** 131:7,18
**draw** 101:15
**drawing** 89:23
 100:23,25 101:2,4
 101:7,20 103:2,8
**drawings** 23:3,14
**drew** 101:13 102:2
 102:7
**drink** 130:21
 131:13,15 132:3
**drive** 9:3 48:13
 174:15
**driven** 150:12
**driver** 98:14,22
 136:18 169:14
**driver's** 6:25
**drivers** 115:22
**driving** 98:15
 133:8 163:20 166:2
 169:10 173:24
**drove** 48:10 98:17
 111:13 165:22
 166:5 170:17
**due** 98:16
**dui** 132:11,15
**duis** 132:6 133:5
**duly** 8:18 189:11
**duplicate** 162:19
**durable** 4:9
**duties** 17:14

**e**

**e** 15:20 40:10,11
 162:4
**earlier** 174:17

**early** 27:17 35:21
 46:14 47:10,25
 49:18 112:19
 128:17 130:3,7
 178:13
**east** 2:6 53:21
 66:17 73:3 83:9
 87:7 192:7
**eastbound** 61:8,9
**eastern** 7:20 70:7
**easternmost** 85:19
**eat** 50:6,6
**echoing** 53:15
**educational** 25:17
**effect** 30:1 95:16
**effective** 107:11
**effort** 156:24
**eight** 123:14
**eighteen** 27:20
**either** 11:19 13:24
 15:12 22:11 38:23
 40:19 62:12 75:12
 81:15 92:8 161:9
**electronic** 38:9,12
 155:9
**electronics** 33:10
 36:10 42:3,12 44:1
 79:25 140:15
 176:18,24 177:19
**else's** 9:22
**employee** 15:6
 161:20 190:18,19
**enclosed** 193:14
**enclosures** 160:23
**endeavor** 80:13
**endeavors** 23:24
**ended** 27:11
**enforcement** 143:8
 153:15,19 157:4
 165:4

**engine** 100:11
**engines** 1:7,11
 52:19
**ensure** 113:15
**enter** 55:21 56:10
 58:13 60:8 65:8
 188:4
**entered** 90:3
 145:23 188:24
**enterprise** 23:24
**enterprises** 26:24
 26:25 159:6
**enters** 61:11
**entire** 42:10 79:7
 79:18 80:23 91:11
 91:16 99:12
**environmental**
 58:16
**equally** 114:2
**equipment** 6:10
 26:6 33:2,21 34:23
 35:2 37:9,20,21
 108:10,20 109:1
 156:15 157:12
**equipped** 42:17
**equire** 2:17
**errata** 3:15 187:4
 188:1
**erratic** 93:12
**erwin** 2:16 5:17,21
 8:5 94:22 150:10
 155:24
**esquire** 2:4,5,11,18
 192:6 193:6
**essentially** 60:21
 85:18 95:15
**established** 121:20
 156:23
**estate** 19:3
**estimate** 73:1,3,6
 184:3,9,19,23

185:5,6,14,17,22
185:24,24 186:1
**estimated** 122:11
**estimating** 62:1
**et** 7:24
**evasive** 111:9,14
**event** 192:16
**eventually** 149:12
　149:16
**everybody** 7:3 74:6
　169:16
**evidence** 97:3
　111:20 112:8
**evinrude** 28:16
**exact** 16:12 37:23
　38:2 183:11 185:2
　185:24
**exactly** 11:11 35:25
　46:19 68:5 119:8
　157:14 160:16
　175:11 179:9
　184:13 185:11
**exam** 3:7
**examination** 3:5,6
　3:8,9,10,11,12,13
　8:21 118:8 171:18
　173:6 176:10 178:6
　179:1 183:23
　184:17
**examined** 8:19
**exchanged** 157:23
**excuse** 16:25 17:6
　179:24
**exhib** 148:19
**exhibit** 4:9,12,14
　4:16,19,22,24 5:4,6
　5:14,17,20 32:16
　32:20 54:3,4,7 55:5
　55:11 59:12,21,22
　59:22,23 60:2
　64:25 72:9 73:18

73:20 77:11 78:3,5
78:10,15 81:25
82:4,8 84:4,12,15
85:12 86:23 87:21
88:24 89:20 90:2
91:9,13 94:2,4
100:20,23 101:21
102:19 103:8,16
104:11 145:21
148:12,14,18,19
155:1,4,13,14
158:4,5,8,8,11
**exhibits** 4:6 5:1,11
　154:19,22
**exists** 107:24
**exoneration** 1:12
**expedite** 166:25
**experience** 63:12
　63:23 106:16
　122:13
**expert** 142:17
**expires** 187:22
　189:23
**explained** 142:15
**extensive** 150:19
**extent** 169:11
**external** 134:12
**eye** 172:19
**eyes** 79:1 84:5
　106:19 120:18
　121:2,12 126:20
**eyewitness** 136:10

---
**f**
---

**fact** 13:5 69:8
　96:24 97:5,21
**factory** 31:19,25
　141:5
**facts** 97:2 111:20
　112:7
**factual** 97:12

**failed** 106:18
**failure** 135:22
**fair** 12:8 21:11,13
　35:19 40:22 43:2
　45:20 56:9 65:24
　70:16 87:10 90:6
　170:16 174:16
　186:2
**fairly** 39:21 168:16
**familiar** 32:24
　118:10 162:5
**family** 48:18
**far** 21:10 35:14
　68:11,22 73:3
　143:8 152:23 157:5
**farther** 54:18 161:2
　169:4
**fast** 68:3 143:22
**fault** 94:23
**fdblawfirm** 2:20
**featured** 37:22,22
**features** 33:11 43:5
　43:14
**federal** 1:24
**feedback** 9:12,21
　156:9
**feel** 12:3 83:22
　107:4 117:11 129:3
　142:10
**feet** 62:2,13,21
**felt** 115:24 165:1
**fiber** 26:2,6
**fifteen** 27:20 28:11
**fightingforfamili...**
　2:21
**figure** 143:12
**file** 193:14
**filed** 136:22
**filling** 82:20
**filmed** 142:3

**final** 172:10
**finally** 130:9
　170:21
**find** 154:21
**fine** 7:10 12:1,9
　73:14 179:15
　182:10 184:14,14
　186:16
**finish** 12:6 104:1
　146:8 164:19
**finished** 164:21
　179:23,24
**fire** 100:8
**firm** 25:15
**first** 4:24 8:18
　21:12 25:22 28:5,8
　28:12 35:19 36:9
　70:15 76:7 106:13
　108:7 133:7,9
　150:7 152:8 160:18
　160:24 161:17,24
　166:17 170:24
**fish** 29:10 133:15
　134:22 153:1,3
　163:8
**fishing** 27:10,19,23
　28:1 33:9 37:15
　39:10,17,20 40:12
　40:15 41:24 100:15
**fitted** 109:1
**five** 14:25 15:2 47:8
　96:14 103:25
　123:14 124:1
**florida** 1:1,16,23
　1:24 2:7,13,19 4:19
　6:1,5,12,15,17,20
　6:23,25 9:3 26:16
　26:18 27:3,11
　187:10,19 188:21
　189:3,9,13,19
　192:2,7 193:2,8

**fluids** 130:23
**focus** 67:13
**focused** 77:2 92:3
  99:23 118:22
**focusing** 36:4
**folks** 22:14 23:8
  84:20 100:9 172:4
**follow** 53:25 118:5
  122:21 164:10
  171:17 173:5 178:2
  179:3 183:20
  184:16
**followed** 152:20
**following** 57:10
  104:7 117:15 148:1
  156:4 172:6
**follows** 8:20 134:20
**foot** 28:15 29:17,18
  33:3 67:15 118:17
  124:1 125:22
  150:11,17
**foregoing** 190:11
**forget** 15:14 46:19
**form** 17:17 19:21
  24:13 25:6 27:7
  29:2,8 30:15 31:12
  32:3 33:16 34:25
  35:7,23 36:20 37:4
  38:22 39:12,18
  40:25 41:11 43:6
  43:11,22 44:25
  45:6,18 46:4,13
  49:4,13 52:8,17
  56:7,15,21 58:10
  58:17,25 60:13,22
  61:16,25 62:15
  63:2,8,16 64:2,7
  65:5,11,19 66:3,9
  66:15,23 67:18
  68:16 69:1,10,18
  70:5,21 71:7,21

72:18 73:8,24
74:13,24 76:19,25
77:7,17,25 78:16
79:8 80:15,24 81:8
81:16 82:21 83:4
83:18 84:1,8 85:7
85:24 86:11 87:1
89:18 90:7,15 91:1
91:18 92:11 95:6
95:17,21 97:1,14
97:22 101:10,24
102:8 103:4 104:22
105:9,19 106:1,8
106:14 107:14
108:14 109:3,15
110:12,19 111:3,18
112:2,6,21 113:12
113:21 114:17
115:10,19 116:20
117:2,8,19,25
118:20 119:5,16
120:19 121:4,15,16
121:25 122:23
124:19 125:7,25
126:23 127:7
133:17 134:23
135:6,11,18 136:3
136:12,24 137:8,19
137:22 138:9,19
139:7 141:23 149:6
150:24 154:2
155:20 162:11
163:25 166:19
168:3,13 172:7
173:11,13,13,16
174:21 175:7,16
176:20 177:4,21
178:16 179:14,20
180:3,9,9,22
181:19 182:13
183:5,7,16 184:22

185:8,15 188:23
**formal** 7:13 156:3
**formalities** 186:22
**format** 11:19
**fort** 2:7 192:7
**forth** 75:24 80:17
  155:7 156:1,15
  174:19 175:1,5,12
  176:18,22 185:10
**forward** 70:9 92:4
  123:16 150:19
  151:15 173:24
  174:13 193:18
**forwarded** 150:5
  152:22 156:8
  158:25 160:5
**foundation** 88:2,19
  89:4
**four** 9:9 29:22
  32:22 57:3 156:20
**frame** 19:16 128:7
  129:24 185:25
**frank** 2:17,18 8:4
  59:13,23 146:4
  147:15 148:7 176:6
**frankly** 175:14
**frenchman's** 61:12
**frequently** 39:3
**friday** 192:15
**friend** 47:2
**friends** 18:21,23
  41:3,18 46:1,20
  49:10 130:20
**front** 18:14 67:2,6
  69:20,22 70:3,17
  71:5,9,10,13 72:6
  79:10 80:17,22
  81:15 91:15 92:20
  92:22 95:11,25
  113:9 118:23 121:3
  139:14,17,18,19

163:11 167:5,10,16
**full** 8:25 17:7
**fully** 31:16 108:21
**function** 25:4
**functional** 44:19
**functioning** 35:6
**functions** 44:5
**furnish** 192:17
**further** 3:7 84:4
  89:16 90:19 168:25
  171:9,18 177:25
  178:25 184:15
  187:6 190:17
**furthermore** 152:1
**fwc** 4:19 84:16,20
  100:16 129:6 130:4
  136:10,22 142:2
  164:13 171:21
  172:1

### g

**g** 5:14 140:25
  148:12,18,19
  155:14
**game** 21:11,13 53:7
  153:3
**garmin** 35:10,20
  36:10,17,24 37:20
  37:21,24 38:3,4,10
  42:16,21,25 43:18
  44:3 62:20 80:2
  81:7 109:21 141:7
  142:19 143:20
  144:3,24 145:3
**garmins** 38:14
**gauges** 107:3 120:9
  120:12 121:7 127:1
  174:17 179:8
  184:20 185:10
**general** 27:15
  33:11 54:9,10
  55:12

**generated** 23:11
**gentleman** 169:14
**gentleman's** 128:12
**gentlemen** 185:17
**geoffrey** 2:24 7:17
**getting** 9:11,12,21
  99:24 131:21 170:9
  170:10,24
**gg** 189:22
**gilbert** 1:22 189:6
  189:19 190:3 191:4
  192:23 193:24
**girlfriend** 13:2
  19:12,18
**give** 17:10 31:22,22
  53:6 60:9 62:12
  77:14 81:24 95:1
  96:8,21 113:23
  114:15 159:19
**given** 63:11 159:24
  178:21
**giving** 96:14
  165:11 166:17
**glasses** 172:13
**go** 7:7,9 10:9 25:21
  32:1 43:12 46:1,23
  48:25 49:1 50:6,6,8
  51:11 52:14 53:12
  53:13 54:18 55:17
  55:18 56:3 60:12
  60:15 63:14 69:24
  70:1 79:20 90:18
  90:18 98:10 114:15
  128:13 130:21
  131:5,10,11,24
  132:24 134:24
  135:20 136:5
  137:20 143:11,21
  144:11 148:3 150:7
  161:2 167:17
  171:15 176:6 178:5

180:16 181:9
  186:11,11,17
**goes** 31:3,4 61:10
  86:23 123:6 151:21
**going** 11:12,13,13
  17:11,15,15 20:24
  21:1,1,17 32:15
  36:10 39:7 41:1,2,4
  41:12,17 46:21
  47:12,23 49:9,20
  51:7 53:8 55:2,6
  57:2 59:7,17,21
  61:7,8 70:8 72:22
  72:23 73:5,6 81:19
  81:23 84:14 85:2,3
  86:21 89:16 92:4
  94:4 96:5 100:22
  100:22 114:8
  122:14 127:9
  128:13,14 130:21
  132:18 143:22
  144:5 145:20 146:4
  146:13,21 148:17
  153:22 154:19
  161:24 162:18
  163:24 171:8
  182:20
**good** 7:14 8:23,24
  111:6 115:17,25
  142:22 147:16
  162:7 168:10,16
  170:9 176:15,15,15
  178:24
**gps** 4:22 80:5 83:11
  84:16,20 85:11
  87:11,12,15 89:12
  100:17 119:14
  120:15 121:7
  126:16,22 139:24
  140:11,24 141:1,3
  142:3,24 143:3,12

155:7 156:21
  184:20
**gpss** 144:20
**grab** 146:6
**graduated** 25:19
**green** 89:13,13,24
**grille** 55:24
**group** 47:22
**grouper** 27:25
**guard** 109:9
**guess** 31:17 73:6
  96:24 168:10,11
**guys** 13:14 21:13
  49:8 50:25 73:6
  84:20 93:6 130:22
  142:4,11 146:12
  147:3,3,13 168:19
  171:13 182:20

**h**

**h** 5:17 22:7 34:13
  40:9 155:1,4
**hac** 1:9
**half** 51:4 62:6,8
  103:23 125:4
**hand** 8:11 68:11
  103:20 189:15
**hands** 140:19
  149:12 150:2,23
  151:1,24 160:13
**handwriting** 82:11
**hang** 147:3
**happen** 74:3
**happened** 13:10,11
  13:13 36:8 83:15
  83:24 90:24 96:24
  96:25 97:13,18,25
  98:9 102:7 125:16
  127:2 143:13
**happening** 75:21
**happens** 10:8 11:22
  75:19 98:3

**happy** 12:5 147:10
**harassing** 96:16,20
  132:22
**hayden** 14:12,21
  16:5 17:1
**head** 15:5 53:1
  58:21 167:3,5
  170:3
**headed** 46:25 53:17
  78:25 79:12,23
  80:10 119:10
**heading** 53:20
  66:17 70:6 83:9
  87:7 102:12 130:9
**headquartered**
  159:7
**hear** 6:9 9:19 41:16
  112:14 171:14
  173:10
**heard** 183:4
**hearing** 136:9,16
**heck** 143:13
**height** 67:20
  123:13,25
**held** 34:4
**helm** 105:7 113:8
**help** 24:10 50:22
  83:13 98:16 100:9
  134:14 166:3,11
**helped** 24:22
  137:14
**hey** 59:13 164:5
**high** 25:19
**highly** 63:17,25
  64:6
**highway** 2:19
**historic** 55:24
**historical** 45:9
**hit** 111:15,16,22,24
  111:25 112:10,11
  112:15 113:15

138:25
hmm 10:4 28:10
138:6 146:2 166:10
hold 31:22,22 88:1
88:13,15 112:4,4,5
112:5,5 121:15
145:22 154:21
164:18 180:17,17
holding 190:4
holiday 64:11
132:1
home 9:2 51:14,15
99:20
honest 102:5
185:21
hopefully 145:21
146:3 154:20
horn 68:8,14,21
114:8,23
hospital 169:20,22
hour 51:5 57:2
66:25 122:12,15
129:8
hours 103:23
128:24 129:2
192:14
house 13:17 46:24
47:18 48:9,12,16
48:22 49:16,20,25
50:8,9,12,13,13,15
50:18 52:12 53:12
53:17 127:18
129:20 158:17,23
houses 118:14
127:21 128:3,4
158:15
hugging 85:19
86:12,15
huh 12:24
hull 1:7,10 33:3

hundred 57:23
118:14 124:22,24
129:1
hundreds 56:24
57:20 125:1,4,4
hurt 98:15 153:12
163:15
husband 163:20
165:11
hypothetical 90:16
106:24 108:15
112:22

i

i.d. 187:15
icw 68:4 83:9
idea 49:9 128:23
159:19
identification 1:7
1:11 6:24 32:19
54:6 60:1 78:9 82:3
84:11 94:1 100:19
103:15 148:11
154:25 158:7
189:12
identified 22:15
identifies 33:7
identify 6:16 77:14
identifying 6:10
identity 6:22
idle 65:16 100:12
100:12
iii 1:5 2:3 4:10 7:24
187:1 188:2 192:8
193:9
image 59:8
immediately 10:5
98:10 151:5 165:23
165:24 175:14
impact 78:22
111:21 127:2
138:23 139:2

implement 106:6
implemented
106:12
implied 6:3 166:9
implies 126:3
imposed 29:25
improper 90:16
106:24 135:4
inappropriate
180:25 182:15
183:8
incident 18:4 20:10
20:14,17,23 22:17
24:21 28:25 30:9
30:14 36:6,8,17
38:18 40:1 77:13
79:5 81:2 83:15,24
84:6,21 85:15 89:1
90:24 94:18 96:25
97:9 99:18,20
101:5 102:6 105:15
116:16 117:16
121:8 126:15
127:15 129:18
132:4 133:14
134:21 138:14
141:2 142:1 143:11
143:16 149:20
151:14,22 153:4
160:16 163:9
171:22 172:1
incidents 74:18
include 18:1
included 37:10
including 12:16
113:7 115:3
inclusive 190:12
incomplete 108:15
112:22
increase 68:23
70:12 155:22

index 3:1
indicate 83:14
129:6
indicated 19:12
27:18 45:24 51:10
52:11 54:13 57:16
79:22 81:4 94:6
115:24 129:8 173:8
indicates 33:1,25
163:8
indicating 54:16,20
54:24 55:19 56:5
60:11,17 61:14,19
61:24 62:14 63:7
63:15 65:3,15
72:17 77:22,24
78:6 85:6 86:25
87:25 89:17 90:6
90:14 102:19,23
103:3
indication 169:11
industry 23:20
information 23:2
24:23 140:14,24
142:25 143:7 144:4
144:20,22 153:8
155:9 156:10 157:3
157:20 161:9 162:9
162:12
initial 18:25 36:11
64:19
initially 18:22
102:11 168:21
169:1
injur 165:5,5,5
injured 98:24
99:22 171:5,6
injuries 150:20
152:3,5,10,19
153:13 154:1,5
155:25 163:23

164:7 165:6 169:12 170:18

**injury** 10:22 154:7 167:3,5 170:3

**inland** 111:6 115:3 116:1,4

**inlet** 53:13,17,19 54:18 56:2,10 116:6

**input** 31:15 32:11 32:12

**inshore** 44:17,22 45:5,11,20 123:2

**inspect** 167:17,18

**installation** 26:20

**installed** 109:22

**installing** 26:1,5,6

**instruct** 21:1,19

**instruction** 4:1

**instructional** 42:20

**insurance** 20:10,12 20:13,18,22 22:4 140:21 150:5 151:6 151:20 152:15,23 153:23 154:17 155:18 156:9 159:1 160:12 161:8,11,12 162:13 164:8 165:2

**intents** 43:19

**interaction** 12:25 13:15 81:13

**interactions** 12:17 13:21,25 19:23 20:9 24:20 34:14 42:23 171:21

**intercoastal** 71:18

**interfering** 70:8

**interject** 21:8

**interjection** 72:21

**intermittent** 35:17 36:1

**international** 115:4

**interpose** 96:5

**interrogatories** 22:22 23:13 94:5

**interrogatory** 94:14

**interrogs** 4:25

**interrupt** 55:3 69:25

**interrupting** 96:4

**interruption** 134:12

**intersection** 61:18 61:22 85:21 86:24 89:1,14,21 90:25 91:8,12,17,25 92:5 92:16 101:8 118:11 118:15 120:1 168:1

**intersects** 61:10

**interviewed** 170:22

**intracoastal** 53:12 53:20 58:5,7,15 85:20 87:5 113:2

**intro** 7:2

**introduce** 7:25

**investigation** 152:18

**invoice** 4:9 32:25

**invoices** 24:24

**involved** 10:25 11:5 18:3,4 19:5,13 25:10 27:24 30:10 33:13,18 137:7,10 153:19

**involvement** 19:9

**irrelevant** 132:21

**islands** 59:2

**issue** 10:9 16:6 35:11

**issued** 135:1,12 136:1,22

**issues** 11:19 172:11

**item** 32:18 54:5 59:25 60:16 78:8 82:2 84:10 93:25 100:18 103:14 148:10 154:24 158:6

**items** 156:5

**j**

**j** 2:5 192:6

**jacket** 30:17,22

**jacqueline** 2:10

**january** 192:10

**jaqueline** 8:3

**jeff** 5:4,6 10:3

**jeffry** 1:9,19 2:3 3:4 4:20,24 6:22 7:23 8:7,9,17 9:1 21:2 24:19 187:1,1 187:7 188:2,2,25 189:9 190:9 192:5 192:8,9,10 193:9 193:10

**jet** 29:21

**jki** 26:25

**job** 113:7 170:9

**johns** 53:13,17 54:18

**join** 173:13,13

**joined** 53:19

**jon** 47:4 128:14,14 128:15

**judge** 128:24

**jump** 7:3 57:4 162:22 166:16 186:6

**jumped** 166:4

**jumps** 165:17

**june** 141:4,11,15 141:18 144:20 145:12 156:25

**k**

**k** 14:17 162:4

**keep** 106:19 113:3 113:19 134:14

**keeping** 93:5 161:4 173:9,25 174:23

**keeps** 37:15

**kelly** 2:18

**kelly's** 22:12

**kept** 48:5 128:7

**key** 77:21

**kids** 9:6

**kind** 27:23 28:13 29:6 33:10 43:3 49:10 70:14 77:14 123:4,6 140:3 151:21 169:10

**kinds** 64:5

**kings** 9:3 48:13 49:16,20,25 50:7 50:12

**kintz** 12:21 13:5,20 13:25 14:2,5,7 18:19 40:23 41:7 47:12 48:21 49:2,8 50:16,24 51:6 76:17 81:6 92:25 99:17,21 119:3 120:17 121:2 123:21 129:13 130:9 162:22 165:17 167:23 169:9,24 170:2,16

**kintz's** 25:15

**kmay** 2:21

**knew** 44:4,5,5,6 111:25 112:10,11 138:5 157:5 171:6

**knight** 1:9,19 2:3 3:4 4:20 5:4,6,14 5:17,20 6:22 7:23

8:7,9,17,23 9:1
10:3,14 13:4 18:7
21:2 22:5 23:18
24:19 25:18 26:24
26:25 32:23 38:16
40:8 45:24 47:17
53:6 54:11 55:15
57:16 60:5 63:11
71:4 73:17 74:8
77:12 78:6 80:8
82:16 83:8 86:3,8
86:16 87:11 88:4
88:16 89:9 90:3,9
91:4 94:5 95:8 96:3
96:21,23 97:4
104:18 105:11
107:1,17 109:7
110:14 112:5,9,18
112:24 113:5 115:1
115:6,15 116:16
118:10 120:16
123:13 126:7,15
131:11,24 134:10
134:11,16,24
135:20 136:6,14
137:23 138:21
148:14 155:3 159:6
164:23 171:20
173:8,22 176:12
177:12 178:2 179:4
180:16 181:6
182:23 183:19,25
185:13 187:1,1,7
188:2,2,25 189:10
190:9 192:5,8,9,10
193:9,10
**knight's** 4:24
**knocked** 98:25
99:9 162:17
**know** 7:4 9:15 11:4
11:8,13,16,22 12:3

12:4 13:20 14:3,21
15:1 16:9,12 17:1
19:12 21:9 23:12
24:22 27:5,18
29:20 30:4 31:14
38:3,7,9,10 43:13
44:2 45:24 47:13
48:15,24 51:10
52:11 54:13 57:16
61:3 67:21 68:5
71:4 72:23 78:17
78:21 80:4,5 86:15
87:12 93:9 95:20
96:11,11 98:8,10
99:10,11,16,23
100:4 101:12,14,15
102:1,2 104:10
105:2 108:16,25
109:8,13,23 111:7
111:16 115:24
119:19 121:20
122:2 124:20,22
128:23,24 130:1,15
136:14 138:17
140:3 143:2,16,20
144:14 145:7,17
146:6,18,19,24
157:11 159:12,17
159:23,25 163:14
164:5,7 165:4
166:25 168:8
169:19 170:1,9
171:4 172:8 174:25
175:9,11,13 178:9
178:22 179:12
181:20 182:24
184:13 185:1,10
**knowledge** 14:4
36:15,25 43:18
66:24 73:8 76:7,17
91:14 114:11,20

123:7 143:24 144:7
159:22 176:14
**known** 47:7 112:20
187:15
**korey** 162:3

## l

**l** 2:18 22:7 47:6
**labor** 11:3 40:24
64:11,14
**labudde** 47:4,7,21
48:24 49:7
**lack** 88:1,18,18
**ladies** 98:23
**lady** 163:11,13
164:6 166:23 170:3
**laid** 79:1
**land** 58:23
**large** 1:23 11:1
67:6,9,13,14 68:1,3
68:4,7,10,13,24
69:7,17 70:3,18
71:5,14 72:10,17
73:21 74:8,16,21
75:3 79:3,15,24
80:11 83:10,16
87:25 88:10 91:25
93:2 101:8,22
102:16,21 103:1,11
187:19 189:9,20
**larger** 29:10,24
31:4 69:11
**largo** 9:3
**las** 2:6 192:7
**lasix** 172:15
**late** 140:3
**lately** 20:7
**lauderdale** 2:7
192:7
**law** 2:5 143:7 150:9
153:15,19 157:4
165:3 172:6 192:6

**lawyers** 11:13,20
12:12 13:21,23
14:8
**leading** 57:18
60:11 76:16 84:20
84:25 85:14 87:23
92:17 93:23 105:15
116:6 173:20
179:17 180:11
182:9
**leads** 58:1,13 63:24
85:5 88:25
**leave** 53:12 157:11
**left** 49:15,25 50:7
68:12 83:10 87:16
87:17 100:6 116:24
124:5 139:18 152:2
153:11
**legal** 6:7 7:17 94:18
104:23 105:10,19
107:15 108:2
110:13 112:23
115:16,20 192:1
193:1
**legitimate** 21:16
**length** 67:15
**lenses** 172:17
**letter** 3:18 5:14,17
5:20 140:13,20
142:10 143:4
148:20 149:4,10,18
150:1,6,23 151:1
151:13 152:2,14,17
152:22 153:23
155:4,8,12,15
156:3 158:10,22
159:20,23 160:2,14
160:18,20,24,25
161:3,7,24 163:21
164:2 192:11
193:15

**level** 43:3,18,20
**liability** 1:12
**license** 6:25
**life** 28:11 30:17,21
  99:3 153:12,13
  165:5
**lifetime** 10:20
  57:22
**lift** 48:5,6 50:20
  52:13,18
**lighting** 26:15
**likewise** 183:9
**limit** 17:15 28:22
**limitation** 1:12
  136:21
**limited** 15:13 26:17
**line** 4:2 25:21 28:1
  70:8 85:12 86:19
  87:4 89:12 93:10
  107:4 132:19
  143:19 144:8,12
  188:5 192:17
**lined** 75:25 102:11
  119:9
**lines** 144:15
**lining** 80:6
**link** 186:7
**list** 156:5 192:16
**listed** 192:12
  193:14
**listen** 125:18 126:1
**litigation** 11:3
  21:24
**little** 14:6 24:5 60:9
  77:18 84:24 87:16
  87:17 146:5 155:23
  169:4,15 170:15
**live** 9:4 27:4 127:19
  128:2 129:13
**lived** 27:8,14
  127:20 158:16

**lives** 48:18 127:21
  127:22,22 128:7
  159:13,17
**living** 19:2 23:17
**llc** 1:5 2:3 4:10 7:24
**loaded** 46:25
  169:19,21
**located** 6:17 13:14
  48:1 50:1 52:12
  70:19 75:4,5 92:25
**location** 6:14 41:4
  48:7,16,17 49:25
  50:4,8,10 74:22
  85:5 87:25 103:10
  149:15 159:5
**logically** 122:21
**long** 6:7 14:21,22
  16:21 23:21 27:4
  28:1 47:7 50:9,11
  50:24 126:16,18
  165:14,18,21 168:5
  170:20 175:9
  181:20 182:24
  183:11 184:1
  185:11
**longer** 103:17,19
**look** 32:23,24 61:5
  101:2 120:9 143:12
  143:21 160:23
  162:10 174:6 178:8
**looked** 22:25 23:15
  42:19 67:15 75:17
  75:23 81:19 83:11
  127:1 143:14,18
  171:5 174:17,18
  175:10 181:16
  182:25 184:1
**looking** 18:9,12,13
  19:16 60:20 61:1
  62:8,11,23 63:23
  64:25 65:1 73:17

76:22 77:11 78:2
  79:25 80:4,13 85:1
  86:23 116:15,17
  119:14 120:13
  123:16 126:16,22
  167:18 173:23
  174:1,4,13 175:12
  176:17,22,22,23
  177:18,18,18 178:8
  178:11 179:8,12
  184:20
**lookout** 93:5 94:24
  105:17 106:19
  135:4 173:9,25
  174:24
**looks** 32:25 34:2
  37:8 56:11 58:22
  86:17
**looping** 9:22
**losses** 152:3
**lost** 100:10
**lot** 63:18 64:21
  106:15 129:1
**lowered** 52:18
**lunch** 41:3,18 46:2
  51:11 146:6 147:24

---
**m**
---

**machine** 44:7
  143:10 157:6
**machines** 142:9
  145:19
**mad** 1:5 2:3 4:10
  7:24 8:9 187:1
  188:2 192:8 193:9
**madam** 134:4,17
**madeira** 159:18
**maintain** 23:23
  105:17
**maintaining** 17:19
**maintenance** 16:1
  17:19 18:3

**making** 56:4 67:3
  79:16 85:25 86:5
  91:16,24 92:22
**mako** 28:15,23,23
**malfunction** 34:23
**malfunctioning**
  34:23
**man** 33:23 106:13
**managed** 15:15
  16:1 98:6
**management** 15:9
  16:19 19:3
**manager** 151:8
  159:3
**manages** 15:10
**maneuver** 112:20
**mangroves** 118:13
**manner** 115:13,16
  117:17,21
**manual** 42:15
  43:13
**manufacture** 31:10
**map** 4:12 54:9
  55:12
**march** 4:9
**marina** 99:14
**marine** 34:13
  100:15 169:1
**maritime** 114:18
  114:25 150:9
**mark** 32:16 54:3
  59:11 81:25 84:14
  85:2,3 94:4 100:22
  103:7
**marked** 5:11 32:19
  54:6 55:3 60:1 78:9
  82:3,8 84:4,11
  91:10 94:1 100:19
  101:20 103:15
  104:11 148:11
  154:25 158:7

**marker** 89:14,25
**markers** 87:20
**marking** 103:13
**markings** 4:12
**marsh** 59:2
**marshland** 60:21
**marshlands** 93:15
**masses** 58:23
**material** 178:10
**matter** 7:23 13:5
    20:8 192:20
**maximo** 61:12
    93:18,22 168:20
    169:1
**mean** 31:15 59:1,19
    69:24 101:16 108:4
    119:24,24 132:12
    137:16 147:5 154:6
    157:15 163:13
**means** 86:13,15
    107:23 185:24
    190:24
**meant** 171:1
**measures** 99:3
**medical** 99:7
**meet** 18:19,22
    41:18 46:1 48:25
    49:9 128:13,14,15
**meeting** 18:25
**megan** 24:14,21
    128:1
**megan's** 25:1
**mention** 12:3
**mentioned** 28:23
    29:23 74:23
**merit** 189:6 190:5
    191:5
**messed** 42:13
**met** 18:23
**meter** 62:9

**meters** 62:2,4,6,13
**miami** 2:13 189:4
    192:2 193:2,8
**mid** 47:10
**middle** 1:1 12:6
    72:3 75:25 79:11
    81:18 86:18 97:6
    119:10 124:3,5,14
    125:20,23
**midmorning** 47:10
    48:25
**midnight** 53:3
**mile** 168:11
**miles** 66:25 122:11
    122:15 129:7
**mind** 116:23 117:1
    146:15 178:12,14
**mine** 168:10
**minor** 79:17 118:5
**minute** 57:3 68:2
    103:25 148:8
**minutes** 50:14 51:3
    51:5 146:6,13,16
    147:11 170:24
**miranda** 4:20
    82:19 83:3
**mischaracterizes**
    111:19 112:6
**mischaracterizing**
    180:12
**misener** 53:23
    57:19 58:2,14
    60:16 62:25 63:24
    65:10 67:4 73:22
    74:11 76:16 79:17
    79:23 80:11 92:17
    92:23 93:1 118:11
    119:11
**misjudged** 125:15
**missouri** 159:9

**misstates** 97:2
    109:4 119:6 121:16
    126:5,24 131:3
    139:10
**mm** 138:6 146:2
**model** 37:23 38:2
    38:10
**modules** 37:25
**moment** 79:21
    90:23 178:13
    185:13
**moments** 75:20
    79:24
**monday** 192:15
**monetary** 152:3
**months** 35:17
**morning** 7:15 8:23
    8:24 46:15,19 47:3
**motion** 181:3,4
**motor** 29:11 67:6
    67:13,14,16 68:1,4
    68:7,13,24 69:7,17
    70:3,18 71:5,10,14
    71:22 72:2,6,10,17
    73:21 74:9,16,21
    75:3 79:3,15,24
    80:12 83:16,20
    87:25 88:10 91:20
    91:25 93:2 101:8
    101:22 102:11,16
    102:21 103:1,10,11
**motorboat** 1:7,10
**motors** 100:10
**mouth** 53:24
**move** 27:6 70:14
    132:19 134:13
    180:22 182:15
    183:8,16
**moved** 28:3,5,17,24
    52:19

**mss** 1:2
**multiple** 13:18
    109:17
**mutual** 18:23

**n**

**n** 40:9,10,11
**nadine** 2:16 5:18
    5:21 8:5 150:10,20
    152:5 155:25
**nah** 70:1
**name** 8:25 10:1
    14:11,13,17 15:2,5
    15:11,14,17,19
    16:20 20:3 22:4,13
    25:1 40:6 46:5 47:2
    47:5 58:1,8 127:25
    128:10,13 159:10
    161:21
**named** 34:1
**names** 9:8 156:14
**nancy** 1:22 189:6
    189:19 190:3 191:4
    192:23 193:24
**narrow** 94:25
**natalie** 2:10 4:24
    8:3
**national** 59:9
**natural** 134:13
**nature** 28:9 152:4
**nautical** 4:14,16
    23:5 55:8,10 59:8
    60:4 62:10 77:12
**navigating** 113:24
**navigation** 109:18
**navigational**
    115:13,15 135:4
**ncra** 1:22 190:3
**near** 18:17 61:21
    74:22 77:13 79:4
**need** 11:15 12:4
    53:15 56:25 96:1

99:2 113:10 142:6
153:6,8 178:15
181:24
**needed** 99:8 153:17
**negligence** 94:17
**neither** 120:17
121:2
**net** 22:16
**never** 14:19 15:3
25:19 42:13 51:1
78:23 95:4,9 111:6
144:16 150:25
151:3,16 161:9
163:22 164:1
**new** 2:12 78:4
141:10 193:7
**nice** 64:8
**niece** 24:14 127:22
**niece's** 127:25
**night** 51:16
**nineteen** 27:21
**noaa** 4:14,16
**noble** 161:21
**non** 153:12,13
**noon** 49:18
**nope** 161:10 178:4
**normally** 174:2
**north** 2:13,19
54:18,22 59:4
61:10,23 93:22
193:8
**northbound** 93:18
**notaries** 6:3,11
**notarized** 192:17
**notary** 1:23 6:8,23
8:13 187:18 189:8
189:19,22
**noted** 179:21
182:19
**notes** 162:16
190:13

**notice** 1:24 35:20
**notification** 5:15
149:24 160:20,22
162:1 163:21
**notified** 20:17
21:23 154:13,16
**notify** 20:18,22
153:9
**notifying** 193:15
**noting** 192:17
**number** 1:7,11 4:7
5:2,12 51:22,23
52:1 94:14 182:4,6
192:13
**numbered** 190:11
**numbers** 37:23
38:11 59:18 192:17
**nurse** 152:11
163:19,24

**o**

**o** 14:17 15:20,20
162:4
**o'clock** 53:4 147:3
**oath** 3:16 6:4,6,12
6:18,20,21 8:12
189:1
**ob** 91:18
**object** 17:17 19:21
20:24 24:13 25:6
27:7 29:2,8 30:15
31:12 32:3 33:16
34:25 35:7,23
36:20 37:4 38:22
39:12,18 40:25
41:11 43:6,11,22
44:25 45:6,18 46:4
46:13 49:4,13 52:8
52:17 55:7 56:7,13
56:21 58:10,17,25
60:13,22 61:16,25
62:15 63:2,8,16

64:2,7 65:5,11,19
66:3,9,15,23 67:18
68:16 69:1,10,18
70:5,21 71:7,21
72:18 73:8 74:13
74:24 76:19,25
77:7,17,25 78:16
79:8 80:15,24 81:8
81:16 82:21 83:4
83:18 84:1,8 85:7
88:15 103:12
113:16 132:18
174:21 175:7
178:16 179:14
180:8,22 181:17
182:13 183:2,5,7
183:16
**objected** 180:3
**objection** 21:22
73:24 74:3 85:22
85:23 86:11 87:1
88:1,17,18 89:3,7
89:10,18,22 90:7
90:15 91:1,6,18
92:11 95:6,17,21
96:4,6 97:1,14,22
101:10,24 102:8
103:4 104:22 105:9
105:19 106:1,8,14
106:22 107:14
108:1,14 109:3,15
110:12,19 111:3,18
112:2,6,21 113:12
113:21 114:17
115:10,19 116:20
117:2,8,19,25
118:20 119:5,16
120:19 121:4,13,16
121:25 122:23
124:19 125:7,25
126:23 127:5

130:25 131:19
133:17 134:23
135:6,11,18 136:3
136:12,24 137:8,19
137:21 138:9,19
139:7 141:23 149:6
150:24 154:2
155:20 162:11
163:25 166:19
168:3,13 172:7
173:11,14,16 175:2
175:16 176:20
177:4,21 178:16,20
179:20,25 180:4,6
180:21 182:12,19
184:7,22 185:8,15
**objections** 181:25
182:2
**observe** 166:21
**observed** 163:11
**obstacle** 92:8
**obstruction** 137:16
**obtained** 171:25
**obvi** 101:11
**obvious** 10:5 139:1
**obviously** 11:18
20:16 33:8 34:15
48:15 59:1 64:13
71:4 80:25 81:14
82:18 95:10 97:7
99:19 100:1,4
101:11,16 109:19
110:2 111:21 119:9
119:21 120:5
125:10,14 132:7
138:22,24 162:6
169:19 170:5 171:6
175:17
**occasionally**
131:16

| | | | |
|---|---|---|---|
| **occupants** 163:6 | 73:13 85:11 86:11 | **oldest** 40:5,6 | **oppose** 181:2,5 |
| **occur** 139:2 | 88:7 90:2,14 96:9 | **omission** 94:15 | **optic** 26:2,6 |
| **occurred** 81:2 89:2 | 104:13 114:14,15 | **once** 53:6 56:10 | **optional** 33:1,21 |
| 97:9 99:18 116:17 | 118:17 120:3,7,25 | 57:24 58:12 64:22 | 37:9 |
| 121:8 124:3 125:6 | 123:4 124:8,13,17 | 65:17 66:12,20 | **options** 32:12 33:8 |
| 128:25 130:2 | 124:24 125:18 | 67:7 70:19 80:11 | 33:14 34:18 |
| 138:18 143:11 | 126:20 127:18 | 90:3,20 91:25 | **order** 6:2 34:1 |
| **occurring** 84:6 | 128:6 129:3,10 | 129:20 136:22 | 108:17 127:9 |
| 126:16 138:14 | 130:4,8,12,15 | 142:9 150:2 152:21 | 189:14 |
| 141:2 | 131:15,17,23 132:3 | **oncoming** 92:9 | **orders** 1:25 |
| **occurs** 98:3 140:9 | 132:6,14 133:5,11 | **ones** 20:16 23:8 | **original** 193:14,19 |
| **ocean** 53:18 54:25 | 133:14 135:3 136:9 | 38:19 133:18 | 193:20 |
| 55:1 80:14 116:8 | 136:18 137:13 | **oops** 41:15 | **originally** 27:2 |
| 116:13 | 138:13 139:19,21 | **open** 1:6,10 | 59:16,17 148:17 |
| **oceanic** 59:9 | 140:2,7,9,13,18,23 | **opened** 163:22 | **outboard** 150:12 |
| **offenses** 133:7,9 | 141:2,14,21 142:15 | **opens** 53:24 | 169:6 |
| **office** 12:16 100:14 | 143:3,17,20,25 | **operable** 45:4 | **outfitted** 32:13 |
| 140:14,17 142:2 | 144:25 145:5,14,21 | **operate** 39:25 44:2 | 38:4,12 |
| 145:24 149:14,17 | 146:10 147:8 148:7 | 108:18 115:12 | **outing** 40:21 41:7 |
| 150:10 151:5,8 | 148:17,23 149:1,4 | 117:17,20 | 41:20,24,25 46:11 |
| 153:3,19 159:3 | 149:10,18 150:6 | **operated** 37:17 | **outings** 40:15 |
| 192:14,14 193:17 | 151:10,16 152:1,17 | 113:6 115:2 116:23 | **outside** 15:22 97:7 |
| **officer** 164:13 | 153:14 154:9,13,18 | 117:18,24 150:12 | 119:25 120:6 |
| **officers** 143:8 | 155:3,6,17,22 | 150:18 | 125:13 190:24 |
| 153:22 163:3 | 156:13 157:2 158:3 | **operating** 40:14,18 | **overcast** 138:1 |
| 170:22 171:21 | 158:10,14,21 | 75:2 87:6 94:23 | **oversaw** 16:1 |
| **official** 189:15 | 159:23 160:14 | 104:19 105:5,14 | **overtake** 112:17 |
| **offshore** 57:18 | 162:7 163:5,19 | 107:2,5,8,18,21 | 113:18 114:7 |
| 122:17 | 164:4,10 165:24 | 110:7 113:14 | **overtaken** 114:13 |
| **oh** 10:20 14:14 27:5 | 166:13 167:23 | 114:22 116:7 | **overtaking** 112:20 |
| 30:20 50:14 51:4 | 168:19 169:9 170:2 | 128:25 | 113:1,20,25 |
| 69:19 72:25 145:25 | 170:12 171:8,10,16 | **operation** 30:1 | **overtook** 68:13 |
| 171:11 | 172:3,25 176:15 | 135:10,15,23 136:2 | 75:3 79:23 |
| **okay** 7:2,11 9:10 | 177:24 179:18 | **operational** 108:22 | **overwrit** 143:1 |
| 10:7 11:16 13:3 | 180:1,9,14,24 | 109:2 110:8 114:23 | **overwritten** 143:1 |
| 20:22 21:5 22:2 | 181:23 182:10,17 | **operations** 16:2 | **owned** 28:21 29:1 |
| 28:17 32:11 34:17 | 184:4 186:5 | 17:20 25:13 | 38:20 42:11 150:12 |
| 41:6,10,19 42:10 | **olas** 2:6 192:7 | **operator** 113:8 | **owner** 1:6,9 128:21 |
| 43:16 44:18 55:1,6 | **old** 9:9,9 16:24 | 115:9 | |
| 57:6,24 58:4,21 | 17:1 28:12 67:16 | **opportunity** 12:11 | |
| 61:5 65:7,24 72:8 | 141:9 | 12:13 | |

**p**

**p.a.** 2:5,12,18 192:6
 193:7
**p.m.** 1:16 104:4,7,7
 104:15 130:5
 147:23,25,25 148:5
 186:13,18,21
 192:15
**package** 38:10
 161:25
**page** 3:2,14 4:2,7
 5:2,12 32:22 87:23
 88:11 90:23 156:21
 188:5 192:17,24
 193:19
**pages** 190:11
**paid** 141:6
**paper** 23:7,8
**paperwork** 24:24
 38:1
**paragraph** 150:8
 152:9 160:19
**paramedics** 99:25
 169:3 170:13
**parcel** 115:8
**parent** 26:25
**park** 2:19
**parked** 52:21
**part** 21:9 65:25
 94:16 115:8 129:4
 139:12 142:22
 151:19 172:24
**particular** 22:9
 24:8 38:7,19 42:16
 46:11 47:15 56:12
 58:1,8 64:18
 133:14 134:21
 143:23 158:15
**particularly** 51:18
 150:4

**parties** 135:1
 190:18,20
**party** 94:16
**pass** 53:13,17 54:18
 55:24 57:19 71:25
 114:8,14
**passage** 56:12
**passed** 66:12 67:8
 68:7,12 70:20
 71:19,20 72:10,11
 72:17 73:21 74:8
 74:16,22 79:3,15
 80:11 83:10,16,20
 87:24 88:10 91:20
 91:25 93:1 101:7
 101:22 102:10
 152:15 155:18
 162:13
**passenger** 98:25
 167:4 169:18
**passengers** 98:20
 99:4 100:9 169:14
**passing** 64:19
 68:15
**patches** 38:9
**path** 60:10 63:1
 85:13 86:20,22
 87:4 95:25 97:9
 111:13 125:15
**patience** 118:6
**patrick** 2:5 7:1 8:6
 21:11,22 192:6
**paying** 81:14
**payment** 16:6
**payroll** 15:15 16:10
 16:19
**penalties** 188:22
**pending** 133:23
 177:8,10
**pends** 133:22

**people** 98:22 100:3
 111:16 112:14
 153:1 169:12
**perceived** 170:18
**percent** 162:18
**period** 16:15 17:16
 36:5 38:17,18
 39:15,25 40:1
 51:20
**peripheral** 175:18
**perjury** 188:22
**permanent** 152:5
**permitted** 30:6
 63:6
**person** 6:8,19
 190:24
**personal** 10:22
 24:6,9 73:7
**personally** 29:14
 33:13 140:16
 164:17,25 187:15
**persons** 6:4,11
**pete** 41:3,18 48:23
 54:1 130:10
**petition** 1:5 7:24
**petitioners** 1:13 2:3
 8:7,9
**phone** 13:24 18:11
 18:13,14 51:19,21
 51:22,23 127:13,15
 141:7
**phones** 52:6
**photo** 84:19
**photocopy** 190:23
**photograph** 4:22
 84:15
**photographic** 6:24
 189:12
**photographing**
 163:3

**photographs** 22:24
 156:13
**physical** 75:9 98:20
 150:20
**physically** 18:8
 75:4 98:15 150:25
 167:17
**pick** 129:21
**picked** 121:23
 122:3,22
**picking** 152:1
**pieces** 97:20
**pinellas** 2:19
**pirate** 15:12
**pirates** 15:13
**pjr** 2:8
**place** 87:9 134:14
 143:16 157:12
**placed** 6:21
**places** 13:18 50:6
**plaintiff's** 4:6 5:1
**plaintiffs** 12:16,19
 54:4,6 55:4,11
 59:11,23 60:1
 64:25 72:9 73:18
 77:11 78:3,4,9,15
 81:25 82:3,8 84:4
 84:11,15 85:11
 86:23 87:21 88:24
 89:20 90:2 91:9,13
 94:1,4 100:19,23
 101:20 102:19
 103:8,15
**plan** 51:10,12 53:7
**plane** 65:21 66:16
 66:19,22 67:7 68:6
 69:16 70:11 74:21
 79:18 123:15
 125:11
**plans** 47:11,14 49:1
 49:2

**plantation** 27:3,4
**play** 137:14
**please** 7:25 8:11,25
  11:22 17:7 74:3
  88:16 96:8,15,17
  125:20 133:24,25
  138:21 150:9 177:6
  177:15 180:16,18
  181:10 182:23
  192:13,16
**plenty** 138:7
**plug** 56:25
**point** 9:3 12:3
  48:13 49:16,20,25
  50:7,12,19 54:17
  60:7,10 61:12
  68:25 71:16 72:4
  76:9,15 79:1 85:1
  90:14 93:11,18,19
  93:22 98:14 99:2,5
  124:9 142:8 152:20
  160:11 165:7 166:4
  166:22 167:19
**police** 67:5 84:19
  100:2,25 152:21,25
  164:14 169:17
  170:22
**pontoon** 71:5,8,9
  71:13,15,24 72:5
  76:11,18,24 77:5
  77:15 78:13,22
  79:2 91:23 93:12
  93:14,17,21 94:23
  95:15 98:18,21
  99:13 111:11,12,15
  111:24 112:15
  118:17 119:19,24
  121:23 122:22
  125:3,11,22 137:6
  138:18 150:18
  162:22 163:1,6

164:11 165:18
  167:13 169:7,12
  172:4 175:13
**populate** 146:1
**port** 68:8,15 92:15
  94:24 95:5 114:8
  139:19 150:19
  163:11 167:5,10,16
**portion** 134:19
  182:18
**position** 134:14
**positioned** 81:21
**positively** 6:15
**poss** 113:24
**possession** 193:20
**possibility** 144:1
  163:23
**possible** 113:24
  137:3 167:1 170:11
**potential** 110:9
**potentially** 110:25
**power** 4:9 26:13
  34:4,11 100:5
**powerboats** 29:22
**practice** 44:22 45:9
  115:17
**practices** 106:12
**predicate** 88:2,18
  89:3
**prefer** 147:6
**premarked** 148:18
**prepared** 190:15
**preprogrammed**
  42:6,7
**presence** 6:5
  112:19
**present** 2:23 13:23
  17:16 100:8
**preserve** 140:23
  143:4 156:4,24
  157:9

**preserved** 157:1
  180:4
**pretty** 13:9 33:22
  42:8 86:17 124:16
  170:7
**preventative**
  113:10
**previous** 126:14
  155:13
**previously** 155:6
  157:24 173:8 179:7
  181:14
**price** 34:17
**primary** 38:25
**principally** 24:4
  25:10 39:9,10
**print** 149:24
**prior** 6:21 10:18
  12:10,23 13:3
  35:15 36:1 39:16
  40:21 41:6,19
  56:23 75:20,25
  76:13,13 77:15
  79:2 80:20 81:5
  82:19 84:6 88:8
  89:14 94:7 109:5
  116:3,6 119:6,20
  119:25 126:5,15
  130:12 131:17
  136:21 175:10,14
  175:15 180:12
  181:15 192:18
**privilege** 20:25
  21:18
**pro** 1:9
**probably** 10:20
  13:7 14:25,25
  16:23 18:12 27:12
  28:11 29:3 35:16
  35:16 39:4 41:22
  47:10 51:4 66:25

67:15 92:3 102:24
  131:25
**problem** 35:14 36:1
**problems** 35:9
**procedure** 96:19
**proceed** 107:10
**proceeded** 166:25
**proceeding** 11:6
**proceedings** 57:9
  57:11 104:6,8
  147:24 148:1
**process** 33:18
  52:16 149:5 160:21
**produced** 31:11
**producing** 189:12
**product** 20:25
  21:18
**professional** 18:25
  190:5 191:5
**programs** 133:6
**prohibited** 92:8
**projects** 26:14
**prompt** 192:20
**pronounce** 14:19
  15:3
**proof** 162:2
**proper** 30:21 94:24
  105:17 106:19
  107:11 117:12
**properly** 107:3,5
**properties** 24:2
**property** 11:4
  116:24 162:25
**proverbial** 106:20
**provided** 6:15
  82:19 83:2 144:23
  171:25 193:17
**provider** 127:14,15
**proximity** 118:18
  121:24

**public** 1:23 6:23
8:13 168:25 169:5
187:18 189:8,19
**pulled** 98:13 99:1
100:14 132:12,14
169:1 170:21
**purchase** 24:25
32:1 34:1,5,17
**purchased** 31:2
**purpose** 33:11
45:25 110:3 114:12
**purposes** 6:6,10
43:19
**purse** 51:9
**pursuant** 1:23
189:13
**push** 146:13
**pushed** 142:16
**put** 6:18 44:5 66:16
66:19 69:16 70:11
101:4 140:18
151:24 171:4
**putting** 14:8 97:20

**q**

**qualified** 6:4,8,11
6:19
**question** 11:15,23
12:6,7 17:8,10 21:2
31:23 43:16 58:19
70:2,14 71:3 72:21
81:12,22 85:25
86:5,8 88:4,20
90:21 94:19 96:2,6
96:15,17 97:19
104:25 107:1
108:12 109:11
110:17 120:14,21
121:10,11 125:19
126:2,4 127:4,14
133:22,25 134:3,18
134:20 135:25

142:22 157:7
165:16 172:10
177:3,6,8,14 179:5
180:13,23 181:6,10
182:5,24 183:21
184:1,6
**questioned** 100:16
164:8
**questioning** 132:19
**questions** 4:1 11:14
11:21 73:7,9 88:17
118:3 120:8 127:10
132:24,25 146:19
146:22 155:6 173:2
176:5,13 177:17,25
178:25 181:14
184:15
**quick** 57:3 103:25
173:5 180:20,20
**quickly** 7:8,9 100:6
104:1 144:4 167:1
170:10
**quite** 20:6 128:12
178:9

**r**

**r** 15:20 162:4
**radar** 38:4 44:2,6,8
44:9,12,14,16,18
44:23 45:4,11,15
108:10,17,20 109:1
109:10,13,17,21,24
109:24 110:1,3,8
110:15,21,24 111:5
115:25 116:4,12
121:22,22 122:13
122:17,20,21 123:1
123:4 156:18
**radio** 81:6
**raise** 8:11
**ramp** 163:3 168:17
168:19,25 169:5

**range** 17:5 29:4
109:24,25 122:16
163:17
**rdr** 1:23 189:19
192:23 193:24
**reach** 164:17,25
**reacted** 99:6
**read** 7:13 42:15
61:3 72:22 83:7
87:12 134:17,20
150:1 151:3 159:21
164:1 186:4,14
188:23 192:10,14
193:11,15
**readily** 6:10
**reading** 3:18
192:12,18,19
193:15,17
**ready** 52:13 118:7
148:2
**real** 19:3 123:8
**realize** 142:18
**realized** 98:8
111:22
**really** 19:15 23:8
49:5 52:20 78:18
118:2 147:1 157:13
170:8 181:18
**realtime** 189:7
190:6 191:6
**reason** 105:23
166:16 188:5
192:17
**reasons** 172:23
**recall** 22:18 34:16
35:25 37:24 38:2
42:1 47:19 51:16
75:14 82:6,9 91:19
92:12,18,24 94:20
123:11,12 129:9
141:5 171:22

**receive** 140:16
156:9 172:2
**received** 133:11,15
134:21 149:4,10,13
152:14,17 155:8
158:22 160:3,21
**recess** 57:9 104:6
147:24
**recognize** 34:10
142:23 149:21
**recollection** 10:23
36:13,15 39:22
47:20 49:17 53:5
64:16 74:1,19
91:14 98:19 100:24
103:6 130:6 132:5
177:23 178:23
**record** 7:7,15 8:1
57:8,14 104:5,16
132:20 147:23
148:6,8 154:23
177:6 182:21
186:12,14,15,17,19
190:13
**recross** 3:11 179:1
**red** 4:16 5:6 49:23
73:19 78:5,14
86:19 87:4 91:10
102:17 103:3,9,10
130:16 131:13
**redington** 48:3,7
48:16 50:1,3,8,9,13
50:15,18 52:12
54:21 116:25
127:19 129:20
158:15,22 161:25
**redirect** 3:9,10,12
3:13 176:10 178:6
183:23 184:17
**ref** 78:14

**reference** 11:1,3 24:24 35:1 60:10 75:23 87:20 90:14 107:3 120:11 126:17 151:12,14 160:4 175:1 181:13
**referenced** 75:22 80:16 81:1,21 121:6 127:18 192:19
**referencing** 80:3 120:15 126:25 175:5 176:21 177:5 185:9
**referred** 4:16 32:18 54:5 59:25 78:8 82:2 84:10 93:25 100:18 103:14 104:12 134:19 148:10 154:24 158:6
**referring** 133:20
**regard** 18:19 34:21 44:1 87:21 114:25 119:4 172:3
**registered** 189:6,7 190:4,5,6 191:5,5,6
**regular** 13:1 50:2
**related** 10:17,21 33:9 154:7
**relation** 120:7 133:5
**relationship** 19:14 129:12
**relative** 127:20 158:16 190:17,19
**relatives** 127:19
**relevance** 101:17 131:20,22
**remained** 159:23

**remember** 11:10 22:12 28:13 34:15 35:24 37:23 48:19 80:1 116:1,5 127:25 138:1 155:10,15 160:9 169:6
**remembered** 101:15
**remote** 7:22 190:9
**remotely** 2:1 6:13 189:10
**removed** 135:13 144:19
**render** 172:6
**rendering** 172:3
**repairs** 24:25
**repeat** 26:4 46:17 53:15 181:10,10
**rephrase** 133:24
**rephrased** 11:15
**replaced** 141:10
**replacing** 142:20
**repondents** 1:22
**report** 67:5 84:17 129:6 130:4 163:8 172:1 190:8
**reporter** 1:23 8:10 8:13,15 17:6 26:3 46:16 53:14 59:19 74:2 104:9 134:6 134:17,20 148:3 181:21 189:6,7,8 190:4,5,5,6,7 191:1 191:5,5,6,6
**reporter's** 3:17 190:1
**represent** 7:8
**represented** 14:2
**representing** 155:24

**represents** 63:5
**reproduction** 190:23
**request** 156:2 186:15
**requested** 24:23 98:16 190:11
**require** 108:25
**required** 95:1 104:20 105:7,16,23 107:10,23 108:17 112:18 113:19 114:7 172:5
**requirement** 6:3
**requires** 109:9
**rescue** 100:8
**residence** 128:8
**respect** 157:19
**respond** 114:13
**respondents** 2:10 2:16
**responding** 8:19 114:14
**response** 11:21 18:10 43:7 62:16 160:21
**responses** 178:18
**responsibility** 17:24 43:9
**responsible** 42:2
**rest** 29:20
**restate** 120:23
**restaurant** 41:8 46:1,2
**restaurants** 24:1
**restricted** 65:25
**restrictions** 29:25
**result** 150:11 152:5
**retain** 140:14
**retained** 150:10

**retired** 159:16
**retrieve** 24:22
**return** 152:11 163:24
**returned** 167:14
**reverse** 127:9
**review** 160:10 162:16 190:10 193:18
**reviewed** 22:19 23:2 94:6
**reviewing** 160:9
**riding** 70:22
**right** 7:3,14 8:11 8:23 9:25 10:11 12:2 14:14,20 15:4 33:11 34:2 41:9,14 43:10 46:3 49:11 49:12 54:11 55:23 55:23 56:2 57:7,12 57:21 58:6,6 60:8 60:21 61:3,14,18 62:5,8,13 65:13 68:11 71:6 72:5 79:11 81:17,20 82:22 84:21 85:5 86:3 87:7,13 90:18 93:3 94:9 96:25 98:12 101:5 102:17 103:21 104:2,3,4 118:2 119:4,9 120:9,10,18 121:12 124:6 133:11 138:5 138:11 139:9,14,18 139:25 140:6,11,19 143:5 144:3,10,13 144:17 145:12,20 146:11,20,23,25 147:9,16,18,22 149:23 150:1,23 153:18 154:13,18

155:3,12 156:5,25
157:9,21 158:3
160:22 161:13,15
161:23 162:7,10,16
163:6,10,24 165:8
167:21 168:12
170:14,19,23 173:1
173:4 176:2 178:12
179:3 183:13 184:6
186:3,18
**rights** 4:20 82:19
**risk** 107:24
**rmr** 1:23 189:19
192:23 193:24
**road** 104:21 105:3
105:8 106:11,20,21
108:25 115:1,7
120:18 148:24
149:1
**roadway** 26:14
121:3,12
**romantically** 19:13
**room** 18:8 113:23
**rough** 37:15 51:2
**roughly** 27:20,21
35:21 39:16 48:25
52:25 78:13
**route** 53:8,9 56:10
56:20 57:17 63:12
**routine** 172:19
**routinely** 63:13
**rpr** 1:23 192:23
193:24
**rudimentary** 43:19
**rule** 109:9
**rules** 96:18 104:21
105:2,8 106:11,21
108:25 114:19,25
115:7,13,15,16
135:4

**ruling** 137:2
**run** 56:19 80:2
**rusli** 2:16,16 5:18
5:21 8:5 94:22 95:5
137:5 150:11,20
152:5 155:25,25
163:9 166:7 167:4
169:21 170:19
171:4
**rusli's** 95:15
152:10,18
**ryan** 2:5 7:4,10 8:6
8:6 12:16 17:17
19:21 20:24 21:4
21:17 22:1 24:13
25:6 27:7 29:2,8
30:15 31:12 32:3
33:16 34:25 35:7
35:23 36:20 37:4
38:22 39:12,18
40:25 41:11 43:6
43:11,22 44:25
45:6,18 46:4,13
49:4,13 52:8,17
55:2,6,13 56:7,13
56:15,21 58:10,17
58:25 60:13,22
61:16,25 62:15
63:2,8,16 64:2,7
65:5,11,19 66:3,9
66:15,23 67:18
68:16 69:1,10,18
70:5,21 71:7,21
72:18 74:13,24
76:19,25 77:7,17
77:25 78:16 79:8
80:15,24 81:8,16
82:21 83:4,18 84:1
84:8 85:7,23 192:6

**s**

**s** 2:4 22:7 40:9,10
**sac** 128:5
**safe** 106:16 107:10
107:19 113:3
115:13 117:21
173:9
**safest** 62:25
**saint** 41:3,18 48:23
54:1 130:10
**sale** 32:17
**salt** 46:3
**sandals** 76:2
**save** 74:5 78:4
155:8 156:10 160:7
**saved** 144:16,18
**saving** 99:3
**saw** 69:7 93:13
95:5,9 161:9
162:25 163:2 165:9
170:2
**sawgrass** 118:13
**sayeth** 187:6
**saying** 21:22,25
87:10 102:15,21
123:23 124:4 143:4
**says** 38:1 55:24
83:7,20 149:24
150:16 152:2,9
156:2,21 162:1
**scale** 102:3
**scalloping** 27:25
**scene** 165:9,14
**school** 25:19 133:8
**scott** 34:2,8,13
**scream** 112:14
**screen** 4:22 147:13
148:15 155:4
**screens** 35:10,20
36:10,17,24 80:18
81:1

**seakeeper** 37:10,13
37:18
**seal** 189:15
**sealed** 159:24
**seamanship** 115:17
**sean** 40:8 127:24
158:19,21
**searched** 100:17
**seat** 93:3 98:6,23
167:5,11,16
**seating** 163:12
**second** 14:15 64:24
81:24 102:22 112:1
119:7 134:16
145:22 154:19,21
154:22 158:10
160:22,24 161:3
**seconds** 96:14
126:19,21 179:8
181:15 184:11
185:25 186:1
**sector** 25:25 26:21
**see** 6:8 10:2,8 13:1
34:5 54:2,13 60:5,9
61:18 64:20 67:3
68:24 69:2,16,19
69:20,22 70:3,19
70:25 71:9 72:5
74:17 76:10,17,23
78:6 79:10 84:23
84:23,25 86:20
87:22 88:24 89:11
89:11,12,16 90:23
91:24 92:1,21
93:11,14,16,17,21
95:2,10 111:12
113:9 118:19,24
120:3,4 123:16,22
129:10 139:22
143:22 144:12
147:13,13,14,15

148:14,20 149:23
150:14,21 151:17
152:6,12 155:3,23
156:2,6,16,18,21
158:12 160:14,25
161:5 162:1 163:5
163:22 164:11
165:11 167:3,5,8,9
167:10,15,21
172:19 174:10
175:21

**seeing** 48:19 62:13
65:14 82:9 92:8,15
155:15

**seeking** 110:9

**seen** 64:5 67:11
68:1 84:17 94:9
113:9 175:22

**select** 33:20

**selecting** 33:13

**semi** 138:1

**send** 151:17 178:2
192:16

**sense** 17:11 53:7
55:20 58:22 77:15

**sent** 141:9 151:5,6
153:22,23 160:20
161:10,18,25
193:15

**sentence** 152:8

**sep** 154:11

**separate** 128:2,2
154:12

**sept** 4:19 5:14,17
5:20

**september** 16:15
17:16 18:5 19:19
25:9 29:13 30:1,9
30:13 34:22 35:15
36:2,4,7,15,25
38:18 39:6,16 40:1

40:13,21 41:6,19
42:4,17 44:11,14
44:18 45:10,23
51:17 52:2 54:11
56:23 64:13 66:7
66:13 76:10 90:4
104:19 105:6,16
107:9,22 108:9,21
109:23 110:3,6
111:1 113:7 114:3
114:23 115:7 116:3
116:10,13 117:15
117:18,24 127:16
140:6,10 141:3,21
142:23 144:21
145:16 148:21
149:19 150:13
155:13 157:8
158:11,17 160:15
160:20,25 161:3,8
171:2,2

**series** 37:25

**serious** 164:7

**seriously** 99:22

**server** 149:5
160:21

**set** 4:24 42:5 62:21
81:6 109:24 146:11

**setting** 42:2

**settings** 42:12

**shaken** 101:12
169:15

**shallow** 59:3 61:22
61:23 62:6

**sheet** 3:15 187:4
188:1

**sheriff's** 100:14
142:1 153:2

**shit** 14:14

**shoals** 60:21

**shock** 170:7

**shoes** 76:3,4,5

**shores** 48:4,7
158:15,22

**short** 93:8 114:15
123:22

**shortly** 71:23 171:2

**show** 32:15,22
42:24 54:2 59:7
72:8 81:23 84:14
143:17 144:8
145:20

**showed** 51:5
143:15,18

**showing** 89:24

**shows** 85:17 86:3
87:15,16 144:3,5
161:18

**shrimp** 27:25

**shrimping** 27:25

**sic** 9:24,25 15:22
54:4 55:5 103:8

**side** 67:8 68:8,11
68:15 85:19,19
87:7,8 92:2,7,10,15
114:9 119:22
124:10,14 125:21
138:24 150:19
165:19,19 167:20

**sight** 70:8 93:10
107:4

**sign** 192:10,14
193:11,16

**signature** 3:14
82:15 94:12 186:21
189:18 191:3
192:22 193:19,23

**signed** 34:1 162:6
192:16

**significant** 74:10

**signing** 82:20
192:12,18,19
193:15

**sim** 141:8,19
144:23 157:21

**similar** 25:4

**simply** 136:1

**sincerely** 192:21
193:22

**single** 100:11 117:5

**sir** 8:10 9:2,24 17:6
40:7 74:2 119:2
130:7 131:15 134:3
173:1 178:24
179:11

**sister** 127:22 128:9

**sister's** 128:10

**sit** 75:11 108:24

**site** 125:5

**sitting** 18:8,14 75:8
75:14 93:3,9 98:23
123:10,19

**situation** 19:17
76:22 98:16 106:18
107:12 116:15,18
164:6

**sixteen** 28:12

**size** 30:21 70:18

**sized** 70:17

**sketch** 5:4,6

**skis** 29:21

**small** 49:22 71:15
85:3

**smaller** 29:20
70:17

**social** 18:25 19:1

**sold** 26:12

**solutions** 7:18
192:1 193:1

**son** 40:5 127:21,24
158:18 159:19

**son's** 40:6
**soon** 69:3,6,14 98:7
  100:15
**sophisticated** 43:4
**sorry** 26:3 32:7
  36:22 37:6 41:16
  46:8,8,16 53:14
  55:2 69:24 72:25
  104:15 124:6
  157:15 166:14
  170:14 181:21
**sort** 27:15 127:9
  178:11
**sorted** 146:17
**sound** 68:8,14,20
  114:7,14 130:5
  162:5 163:10
**sounding** 114:12
**sounds** 168:12
**source** 134:13
**south** 53:17 59:3,6
  61:11,23 77:9
  93:22,22 192:2
  193:2
**southeast** 26:18
  77:8,9 119:22
  138:24
**speak** 12:11 19:24
  49:8 99:17
**speaking** 7:16
  181:22
**spec** 35:6
**specific** 41:4
  128:18 130:23
  177:5
**specifically** 145:14
**specification** 37:2
**spectre** 29:17,23
**speculating** 97:12
**speculation** 91:2
  97:20 106:2,23

**speculative** 97:2
  109:16 111:4
  112:22 117:9 131:2
**speed** 65:7,14,16
  65:18,25 66:14,21
  68:24 70:12,23
  107:10,19 122:3,5
  122:7,8,10 125:12
  125:15 129:7
  143:17
**spell** 15:19 47:5
**split** 39:16,21 112:1
**spoke** 13:4 14:6
  20:6 22:16
**spoken** 12:20 14:7
  20:13
**sport** 29:10,10
**spots** 59:4
**ss** 187:10 189:3
**stabilizes** 37:14
**staff** 151:16
**stahl** 20:15,20 22:6
  22:11 151:15 160:5
  161:13,14 164:4
**stand** 75:11 178:18
**standard** 7:20
**standards** 106:12
**standing** 75:8,14
  123:10
**stands** 178:14
**starboard** 67:8
  85:19 92:1,7,9
  138:18 139:5
**start** 54:15 56:4
  65:9 91:12 148:4
**started** 25:22 35:20
  52:19 66:17 130:9
**starts** 90:5,10

122:1,25 125:8
  126:4 136:13 168:4
**state** 1:23 6:5,12,15
  6:17,20 187:10,19
  188:21 189:3,8,19
**stated** 67:5 78:24
  121:6 122:11
  174:16
**statement** 1:6,10
  4:9,19 29:16,23
  30:23 31:9,24
  34:13,21 36:16
  37:17 38:24 39:4
  39:17,25 40:13,24
  42:3,11,16 44:10
  48:1 50:1 66:21
  69:9 79:18 81:24
  82:13,20 83:2,7
  84:3 85:14,18 86:1
  86:5 91:15 100:2
  104:20 105:5,14
  107:8,22 109:22
  110:7,8 114:22
  126:2,10 128:6,25
  129:21 177:9 185:6
**statements** 169:17
**states** 1:1 115:3
  150:6
**status** 98:20 169:25
**stay** 98:6 165:14
**stenographic** 1:22
  190:3,13
**stenographically**
  190:8
**stereo** 75:17 80:2
  119:4 120:12
**stilt** 118:13
**stipulated** 7:12
**stop** 89:13 96:2,16
  96:16 134:7,10,11
**stopped** 83:12
**stops** 49:24 89:24

**stopwatch** 184:9
**stored** 140:25
  142:9 143:9
**straight** 71:23 75:7
  92:4 174:1,5
  176:23
**strehling** 2:10,10
  8:3
**strehling's** 4:24
**stretch** 58:14 91:11
**strike** 70:13 76:8
  132:20 165:15
  167:23 180:22
  181:3 182:16 183:8
  183:17
**struck** 150:11
**stteb112l718** 1:7,11
**stuck** 148:18
**subject** 13:5 20:8
  188:23
**subscribed** 187:13
**substance** 188:24
**substantial** 112:19
**substantially** 72:2
**sufficient** 96:15
**suggest** 72:20
**suite** 2:6 192:1,7
  193:1,7
**summer** 35:22
**sunbiz.org** 4:10
**sunny** 64:8
**supervision** 190:16
**support** 145:3
**supposed** 87:8
  113:2,23 128:15
**supreme** 1:24 6:1
  189:13
**sure** 16:8,12 51:1
  75:24 81:19 86:12
  99:7 101:18 109:25
  137:2 140:2 149:7

155:19 161:22
180:19 181:11
183:6,22
**susan** 34:2,8,13
**suspended** 6:2
**sustained** 167:6
**suzuki** 33:5
**swear** 6:13
**sworn** 4:19 8:19
81:24 82:13,20
83:2 84:3 187:13
189:11
**synopsis** 49:11
**system** 38:5,7

**t**

**t** 22:7 95:16,22
**tackle** 1:8,11
**take** 7:22 12:4,7
32:23 44:10 49:19
50:9,11 53:8,9,22
57:3 96:18 103:25
107:11 111:9,13
112:18 113:10
133:6 146:5,16
147:6,7 157:8
**taken** 1:22 57:9,17
84:5,16 99:14
103:22 104:6
141:15 143:6,7
147:24 187:2 188:3
192:9 193:10
**talk** 17:12 75:18
139:24 155:24
157:15
**talked** 21:12 47:13
155:10 158:14
170:14,17 171:20
**talking** 23:4 42:4
65:13 66:21 106:5
114:18 133:18
137:5 140:4,4

145:11 149:20
153:1,2 170:23
**talks** 161:4
**tall** 67:17
**taller** 67:24 69:9
**tampa** 53:21,24
55:18 56:5,11
57:20 60:11 61:8,9
63:14,25
**tara** 12:20 46:21
52:22 75:16 80:1
98:6,9,11,17 119:3
146:10 166:4,4,24
**tasks** 24:11
**tech** 29:18,23 38:24
145:3
**technical** 10:9
11:19
**technology** 6:14,19
**telecommunicati...**
23:19
**television** 25:23,25
26:21
**tell** 8:25 12:12 44:9
47:21 78:18 79:9
109:25 111:7 122:6
123:2 125:3,20
137:25 138:15
151:10 153:21
160:10 169:9 170:8
183:10 185:24
**telling** 126:8
160:19 180:5,9
185:23
**ten** 16:23 18:21
50:14 133:3 170:24
**tendency** 75:10
**tender** 31:4
**terms** 19:9,24 21:3
21:22 24:3 25:10
26:19 29:22 32:11

32:12 37:8,20
38:15 43:4,18 53:7
58:22 66:14 80:9
83:23 91:23 95:14
**testified** 8:20 79:4
79:15 83:23 121:21
123:21 124:2
178:13
**testify** 119:2
**testifying** 180:10
**testimony** 6:7
101:21 109:5
111:19 112:7 119:6
121:17 126:6,24
131:3 139:10
178:12,15 179:16
180:12 182:8
**testing** 190:4
**thank** 8:15 17:8
59:23 73:15 74:4
104:16 118:6
147:17 173:2 176:2
179:21 180:2,14
181:2,7 183:18,18
186:3
**thanks** 147:21
164:19
**thanksgiving** 132:1
**thing** 12:2 30:16
117:5 153:10
162:20
**things** 127:12
150:7 176:17
**think** 7:1 13:13
14:14 15:4,12,13
16:7,20 21:10 23:2
28:21,25 29:19
30:16,25 34:11,18
39:15 46:2 47:14
47:18,24 49:15
52:25 55:7 56:19

59:16,17 63:18
72:9,11 74:20
75:16 77:15 79:20
79:22 81:4,25 94:6
94:11 97:18,25
117:5 127:24
141:18 142:16
143:14 144:6 146:8
150:4 156:23
162:17 163:18
168:11 174:16
179:9 182:24
**thinking** 96:7,11
**thirty** 23:22
**thought** 125:14
164:20 185:1
**threatening** 153:13
165:5
**three** 57:3 98:22
100:3 127:21 128:2
128:4 132:16
149:19 166:18
169:13
**thrown** 98:5
**tickets** 135:1
**tied** 50:20 52:21
167:20
**tierra** 53:19 56:4
57:18 58:13 60:8
64:20,23 65:8,17
65:25 66:12,20
68:23 69:3,7,15
70:20 72:12 73:4
74:22 79:4 85:5,9
87:23 88:12,25
101:9 116:7 122:19
**time** 7:7,20,21 11:8
13:4 16:15 17:16
19:16 21:23 28:19
28:22,24 35:12,18
35:20 36:5,11,16

36:17 38:16,18,20
39:15,25 40:1
41:20 42:10 47:9
47:21,22 48:21
49:15,24 51:1,20
52:25 53:10 57:7
57:12 67:11 72:4
74:15,16 75:3,13
75:15 79:3,5,7,18
80:23 83:16 84:21
85:14 90:24 91:16
93:7,7 94:25 96:8
96:17 98:14,25
99:6,12 100:6
101:12 102:3 104:4
104:14 105:15
106:6 109:10
111:24 112:25
113:13 116:4,24,25
119:14 120:17
121:1,14 122:9,16
123:9 125:5 126:3
128:7,15,18 129:7
129:23 130:1
131:18 133:7,9
136:19 140:22
143:23 147:22
151:9 157:4 159:4
163:9 164:10 167:9
173:3,9 175:5,15
179:12 181:22
183:11 184:20
185:2,25 186:13
193:19
**times**  10:18,24
13:16 56:19 57:20
57:23 63:13 80:12
105:6,17 107:9
113:6 115:2 125:1
132:10,12,14 138:8
182:7

**titled**  1:6
**today**  10:18 11:14
12:10,18,23 13:3
22:20 101:21
108:24,24 117:6,16
131:17 149:20
183:14
**today's**  7:19
**toe**  134:13
**toes**  134:14
**told**  97:18,24 98:11
101:14 102:10
126:9 127:25 131:7
152:21 153:10,22
157:23 165:3 166:4
168:21 169:2
**top**  15:4 58:21
**total**  141:5
**totally**  154:11
183:15
**touch**  176:7
**towed**  31:6
**tower**  2:12 192:1
193:1,7
**town**  159:13
**toys**  4:10
**toyz**  1:5 2:3 7:24
8:9 187:1 188:2
192:8 193:9
**track**  84:20,23,25
85:11,17 86:17
87:11,15,22 88:25
89:16 90:21,23
91:9 143:19 144:8
144:13
**tracks**  87:12 91:12
144:14
**traffic**  63:18 64:17
64:21
**trafficked**  63:13
64:1,6

**trans**  16:11
**transcribe**  17:13
**transcript**  4:17
72:22 187:5 188:4
188:23 190:10,15
190:22 192:11,14
192:20 193:14,16
193:17,18,20
**transfer**  145:2
**transferred**  16:8
16:11
**travel**  60:10 63:1,6
84:6 85:13 93:6
**traveled**  27:9,10
63:18 74:10
**traveling**  54:10
68:4 71:16 92:16
93:1,12,17,21
125:12
**trek**  138:7
**tried**  175:22
**trip**  45:25 50:2,3
**triple**  33:5
**trips**  40:12
**true**  62:18 63:1
97:13 105:25 106:3
106:7,13,21 107:13
107:25 114:16
115:18 120:16,24
181:16 187:5
188:23 190:12
**truth**  183:13,15
**truthful**  177:2,19
184:2,6,19 185:6
185:14
**truthfully**  176:13
176:18 178:19
185:4
**try**  36:9 47:24 99:6
101:14 111:10
113:23 141:19,22

143:12 145:20
156:10 162:18
164:15
**trying**  21:15 55:20
75:17 80:1,4 81:6
102:5,9 158:1
165:25 166:5
**tuesday**  1:16
**tumultuous**  45:13
**tune**  75:17
**turn**  36:9,16 42:8
44:6 65:8 95:5,9
109:9
**turned**  36:7 42:9
83:12 95:11 98:9
140:21 141:8
154:16 165:1
167:13
**turning**  35:10,20
36:10,24 94:24
**tv**  26:5
**twenties**  27:17 28:6
**twenty**  47:8
**twice**  68:14 114:8
114:13
**two**  9:9 38:25 39:2
62:6 74:18 89:1
98:22 102:24
103:23 114:15
124:10,15 125:21
130:22 132:9
133:15 134:21
136:22 138:23
139:25 140:10
144:11 160:15,16
165:19 168:1
169:14 171:23
182:6 192:2 193:2
**type**  10:22 11:5
17:23 22:24 23:23
24:6 26:22 28:2,19

29:24 30:10,14
41:25 42:19,20
93:11 99:3 111:9
**types** 73:9
**typical** 53:9,9
56:10
**typically** 11:2 29:6
31:3 38:23 42:13
44:16 80:4 128:21
151:21 174:6,14,25

**u**

**u** 47:6
**u.s.** 2:19
**ulmerton** 148:24
149:1 159:8 161:18
**ultimately** 55:17,21
58:14
**unclear** 179:9
**unconscious** 98:25
99:9,12,22 165:8
166:24
**understand** 11:15
58:18 67:12 70:2
71:3 88:3,21 90:12
90:12 104:24
106:25 107:16
108:3 109:6 120:20
122:18 129:11
134:3 177:14
**understanding**
21:21 46:3 62:11
76:23 153:18
**understood** 73:10
82:18 136:22
185:19,20
**underway** 50:25
53:1,6
**unfortunately** 10:6
**unit** 37:10,13 42:16
42:21,25 44:3
109:21

**united** 1:1 115:3
**units** 139:24
140:11,24 141:1,3
141:6,9,10,15
142:20,24 143:4
144:11 157:23
**unlimited** 15:13
**ups** 118:5 161:15
162:1 173:5
**upset** 166:14
**usage** 39:16
**use** 20:14,19 23:8
24:7,10 38:20 39:8
39:9,10 42:20,25
43:3,4 44:4,6,16,22
45:5,15 52:7 58:8
86:12 90:13 107:23
108:8 109:1,13
110:7 111:6 123:1
142:24 143:3 144:8
**uses** 109:18
**utilize** 116:12
**utmost** 113:15

**v**

**v** 14:17 15:20
**vague** 106:22 108:1
108:14 109:15
115:10
**varies** 124:21
**variety** 33:1,7
**various** 19:10
24:11 33:14
**venture** 26:10
**verde** 53:19 56:4
57:19 58:13 60:8
64:20,23 65:8,18
65:25 66:12,20
68:23 69:3,7,15
70:20 72:12 73:4
74:22 79:4 85:5,9
87:23 88:12,25

101:9 116:7 122:19
**verified** 145:4
**veritext** 7:17 192:1
192:14 193:1
**verizon** 52:5
127:17
**vessel** 27:10,19
30:24 33:8,21
34:22,24 37:8
38:16,19 40:15
41:8 44:2 48:1 50:1
66:14 67:11,17,22
67:24 69:12 70:17
75:2 85:14,18
91:15 92:7,9,10,20
94:24 95:1 98:10
98:13 108:18
111:16,22 112:12
112:18 113:1,18,20
113:25 114:7,10,13
116:24 118:18
122:14,21 129:4
130:8,10,18 135:10
135:16,23 136:2,18
137:5,5,6,6,10
139:12,12,14,15,17
139:18,19,25
140:11 141:4,16
150:12,17 155:9
156:14,14 166:18
167:13
**vessels** 17:20 19:10
29:13 30:2,4,7
38:15 63:14 67:2
74:17 79:10 92:15
92:21 105:17,25
109:14 110:10
111:1 154:10 163:4
**vice** 1:9
**vicinity** 27:15

**video** 6:9,13,18,24
7:22 148:5 156:14
189:10
**videoconference**
190:9
**videographer** 2:24
7:6,14,16 9:11,16
9:17,20 10:4,11
57:7,12 104:3,14
147:9,22 148:4
186:11,18
**videos** 22:25 42:20
**videotaped** 1:19,24
**view** 67:22 68:25
167:19
**violation** 30:17
106:20 135:3
**virtual** 1:15 6:24
**virtually** 13:24
**visibility** 71:15
80:22 92:20 138:16
**vision** 28:7 92:6
123:23 172:11
175:18
**vok** 14:17,17,18
16:5,16,24 17:3
18:3 19:24
**vok's** 17:14
**vokner** 14:19
**voluntarily** 83:1

**w**

**w** 5:21 15:6 40:9
**wait** 17:7 50:24
88:16 148:4
**waited** 52:22
**waiting** 50:21
100:1 170:13
**waive** 7:2 193:15
**waived** 7:13 186:22
192:19

**walk** 25:17 45:22
45:22 46:10 52:15
55:15,15 64:22
98:2 167:18
**walked** 100:4,4
169:16
**want** 10:1,1 51:15
63:14 79:20 86:6
128:23 137:2 140:2
145:7 146:12
178:10 179:4,11
181:13 186:14
**wanted** 32:12
46:23 142:11
160:10
**warning** 83:3 123:5
123:6
**watching** 119:8
173:23
**water** 26:13 30:11
30:14 37:15 48:5
59:5 93:23 106:7
106:20 107:13,21
108:9 110:11 111:1
114:4 130:16
174:18 175:10
179:13 181:16
182:25
**waters** 49:22 115:3
115:4 116:1,4
**waterway** 53:13,20
58:5,7,15,16 85:20
86:24 87:5 105:25
107:25 120:18
121:3 126:21
**waves** 137:17
**way** 11:9 16:14
30:5 36:8 46:25
50:10 53:23 54:20
54:23,24 55:17
56:4 57:25 61:7

62:10,20,24 65:9
67:3 70:24 71:2
73:21 76:8 79:16
83:19,23 85:20
87:22 89:17 90:10
91:16,24 92:23
95:1,14 102:6
109:24 111:6
113:19 115:5,8
116:23 117:23
125:23 138:13
139:2 146:16 178:3
185:16
**waypoint** 44:5
**we've** 13:16 18:21
22:14 23:2 57:2
78:14 103:22
116:16 149:20
153:7 164:5 178:9
**wear** 172:13,17
**wearing** 76:2
**weather** 45:12,14
64:12 109:18
137:17 138:1,2,5
**weekend** 64:9
**weekly** 33:24
**weeks** 160:15,16
**welcome** 142:13
**went** 13:9 16:4
22:21 25:20 53:17
99:19 100:16,16,17
142:2 143:14
168:20,22,24,24
169:3,4
**west** 26:17 124:10
124:14 125:21
**wheel** 75:7 165:22
**white** 85:12 86:19
86:20,22 87:4
**whoa** 171:12

**wide** 22:16
**width** 124:17,18
**wife** 166:23
**wildlife** 133:15
134:22 153:1 163:8
**window** 18:12
**wiring** 26:1,20
**witness** 3:2,14,16
3:18 6:9,13,16,16
6:17,22 8:14,18
9:20,21 10:3 17:18
24:14 25:7 26:5
27:8 29:3,9 30:16
31:13 32:4 33:17
35:1,8,24 38:23
39:13,19 41:1,12
43:7,12 45:7 46:5
46:14,18 49:5 52:9
52:18 53:16 56:14
57:6 58:18 59:1
60:23 62:1,16 63:3
63:9,17 64:3,8
65:20 66:10,16,24
68:17 69:2,11,19
70:6,22 71:8,22
72:19 73:1,25
74:25 76:20 77:1,8
77:18 78:17 79:9
80:16,25 81:9,17
82:22 83:5,19 84:9
85:8 87:2 88:5,14
88:22 89:11,23
91:19 92:12 95:9
95:22 96:2,7 97:5
97:24 101:11 102:1
102:9 103:5 104:24
105:12,21 106:3,9
106:15 107:2,18
108:3,16 109:8,17
110:15,21 111:5,21
112:3,10,25 113:13

113:22 114:18
115:12,21 116:21
117:3,11,20 118:1
118:22 119:7,17
120:20 121:5,14,18
122:2,24 123:1
124:21 125:10
126:8,25 127:6
131:1,13,25 132:23
133:3 134:5,8,25
135:7,12,21 136:7
136:15,25 137:9,20
137:24 138:22
141:25 142:17
149:7 150:25
156:14 162:12
164:1,19 166:21
168:5,14 172:8
173:12,20 175:17
176:21 177:22
178:21 179:17
180:11 181:18,20
182:9 183:10 184:8
184:23 185:9,16
186:8 189:1,9,15
190:10,14 193:14
193:17,19
**witness's** 109:4
111:19 112:7 119:6
121:17
**witnesses** 6:6,11
**woman** 99:9,22
**women** 166:18
**word** 86:12,15
**words** 63:25
140:18
**work** 15:21 16:5,16
20:25 21:18 24:16
25:5,11,20,21
26:13,19,20,23
28:2 43:14 111:5

115:25 122:14
123:2 152:11
159:14 162:6
163:24
**worked**  14:22 27:9
27:18 159:6
**working**  28:18
36:12,18 37:2
**workman's**  154:6
**works**  15:7,7,9
24:17
**world**  2:12 193:7
**worse**  35:18,18
**wright**  9:24,25
**write**  83:1 188:4
**written**  4:19
**wrong**  83:15

**x**

**x**  168:15

**y**

**y**  162:4
**yacht**  15:10,16 16:2
29:11,24 52:22
67:6,13,14,16 68:4
68:7,14,24 69:7,17
70:4,18 71:6,10,14
71:22 72:3,6,10,17
73:21 74:9,16,21
75:3 79:4,15,24
80:12 83:17,20
87:25 88:11 91:20
92:1 93:2 101:8,22
102:11,16,22 103:1
103:11
**yards**  118:14
124:22,24 125:4,5
**yeah**  9:5,6 14:18,18
15:24 17:10 20:5,6
23:25 28:20 34:7
39:20 49:22 50:12

51:24 54:21 55:4
55:23 56:2 59:1,20
61:1 67:24 72:25
85:8 92:3 101:11
118:16 120:12
126:13 142:21
144:14 145:15
146:8,12 147:5,12
147:14 157:7,25
162:12 164:20
168:7,15,16 169:24
176:9 179:22
181:11 182:11
**year**  39:7 40:14
64:14
**years**  9:9,9 11:10
14:23,23,24,25
15:2 16:23 18:21
23:22 26:9 27:20
28:12,20 30:20
47:8 56:24 133:3
**yep**  24:12 31:6
59:24 156:19,22
161:1
**young**  106:13
**younger**  27:10
**youtube**  42:20

**z**

**zoom**  1:15,24 11:18
84:24 146:14

FLORIDA RULES OF CIVIL PROCEDURE

Rule 1.310

(e) Witness Review. If the testimony is
transcribed, the transcript shall be furnished to
the witness for examination and shall be read to or
by the witness unless the examination and reading
are waived by the witness and by the parties. Any
changes in form or substance that the witness wants
to make shall be listed in writing by the officer
with a statement of the reasons given by the
witness for making the changes. The changes shall
be attached to the transcript. It shall then be
signed by the witness unless the parties waived the
signing or the witness is ill, cannot be found, or
refuses to sign. If the transcript is not signed by
the witness within a reasonable time after it is
furnished to the witness, the officer shall sign
the transcript and state on the transcript the
waiver, illness, absence of the witness, or refusal
to sign with any reasons given therefor. The
deposition may then be used as fully as though
signed unless the court holds that the reasons
given for the refusal to sign require rejection of



the deposition wholly or partly, on motion under

rule 1.330(d)(4).

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES

ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.

THE ABOVE RULES ARE CURRENT AS OF APRIL 1,

2019.  PLEASE REFER TO THE APPLICABLE STATE RULES

OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.